## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MAINE

| | |
|---|---|
| **Bryan C.** and **Henry B.** through their next friend **Michael P. Dixon**; **Trent W.**, **Grayson M.**, and **Kendall P.** through their next friend **Taylor S. Kilgore**; and **Neville H.** through his next friend **Sandra Romano-Shain**, for themselves and those similarly situated, <br><br> **Plaintiffs**, <br><br> **v.** <br><br> **Jeanne M. Lambrew** in her official capacity as Commissioner of the Maine Department of Health and Human Services; and **Todd A. Landry** in his official capacity as Director of the Maine Office of Child and Family Services, <br><br> **Defendants**. | ) <br> ) <br> ) <br> ) C/A No. 1:21-cv-00005-NT <br> ) <br> ) <br> ) <u>**FIRST AMENDED COMPLAINT FOR**</u> <br> ) <u>**INJUNCTIVE AND DECLARATORY**</u> <br> ) <u>**RELIEF AND REQUEST FOR CLASS**</u> <br> ) <u>**ACTION**</u> <br> ) <br> ) <br> ) <br> ) |

## I. INTRODUCTION

1.     The State of Maine, through its duly appointed state officials, has an affirmative duty under the United States Constitution to keep safe over 2,000 children in foster care placed into its custody and care due to substantiated abuse or neglect.  Oftentimes, these children are given powerful psychotropic medications while in state custody to address mental health conditions or simply to control their behavior.  However, there is a profound "gap" between what Maine "believe[s] to be important to keep children safe when using [] powerful [psychotropic] drugs, and what is actually happening."  According to the Assistant Inspector General for Evaluations and Inspections at the federal Department of Health and Human Services, what is actually happening is that "children in the [Maine] foster care system [] aren't getting the

1

safeguards they need to protect them from inappropriate care" with respect to the administration of psychotropic medications.

2.     Psychotropic medications are powerful drugs that impact emotions and behavior, such as anti-anxiety agents, antidepressants, mood stabilizers, stimulants, and antipsychotics. These medications are particularly potent to children.  Alas, any child administered these medications faces a heightened risk of life-threatening physical and emotional harms at a greater frequency and at a greater severity.  These harms include seizures, psychosis, suicidal thoughts, self-harm, weight gain, lack of mental clarity, excessive fatigue, aggression, mental health crises, involuntary movements, diabetes, cardiovascular events, organ damage, and even sudden death.

3.     Foster children are particularly vulnerable to these serious harms associated with psychotropic medications.  The U.S. Department of Health and Human Services Office of Inspector General ("OIG") informed the public that "[u]p to 80 percent of children in foster care enter State custody with significant mental health needs.  Unlike children from intact families, children in foster care often do not have a consistent interested party to coordinate treatment planning or to provide continuous oversight of their mental health treatment.  Further, responsibility for children in foster care is shared among multiple people—foster parents, birth parents, and caseworkers—which creates risk of miscommunication, conflict, and lack of follow-up.  Children in foster care may also experience multiple changes in placement and in physicians, which can cause health information about these children to be incomplete and spread across many sources.  Therefore, children in foster care may be at risk for inappropriate prescribing practices (e.g., too many medications, incorrect dosage, incorrect duration, incorrect indications for use, or inappropriate treatment)."

4.      For about a decade, Maine's Department of Health and Human Services ("DHHS") and Office of Child and Family Services ("OCFS") have openly acknowledged the serious risks associated with psychotropic medication administered to foster children as well as their duty to maintain robust protections to protect Maine foster children against these dangers.  Unfortunately, however, Maine has never created an adequate system to protect foster children in its care.  Instead, DHHS and OCFS acknowledged their own system's failures.  The same systemic failures have persisted for years as the State has continued to receive scrutiny.  For instance, in late 2018, Maine was criticized by the federal Department of Health and Human Services OIG for having one of the worst systems in the nation with respect to its oversight and management of psychotropic medications for foster children.

5.      Maine DHHS and OCFS continue to permit hundreds of foster children to be administered one or more dangerous psychotropic drugs without ensuring the provision of sufficient oversight mechanisms critical for their safety, knowingly exposing vulnerable children in their care to life-threatening risks.  Maine's most pronounced and harmful oversight failures include the following:

    a.  **Inadequate Medical Records**:  Maine fails to maintain readily accessible, comprehensive, and up-to-date medical records for children in its custody.  It further fails to provide these records to all foster caregivers promptly upon the placement of a child in their care or to all prescribing physicians for purposes of treatment.  Without maintaining and promptly providing such critical records that detail the child's physical and mental health history, including current and prior medications and observed side effects, DHHS and OCFS fail to facilitate fully informed, safe, and well-coordinated treatment for its foster children.

    b.  **Inadequate Informed Consent**: Maine fails to maintain and enforce a minimally adequate informed consent process, whereby a clearly designated adult consents to the administration of any recommended psychotropic medication to a child only after receiving complete information, both prior to and throughout the administration of the medications, assessing the intended benefits and potential risks associated with the drugs.

    c.  **Inadequate Secondary Review**:  Maine fails to maintain and operate an appropriate system to sufficiently ensure that all especially dangerous and outlier prescriptions of psychotropic medications to children—such as potentially life-threatening combinations of psychotropic drugs administered concomitantly to a child—are immediately flagged for purposes of conducting a secondary review through a qualified child psychiatrist to assure safety.

6.     As a result of these failures, hundreds of preschoolers through teens in Maine's foster care system remain at an unreasonable risk of serious harm with each passing day.  They take heavy cocktails of psychotropic medications that can, and do, lead to serious, life-altering physical and psychological harms—without proper structures in place by Defendants to identify and guard against these harms.

7.     This litigation seeks solely injunctive relief to remedy these systemic failures and to protect these vulnerable Maine foster children.

8.     Named Plaintiffs Bryan C., Henry B., Trent W., Grayson M., Kendall P., and Neville H. bring this class action on behalf of a putative class of Maine foster children who are or will be administered psychotropic medications in the State's custody and, hence, are subjected to a substantial risk of serious harm through the State's oversight failures.  The Named Plaintiffs name Jeanne M. Lambrew, Ph.D., Commissioner of the Maine Department of Health and Human Services, and Todd A. Landry, Ed.D., Director of the Maine Office of Child and Family Services, as Defendants in their official capacities only.

## II. JURISDICTION AND VENUE

9.     This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution and federal statutory law.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is proper in this Division because a substantial part of the events or omissions giving rise to these claims occurred in Kennebec and Cumberland counties.  Named Plaintiffs Bryan C. and Neville H. currently reside in Cumberland County.  Named Plaintiff Henry B. currently resides in Kennebec County.

### III. PARTIES

**A.  The Named Plaintiffs**

i.  <u>Bryan C.</u>

11.     Bryan C.[1] is a 7-year-old boy.  He was drug-exposed at birth and subjected to neglect, emotional abuse, and physical abuse throughout his early childhood.  Bryan C.'s biological mother struggled with drug addiction.  At age 5, he was involved in a serious car accident while his mother was driving under the influence.  He was hospitalized for his injuries, removed from his biological home in Hiram, Maine, and placed into foster care custody.

12.     In the brief two years since being placed into foster care, Bryan C. has cycled through multiple settings across the state.  Bryan C. has moved between a kinship placement with his maternal aunt, crisis placements, and psychiatric hospitals and treatment facilities throughout the state, such as in Aroostook County, over five hours away from his biological family.  In July 2020, he was placed in a residential treatment facility in Bridgton, Maine, and he remains there today.

13.     While in state custody, Bryan C.'s psychotropic medications have included at least the following: (1) Risperidone (an antipsychotic); (2) Clonidine (an alpha agonist); (3) Vyvanse (a

---

[1] All Named Plaintiff first names and last initials listed in this Complaint consist of pseudonyms to protect the identities of the Named Plaintiff children.  A corresponding motion to use pseudonyms is filed herewith.

stimulant); (4) Aripiprazole (Abilify, another antipsychotic); (5) Methylphenidate (Ritalin, a stimulant); (6) Adderall (another stimulant), and (7) Sertraline (Zoloft, an antidepressant).  He has also frequently been administered Melatonin.

14.     Bryan C. has been repeatedly subjected to polypharmacy of psychotropic medications throughout his time in state custody.

15.     He has been administered at least four different psychotropic medications concurrently while in state care.  For example, he is currently being administered a cocktail of Vyvanse, Risperidone, Clonidine, and Zoloft in addition to Melatonin.

16.     Bryan C. has been reportedly subjected to inappropriate dosages of medications for a child of his age and size.  When Bryan C. was hospitalized following a crisis, a doctor reviewing his medical history found the administration of Vyvanse to Bryan C. to be entirely inappropriate in terms of the medication itself and the dosage level.  Upon information and belief, no red flag or secondary review process has been triggered by this prescribing practice.

17.     Bryan C. has experienced a litany of harms and adverse effects from these psychotropic medications.

18.     In August 2019 at age 6, Bryan C.'s medication regime was changed to Risperidone, Vyvanse, and Melatonin.  In late August 2019, he experienced increased aggression and irritability.  Bryan C. also experienced his first of many suicidal ideations and threats.  He threatened to kill himself with a toy gun.  He was subsequently hospitalized in Bangor, Maine.

19.     Bryan C. began to inflict self-harm.  For instance, at school, he would repeatedly bang his head against the wall.  By early 2020, a typical day at school for him consisted of violent behavior toward himself and others, as well as multiple suicidal statements.

20.     Bryan C.'s caregiver reported as early as June 2019 that his ADHD medications made him withdrawn, anxious, and irritable.

21.     He experienced weight gain.  At age 6, he reportedly gained approximately 25 pounds while taking Risperidone without any discernable benefit.  OCFS has expressed awareness of this weight gain.

22.     At one point, Bryan C. developed a tic in his eye.

23.     Bryan C. experienced excessive fatigue, excessive sleeping, and other sleep disturbances. While in his one-on-one learning environment in early 2020, he would constantly fall asleep in class, often laying sound asleep on a couch in his classroom.  This fatigue, in addition to his frequent hospital and crisis stabilization unit stays, has significantly disrupted his learning and development.  In spring 2020, at age 7, he reportedly could not write his own name.

24.     Bryan C. has reportedly experienced excessive thirst and excessive urination while taking psychotropic medications, which can be suggestive of diabetes.  His A1C levels, a critical marker for diabetes, were once belatedly tested months ago but not followed up on.  Upon recent request for the results of this test, the child's OCFS caseworker, case manager, and residential treatment placement were all unable to produce the relevant records.  OCFS instead directed the placement to reach out to the local hospital directly to try to obtain the records themselves.  As of this writing, his A1C results continue to remain unknown to Bryan C.'s guardian ad litem and, upon information and belief, his OCFS caseworker.

25.     While receiving psychotropic medications, Bryan C. has experienced an inability to focus and a lack of mental clarity.  In the child's own words, his "brain doesn't work.  [He] can't feel [his] brain."

26.     More psychotropic medication became the answer to problems caused by psychotropic medications.  Bryan C. was often prescribed new psychotropic medications to treat side effects of other psychotropic medications.  For instance, after he was first prescribed Vyvanse in approximately April 2019 at age 6, he experienced irritability and aggression.  A few months later, in early August, his aunt informed his OCFS caseworker and Next Friend that Risperidone was added on top of his existing Vyvanse due to his aggressive behaviors.  He has more recently been administered Zoloft "to try [to] settle him down at night," and he has regularly been prescribed Melatonin to help him sleep.

27.     When he was 6 years old, a hospital monitored him for 5 days without medications, switched his medications to Abilify and Adderall, and expressly directed that his prior prescriptions of Vyvanse, Melatonin, and Risperidone all be discontinued.  But just weeks later, his prior prescriber reinstated his use of Vyvanse, and his use of Risperidone was also reinstated shortly thereafter.  Bryan C. again fared poorly on the old medication regime, and again ended up in a crisis stabilization unit.

28.     At the time of and since these medications' prescription, Defendants have not communicated or implemented an effective informed consent process through which an objective decision-maker can consent to medication for Bryan C. after receiving full information about a potential medication's risks, benefits, and alternative treatments, nor has there been any communicated process by which one can object to medications.

29.     Upon information and belief, Bryan C.'s caseworkers are not typically present at or involved in appointments with prescribers when potential psychotropic medications are discussed or prescribed.  At times, upon information and belief, they were notified of medication changes after the fact, rather than playing a necessary role in the medication discussion to ensure that the

child is safe and that meaningful informed consent is fully obtained. For instance, when his residential treatment facility added a fourth psychotropic medication, Zoloft, to Bryan C.'s cocktail of psychotropic medications, his OCFS caseworker was notified of the medication change only *after* Bryan C. had begun the medication.

30.     Defendants have not promptly provided Bryan C., his caregivers, his advocates, or his prescribing physicians a comprehensive, up-to-date medical record that would contain his medical information and psychotropic medications, such as adverse effects and instructions for current medications, or warnings about prior unsuccessful medications.

31.     For instance, no medical passport listing his medical history and psychotropic medications has moved with the child from placement to placement.

32.     Bryan C.'s health record is poorly maintained by Defendants such that Bryan C.'s caretakers, clinicians, advocates, and even Defendants' caseworkers do not have ready access to his prior and current medication regimes at any given time. This has harmed Bryan C. on more than one occasion.

33.     For instance, when Bryan C. first entered care at age 5, he suffered an approximately 3 month gap when no caseworker had clear and comprehensive responsibility for, or access to, Bryan C.'s medical file containing his critical health information, and, hence, could not adequately monitor him or his medications. During those three months, no OCFS caseworker took responsibility for his file or his case, such that no one at OCFS was maintaining and promptly updating the file during that period.

34.     Even worse, in early March 2020, Bryan C. landed in the emergency room for a crisis evaluation due to suicidal threats and aggression, and shortly thereafter was transferred to a crisis stabilization unit several hours away in Rockport, Maine. The clinician there expressed

concerns that Bryan C.'s medications may need to be changed, since they were seeing many of the same problematic behaviors.  However, Defendants did not provide the unit's clinicians with a list of current and prior medications for the child.  When the clinician reached out to his OCFS caseworker to request it, the caseworker failed to respond to the request and provided no such information.  As a result, Bryan C. suffered a one-month period during which the clinicians in charge of treating the acute crisis Bryan C. experienced could not access his basic psychotropic medication records needed to sufficiently treat or monitor him.  After the OCFS caseworker finally contacted them, the caseworker reported that they did not have ready access to the information and therefore could not provide the information.  Instead, the caseworker directed Bryan C.'s aunt to contact Bryan C.'s previous psychiatrist to try to learn information about his medications.

35.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Bryan C.'s constitutional and federal statutory rights.  Defendants have failed to protect him from harm and risk of harm while in their care by failing to adequately oversee harmful psychotropic medication regimens, failing to ensure a consistent informed consent process, and failing to provide his caregivers with updated medical and mental health records.

36.    Bryan C. remains in Defendants' custody and continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

37.    Bryan C.'s case is brought by his adult Next Friend Mr. Michael P. Dixon.

ii.    Henry B.

38.    Henry B. is a 15-year-old boy who is currently in foster care custody.  Henry B.'s case is brought by his adult Next Friend Michael P. Dixon.

39.     Henry B. currently resides in Belgrade, Maine in a respite foster home, where he has been for the past several months.  He entered foster care custody from Bridgton, Maine as a result of neglect in July 2018.  Over the last two and a half years that he has been in Maine foster care, Defendants have failed in their obligation to provide for his safety and well-being as to how psychotropic medications are administered and monitored.

40.     Henry B. has received several psychotropic medications throughout his time in state custody.

41.     Henry B.'s current cocktail of medications consists of the following psychotropic medications:  (1) Venlafaxine (an antidepressant); (2) Trazodone (an antidepressant); (3) Clonidine (an alpha agonist); (4) Guanfacine (an alpha agonist); and (5) Concerta (a stimulant).

42.     Henry B. has received up to six different psychotropic medications at once while in state custody.  For instance, Henry B.'s cocktail of psychotropic medications earlier this year consisted of:   (1) Bupropion (Wellbutrin, an antidepressant); (2) Sertraline (Zoloft, an antidepressant); (3) Trazodone (an antidepressant); (4) Clonidine (an alpha agonist); (5) Guanfacine (an alpha agonist); and (6) Concerta (a stimulant).

43.     To Henry B. and his Next Friend's knowledge, no secondary review process has been triggered by this polypharmacy.

44.     Henry B. has experienced numerous adverse effects as a result of these psychotropic medications.

45.     Henry B. has experienced rapid blinking and a twitch in one eye.

46.     He has experienced brain fog as well as difficulty processing information.

47.     While taking psychotropic medications, he has experienced increased aggression, sexualized behaviors, and mental health crises.

48.     At the time of the prescription and continued administration of his psychotropic medications, Henry B. and his caregivers were not adequately and consistently informed about the risks, potential consequences, and alternatives to these medications.   Defendants did not communicate an effective informed consent or assent process through which Henry B. or his caregivers could object to taking medications.

49.     Henry B. has not been regularly included in meaningful informed consent conversations about the administration of new or ongoing psychotropic medications, even after he turned 14.  Upon information and belief, Defendants have never informed Henry B. that he is able to have a meaningful role in the decision-making process.

50.     He does not currently understand which psychotropic medications he is on, why he is taking them, and what their alternatives are.  Henry B. does not even seem to understand that these psychotropic medications have side effects that could affect him.

51.     Over the past two and a half years, Henry B. has had 5 different OCFS caseworkers with minimal involvement in his psychotropic medication decision-making or administration.

52.     Henry B. and his caregivers have not received a portable record of critical health information pertaining to his mental health and psychotropic medications.

53.     OCFS has so poorly maintained his mental health records that it is unclear, for instance, what Henry B.'s mental health diagnoses even are.   A comprehensive, adequate psychological evaluation was never performed for this child after entering care.  When Henry B.'s new caseworker asked what his diagnoses were at a recent transition meeting with OCFS and others, no one present from OCFS could answer this question.  When the new caseworker asked for a copy of Henry B.'s initial evaluation—which would contain at least his initial diagnoses, his current case manager reported that they did not have a copy of this document.

54.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Henry B.'s constitutional and federal statutory rights. Defendants have failed to protect him from harm and risk of harm while in their care by failing to adequately oversee harmful psychotropic medication regimens, failing to ensure a consistent informed consent process, and failing to provide his caregivers with updated medical and mental health records.

55.     Henry B. remains in foster care custody and continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

iii.    Trent W.

56.     Trent W. is an 8-year-old boy currently in foster care custody.  Trent W.'s case is brought by his adult Next Friend Taylor S. Kilgore.

57.     Trent W. now resides in a crisis unit in Calais, Maine.  He entered state custody in January 2020, as a result of extreme neglect.

58.     Trent W. spent his first five to six weeks in state custody "hotelled," that is, cycling between spending days at a time residing at a hotel supervised by an OCFS caseworker, leaving the hotel to spend days at a "respite" foster home, and then returning to a hotel stay.

59.     In February 2020, Trent W. was seen by a primary care physician for his initial evaluation, a "pediatric rapid evaluation."  The records from that appointment noted that he "has been diagnosed with ADHD," for which he took psychotropic medication.

60.     That diagnosis was wrong.  In fact, a 2018 psychological evaluation of Trent W. by a psychologist had specifically ruled out a diagnosis of ADHD.

61.     The primary care visit noted that Trent W. was having problems sleeping, and had been prescribed Trazodone to help with his sleeping issues.

62.     Eventually, in March 2020, Trent W. was placed in a therapeutic foster home.

63.     In late June 2020, Trent W. underwent a psychological re-evaluation.  This re-evaluation was conducted by the same psychologist who had performed the 2018 evaluation of Trent W.  The re-evaluation concluded that Trent W. had been accurately diagnosed with autism-spectrum disorder and that Trent W. had impairments in communication, understanding social cues, and interacting with his peers.

64.     Notably, the 2020 re-evaluation confirmed the finding made in 2018: that Trent W. did not have ADHD.

65.     However, upon being placed into state custody in January 2020 until November 2020, Trent W. was prescribed, and took, a stimulant psychotropic medication aimed at treating the condition he did not have, ADHD.

66.     The continued administration of the stimulant medication harmed Trent W.

67.     Specifically, the psychologist who reevaluated Trent W. in June 2020 noted that his then-current treatment of stimulant medication was "not appropriate and is contra-indicated."  The psychologist further concluded that it was likely that the administration of the psychotropic stimulant medication was contributing to Trent W.'s hyperactivity and was exacerbating his sleep problems.

68.     According to that psychologist, Trent W.'s worsening behavioral difficulties could be attributed to his medication.  The psychologist noted that the continued medication of Trent W. was concerning based on his previous medical history and diagnoses, which included his diagnoses of autism and post-traumatic stress disorder.

69.     Nonetheless, following his June 2020 psychological re-evaluation, Trent W. remained on the stimulant despite ruling out a diagnosis of ADHD in 2018 and confirming that finding in June 2020.

70.     On or about November 17, 2020, following an acute crisis he experienced in southern Maine, Trent W. spent the weekend in the emergency room at Maine General Medical Center in Waterville.  Trent W. was then transferred and admitted to Northern Maine Medical Center, a hospital in Fort Kent.

71.     The day after Trent W.'s admission to Northern Maine Medical Center, a team of individuals associated with Trent W.'s care conducted a meeting to assess treatment of his crisis. Attending this meeting were Trent W.'s OCFS caseworker, his guardian ad litem, his private-treatment foster-care coordinator, a social worker, and healthcare providers from the hospital.

72.     At the meeting, the hospital healthcare providers reported that Trent W. was on a stimulant.

73.     Those team members who had knowledge of Trent W.'s prior medical history noted that Trent W. should not be taking such medication because he did not have a diagnosis of ADHD.

74.     With this information, the hospital later discontinued Trent W.'s use of the stimulant.

75.     The hospital also noted that Trent W. had been taking Trazodone to help with his sleeping problems.

76.     Although the hospital discontinued use of the stimulant, the hospital did prescribe Trent W. Abilify to treat anxiety.  Trent W. remains on Abilify today.

77.     The November 18 meeting with the hospital's healthcare providers also revealed that the hospital had no medical records for Trent W.  This included a lack of any records

documenting his recent psychological evaluation, his recent pediatric rapid evaluation, or records of a prior, crisis-related hospitalization.

78.     Accordingly, Trent W.'s guardian ad litem endeavored to obtain Trent W.'s records from a prior crisis hospitalization and fax them to Northern Maine Medical Center, and also send Trent W.'s available medical history.  The guardian ad litem, however, did not have a copy of Trent W.'s 2020 psychological evaluation and thus that most recent evaluation was not immediately provided to the hospital.

79.     Subsequently, Trent W. was discharged from the hospital and placed in a crisis unit in Calais, where he remains today.

80.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Trent W.'s constitutional and federal statutory rights. Defendants have failed to protect him from harm and risk of harm while in their care by failing to adequately oversee harmful psychotropic medication regimens, including the administration of psychotropic medication for treatment of a diagnosis he did not have; failing to ensure a consistent informed consent process; and failing to provide his caregivers with updated medical and mental health records.

81.     Trent W. remains in Defendants' custody and continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

        iv.     Grayson M.

82.     Grayson M. is an 11-year-old boy from Rumford, Maine who is currently in foster care.  His case is brought by his adult Next Friend Taylor S. Kilgore.

83.     Grayson M. entered DHHS custody in December 2019 due to long-term physical abuse and neglect.  He was separated from his sibling and placed in hotels, a hospital, a crisis unit,

a kinship placement, and foster homes.  Grayson M. has had at least 9 placements over an approximately one-year span.  He is currently in a respite placement in South Paris, Maine.  In the past year, Defendants have failed in their obligation to provide oversight for Grayson M.'s safety and well-being with respect to psychotropic medications.

84.     Shortly upon entering care, his January 2020 psychological evaluation reported his official diagnoses to be oppositional defiant disorder ("ODD") and generalized anxiety disorder ("GAD").  In February 2020, his medication manager reported his diagnoses as ADHD with a potential sensory integration disorder, without any reference to the prior diagnoses of ODD or GAD.  A few months later in May, his therapeutic agency reported his February diagnoses as ADHD and Fetal Alcohol Syndrome, without reference to his February 2020 potential sensory integration disorder or any of this other diagnoses from January 2020.  In June, a hospital treated him for a mental health crisis and simply reported his diagnosis as adjustment disorder.

85.     Grayson M. has received psychotropic medications during much of his time in state custody.  These psychotropic medications have included Risperidone (an antipsychotic) and Methylphenidate (a stimulant).

86.     He has been subjected to polypharmacy.  At times, Grayson M. has been administered Risperidone, Methylphenidate, and Melatonin concurrently.

87.     Grayson M. has experienced numerous adverse effects from these psychotropic medications.

88.     Before coming into state custody, Grayson M. had a substantial, but not positive, medical history with psychotropic medication.  He had been prescribed multiple different psychotropic medications, but these medications had adverse, not positive, effects on him.

89.     Upon entering custody, in early 2020, Grayson M. informed clinicians that his medications such as Risperidone did not help him and, rather, *did the opposite*.  His biological mother, who maintained parental rights, expressed apprehension, too.  She reported that such medication made Grayson M. act like a zombie or stay awake for days at a time.  Nonetheless, Grayson M. was administered Risperidone thereafter.  He continues to receive it today.

90.     While being prescribed Methylphenidate in early 2020, 10-year-old Grayson M. experienced increased aggression.

91.     Around that time, he made threats to harm others and himself, self-harmed, and experienced suicidal ideations.

92.      Both Grayson M. and his biological mother reported prior and then-current hallucinatory effects of his psychotropic medication to his clinician and caseworker in October 2020.

93.     To his Next Friend's knowledge, no secondary review process has been triggered by Grayson M.'s polypharmacy or adverse reactions to psychotropic medication.

94.     Defendants failed to communicate a sufficient informed consent or assent process through which a biological parent, his caregivers, or the child could object to Grayson M.'s administration of psychotropic medications.  Accordingly, there is no formal medical record of all concerns voiced by Grayson M.'s biological parent, his caregivers, or Grayson M. himself which would inform clinicians in the future treatment of Grayson M.

95.     In fall 2020, Grayson M. attempted to refuse his medications after reporting hallucinations.  Grayson M.'s biological mother also objected to the use of the psychotropic medications in light of the hallucinations.  She asked his OCFS caseworker that he be taken off them.  The OCFS caseworker responded that regardless of any hallucinations, he must remain on

the medications.  Instead of providing Grayson M.'s biological mother with any meaningful opportunity to be heard by a neutral decision-maker, the caseworker simply told her she was welcome to contact his clinician.

96.     At the time of these medications' prescription and while he was taking these medications, Grayson M. and his caregivers were not consistently informed about the intended purpose, risks, consequences, and alternatives to treatment through an adequate informed consent or assent conversation.  Rather, they have little to no involvement in the decision-making process.

97.     The only record of consent resulted from a cursory process initiated by the healthcare provider, not by the Defendants.  In February 2020, a clinician faxed the clinician's own consent form to Grayson M.'s OCFS caseworker, requesting the caseworker's consent to prescribe Methylphenidate to Grayson M. after merely noting a few potential side effects.  The caseworker signed the form five days later.

98.     Defendants have not provided Grayson M., his caregivers, or his medical doctors a comprehensive, up-to-date medical record of current and past medications, potential adverse effects and instructions for current medications, past adverse reactions to psychotropic medications, or biological family medical history.

99.     In Grayson M.'s recent crisis hospital stay from early October 2020 to early November 2020, upon information and belief, the hospital did not receive adequate medical and mental health records for Grayson M.

100.    There is no known, up-to-date summary of Grayson M.'s medical and mental health history and treatment that has moved with him from placement to placement.

101.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Grayson M.'s constitutional and federal statutory rights.

Defendants have failed to protect him from harm and risk of harm while in their care by failing to adequately oversee harmful psychotropic medication regimens, failing to ensure a consistent informed consent process, and failing to maintain and disseminate current medical and mental health records.

102.    Grayson M. remains in foster care custody and continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

v.    <u>Kendall P.</u>

103.    Kendall P. is a 17-year-old girl from Franklin County, Maine who is currently in Maine foster care custody.  Kendall P.'s case is brought by her adult Next Friend Taylor S. Kilgore.

104.    Kendall P. has been subjected to neglect and physical abuse for most of her life. Maine DHHS first took custody of her when she was 3 months old through 18 months old due to neglect by her mother.  DHHS and OCFS returned when she was 7 years old, and after intermittent non-custodial involvement, DHHS took custody of Kendall P. again at age 15 in May 2019.  By then, she had been subjected to long-term sexual abuse.

105.    Since most recently entering custody in May 2019, Kendall P. has had approximately 9 different placements.  She has been shuffled through unlicensed and licensed homes, treatment centers, and hospital crisis units and emergency rooms throughout Maine, such as in Portland, Auburn, Rangeley, Farmington, Lewiston, and Bangor.

106.    Kendall P.'s recent mental health diagnoses are PTSD, ADHD, and an unspecified mood disorder.  Her prior diagnoses have included Fetal Alcohol Syndrome, which she is no longer diagnosed with.

107.    Kendall P. has been repeatedly administered psychotropic medications while in state custody, and Defendants have failed in their obligation to provide for Kendall P.'s safety and well-being as to how psychotropic medications are administered and monitored.

108.    As of early January 2021, her medication cocktail consisted of: (1) Abilify (atypical antipsychotic); (2) Hydroxyzine Pamoate (anti-anxiety sedative, generic for Vistaril); (3) Prazosin HCI (anti-anxiety alpha blocker, generic for Minipress); (4) Strattera (antidepressant sNRI whose FDA indication is to treat ADHD); (5) Lexapro (antidepressant SSRI); and (6) Propranolol (anti-anxiety beta blocker, generic for Inderal).  Her prescriptions for Prazosin HCI and Propranolol have since been discontinued.

109.    Kendall P. has experienced numerous adverse effects as a result of the psychotropic medications she's been administered.

110.    In Kendall P.'s own words, she does not feel right when she is taking psychotropic medications.  Instead, she often feels like a "zombie."  At other times, she feels as if she's crawling out of her own skin.

111.    She has suffered increased anxiety and depression while taking psychotropic medications.

112.    Kendall P. has experienced suicidal ideations as well as attempted harm toward herself and others.  In June 2020, she eloped from a residential treatment home to lay down in the middle of a four-way intersection in the middle of a rainy night, intending to kill herself.  In July 2020, Defendants then sent Kendall P. to a residential treatment center in Bennington, Vermont, where she remains today under DHHS custody.

113.    Kendall P. has also experienced severe weight gain due to psychotropic medication. From April 2020 to October 2020, she gained over 60 pounds while taking the antipsychotic

Zyprexa, known to cause severe weight gain.  She reported this to her clinicians and explained that her body felt very heavy, she had a hard time moving her body, and she did not feel like herself. Nonetheless, she remained on this medication for months.

114.    At the time of these medications' prescription and while she was taking these medications, Kendall P. and her caregivers were not adequately informed about the risks, potential consequences of, and alternatives to these medications.

115.    Defendants did not communicate an effective informed consent or assent process through which Kendall P. or her caregivers could object to taking medications.  Due to the lack of a clear informed consent and assent process, Kendall P. often continued taking psychotropic medications that actively harmed her because Defendants did not define a coherent path for refusing her medications and transitioning to less harmful treatments or medications.

116.    Kendall P. repeatedly requested to stop or revisit her psychotropic medication prescriptions.  Unfortunately, however, this was typically ignored by her OCFS caseworkers and providers.

117.    On one occasion on or about May 2020, Kendall P. reported to her OCFS caseworker her concerns about the way that Zyprexa harmed her.  Instead of providing her with any information about Kendall P.'s decision-making role or any process to be heard by a neutral decision maker, the caseworker incorrectly informed Kendall P. that they must do whatever her doctor says.  Kendall P. subsequently met with the doctor and her guardian ad litem Next Friend to inform the doctor of these adverse effects and to request to be taken off the medications.  When Kendall P. asked if there were any alternatives to these medications, the doctor replied no and that she needed to remain on the medication.  Kendall P. felt defeated and anxious. She believes that she does not have any voice or autonomy with respect to her psychotropic medications.

118. Instead of being adequately informed and involved in the decision-making process for medication changes, Kendall P. is often notified of medication changes after the fact. This has furthered her anxiety.

119. For instance, in the first week of December 2020, her caseworker and clinician made a decision about a medication change for Kendall P. without involving Kendall P. in any capacity. On December 8, 2020, her guardian ad litem Next Friend reported to her OCFS caseworker, aunt, and clinician that Kendall P. feels like her recent medication change has caused increased anxiety along with night terrors, fears of being attacked, and inability to sleep. On December 9, the clinician reported to the Next Friend that the OCFS caseworker recently approved a medication change to begin the following day to help with anxiety. When her Next Friend mentioned the medication change to Kendall P., Kendall P. asked what she was talking about. Kendall P. was never involved in any conversation to discuss any specific proposed change, ask questions, consider the risks and benefits, learn about alternatives, or provide consent. Kendall P. became confused and even more anxious. When she informed staff about her anxiety over this unknown medication change, staff directed Kendall P. to take her anxiety medication.

120. This early December surprise medication change ended up being the addition of Lexapro, which has reportedly not helped with her anxiety.

121. One week later in mid-December, Kendall P. was subjected to another surprise medication change. Similarly, this new psychotropic medication was approved without Kendall P.'s involvement in the decision-making process. Unbeknownst to Kendall P., her OCFS caseworker and her clinician reached out to Kendall P.'s medication provider to request and approve a medication change. Her clinician notified Kendall P. after the fact that Kendall P. would be adding Propranolol to her cocktail of drugs. Kendall P. felt upset but agreed to try the

medication to avoid trouble.  The day after Kendall P. tried the Propranolol, she felt so fatigued that she slept the entire day.  She worries that the Propranolol will continue to interfere with her functioning and her goals.  In Kendall's own words, "I don't want another med[ication]; I wanted support for the anxiety."

122.    Kendall P.'s foster parent recently expressed concerns about Kendall P.'s psychotropic medications.  Her aunt suggested to Kendall P.'s OCFS caseworker and clinician that it may be better for Kendall P. to be removed from all of her medications, like a doctor had once done years prior.  The caseworker did not address her concern or otherwise provide her with any opportunity to be heard.

123.    To Kendall P. and her Next Friend's knowledge, no secondary review process has been triggered by any of this.

124.    Defendants have not given Kendall P., her caregivers, or her medical doctors an up-to-date comprehensive medical and mental health record of her current and past medications, potential and past adverse effects, instructions, or biological family medical history.

125.    For instance, Kendall P. was previously placed in two residential treatment centers prior to her current DHHS custody period.  However, there is no medication history or any record of her prior treatments from those facilities accessible to those charged with caring for Kendall P.

126.    Kendall P. and her Next Friend are not aware of any portable record of her critical mental health information that has moved with her from placement to placement.

127.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Kendall P.'s constitutional and federal statutory rights.  Defendants have failed to protect her from harm and risk of harm while in their care by failing to adequately oversee harmful psychotropic medication regimens, failing to ensure a consistent

informed consent process, and failing to provide her caregivers with updated medical and mental health records.

128.    Kendall P. remains in foster care custody and continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

> vi.  Neville H.

129.    Neville H. is a 10-year-old boy from Biddeford, Maine who is currently in Maine foster care custody.  At age 4, he was removed from his home due to abuse and neglect.  Neville H.'s case is brought by his adult Next Friend Sandra Romano-Shain.

130.    While in foster care, Neville H. has been placed in 4 different foster homes and 2 residential placements throughout Maine:  Long Island, Buxton, Cornish, Kennebunk, Auburn, and Bridgton.  During the span of these varied placements, he had 5 separate hospitalizations.  Neville H. currently lives in a residential group home in Bridgton.

131.    Neville H.'s recent mental health diagnoses are chronic PTSD, disruptive behavior disorder, and reactive attachment disorder.

132.    He has been repeatedly administered psychotropic medications while in state custody, and Defendants have failed in their obligation to provide for Neville H.'s safety and well-being as to how psychotropic medications are administered and monitored.

133.    Shortly after entering foster care, he was administered Tenex to manage his behavior.

134.    At age 5, he was placed on Prozac, an antidepressant.  Neville H.'s long-term therapist expressed anger and confusion to his OCFS caseworker about the administration of Prozac to Neville H., who was only in kindergarten at the time.  Upon information and belief,

Defendants did not follow-up with the prescriber or conduct any sort of secondary review in response.

135.    Neville H. has been subjected to polypharmacy while in state care.

136.    His current medication cocktail consists of Seroquel (an atypical antipsychotic), Guanfacine (an alpha agonist), and Melatonin.

137.    Neville H. has experienced adverse effects as a result of the psychotropic medications he has been administered.

138.    For instance, while taking Seroquel, he experienced a 30 to 40 pound weight gain over the course 6 months.  At a meeting with his OCFS caseworker, a doctor suggested that Seroquel caused his weight gain.  Neville H. remains on Seroquel.

139.    Neville H. has experienced lethargy and drowsiness.  Although he entered care as a vivacious, engaging youngster, he now struggles to carry a conversation and avoids eye contact.  Although he has been found to be of average intelligence, 10-year-old Neville H. tests at a first grade reading level and a second grade math level.

140.    He has experienced suicidal ideation and increased aggression.

141.    Neville H.'s Next Friend recounts that his behaviors have only become worse after he began taking psychotropic medications, such that "he is not the same child."

142.    The long-term administration of psychotropic medications to Neville H. from age 5 though today at age 10 has not helped to improve his behaviors.

143.    Defendants have not communicated an effective informed consent or assent process through which Neville H. and his caregivers could meaningfully participate in the informed consent process.

144.    Prior to his psychotropic medications' prescriptions and during their continued administration, Neville H. and his caregivers were not consistently informed about the intended purposes, risks, potential consequences of, and alternatives to his psychotropic medications.

145.    Neville H.'s assent is not regularly sought from him, nor is he regularly included in conversations about his medications.

146.    In summer 2017, a doctor removed a medication from Neville H.'s cocktail and prescribed a new medication, but his foster parents only learned of these medication changes after the fact.  They were not involved in any meaningful informed consent process prior to these changes and later objected to their lack of any involvement.

147.    To his Next Friend's knowledge, no meaningful secondary review process has been triggered for Neville H.

148.    Defendants have not provided Neville H. and all his caregivers and medical providers with a current, updated comprehensive medical and mental health record for Neville H.

149.    For instance, a doctor treating Neville H. in a psychiatric hospital informed an OCFS caseworker that he did not have Neville H.'s psychotropic medication history.  Specifically, he considered the possibility of treating Neville H. with a new antidepressant or anti-anxiety medication, but he did not know if Neville H. was previously administered the antidepressant Prozac or the antipsychotics Risperidone or Abilify, or how those medications may have fared in the past.

150.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Neville H.'s constitutional and federal statutory rights. Defendants have failed to protect him from harm and risk of harm while in their care by failing to adequately oversee harmful psychotropic medication regimens, failing to ensure a meaningful

informed consent process, and failing to provide his caregivers with updated medical and mental health records.

151.     Neville H. remains in foster care custody and continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

### B.  The Next Friends

152.   Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiffs Bryan C. and Henry B. appear through their Next Friend Mr. Michael P. Dixon.  Mr. Dixon has been an attorney guardian ad litem based in the Portland, Maine area for the past 7 years.  He knows Bryan C. personally, and he has served as Bryan C.'s guardian ad litem from early 2019 to the present.  He also knows Henry B. personally, having served as Henry B.'s guardian ad litem from mid-2018 to the present. Mr. Dixon has observed Defendants' failure to adequately oversee the administration of psychotropic drugs to Bryan C. and Henry B.  Mr. Dixon is able to represent and act upon the best interests of Bryan C., Henry B., and the putative class without any conflict or bias.

153.   Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiffs Trent W., Grayson M., and Kendall P. appear through their Next Friend Ms. Taylor S. Kilgore.  Ms. Kilgore is an attorney guardian ad litem based in Androscoggin County.  She accepts guardian ad litem cases from Lewiston, South Paris, Rumford, Farmington, Augusta, and Waterville District Courts.  Ms. Kilgore personally knows each of Trent W., Grayson M., and Kendall P.  Ms. Kilgore began working as a court-appointed special advocate (CASA) guardian ad litem in 2011 during law school, and she first represented Kendall P. from July 2011 to March 2012.  She began taking attorney guardian ad litem appointments in 2013 after graduating from law school and passing the bar.  Ms. Kilgore has served as Trent W.'s attorney guardian ad litem since August 2019, and she has served as Grayson M.'s attorney guardian ad litem since January 2020.  Ms. Kilgore has most recently

served as Kendall P.'s attorney guardian ad litem since November 2018.  Ms. Kilgore has observed Defendants' failure to adequately oversee the administration of psychotropic drugs to Trent W., Grayson M., and Kendall P.  Ms. Kilgore is able to represent and act upon the best interests of Trent W., Grayson M., and Kendall P. as well as the putative class without any conflict or bias.

154.   Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff Neville H. appears through his Next Friend Ms. Sandra Romano-Shain.  Ms. Romano-Shain is an attorney guardian ad litem based in York County.  She accepts guardian ad litem cases from Biddeford and Springvale District Courts.  Ms. Romano-Shain has been a Maine guardian ad litem for the past 25 years.  Ms. Romano-Shain personally knows Neville H.  She has served as Neville H.'s attorney guardian ad litem since 2014.  Ms. Romano-Shain has observed Defendants' failure to adequately oversee the administration of psychotropic drugs to Neville H.  Ms. Romano-Shain is able to represent and act upon the best interests of Neville H. as well as the putative class without any conflict or bias.

**C.  Defendants**

155.   Jeanne M. Lambrew, Ph.D., the Commissioner of the Maine DHHS, is sued in her official capacity only.  Defendant Lambrew maintains her principal office at Maine DHHS, 109 Capitol Street, Augusta, Maine 04333.  Defendant Lambrew is vested under state law with "all of the powers and duties necessary to carry out the mission and responsibilities" of DHHS.  The mission and responsibilities of DHHS expressly include "provid[ing] supportive, preventive, protective, public health and intervention services to children, families and adults," and "assist[ing] individuals in meeting their needs and families in providing for the developmental, health and safety needs of their children, while respecting the rights and preferences of the individual or family."

156.    Todd A. Landry, the Director of the Maine OCFS, also known as the Central Bureau of Child and Family Services, is sued in his official capacity only.  Defendant Landry maintains his principal office at the Maine OCFS Central Office, 2 Anthony Avenue, 11 State House Station, Augusta, Maine 04333.  Defendant Landry oversees the office that is "primarily responsible for the development, delivery and oversight of all activities attendant to Child Protective and Children's Services," and which "drafts, implements and monitors all aspects of programs relating to child welfare by way of State Plan for Child Welfare Services."

157.    Ms. Lambrew and Mr. Landry, in their official capacities as Commissioner of DHHS and Secretary of OCFS, respectively, are responsible for Maine's Title IV-E Agency, which is the State of Maine, Department of Health and Human Services, Office of Child and Family Services.

## IV. CLASS ACTION ALLEGATIONS

158.    Plaintiffs Bryan C., Henry B., Trent W., Grayson M., Kendall P., and Neville H. bring this action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated children.

159.    This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

160.    The putative class ("the Class") is defined as all children who are or will be in DHHS foster care custody and who are or will be prescribed or administered one or more psychotropic medication while in state care.  Psychotropic medications are medications that impact emotions or behavior.  Psychotropic medications include medications in the drug classes of: antidepressants; antipsychotics; stimulants; alpha agonists (e.g., Clonidine, Guanfacine); anxiolytics (anti-anxiety) / hypnotics (e.g., benzodiazepines, non-benzodiazepines); and mood

stabilizers (e.g., lithium). They also include medications from the anticonvulsant and antihypertensive drug classes when the medication is prescribed for a behavioral health indication.

161. The Class is sufficiently numerous to make joinder impracticable. Upon information and belief, at least hundreds of children in Maine foster care receive psychotropic medications. As of December 1, 2020, an estimated 2,316 children were in the legal custody of DHHS. Defendant Landry stated in November 2019 that 20.8% of children in Maine foster care were administered one or more psychotropic medications. That would equate to almost 500 children in the current foster care population. Joinder of hundreds of children would be unduly burdensome and impractical in these circumstances.

162. The Named Plaintiffs will fairly and adequately represent and protect the interests of the entire Class.

163. The violations of law and resulting harms averred by the Named Plaintiffs are typical of the legal violations and harms suffered by all class members.

164. Each Named Plaintiff appears by a Next Friend. Each Next Friend has sufficient knowledge and familiarity with the facts of their respective Named Plaintiffs as well as the systemic common deficiencies underlying this complaint. Each Next Friend is dedicated to fairly and adequately representing the best interests of their respective Named Plaintiffs as well as the best interests of the putative class.

165. Named Plaintiffs and the Class are represented by attorneys employed by: (i) Children's Rights, a non-profit organization whose attorneys have substantial experience and expertise in child welfare institutional reform class actions; (ii) Bernstein Shur, a private law firm based in Portland with extensive experience in complex civil and public interest litigation, including class action litigation; and (iii) Maine Equal Justice, a nonprofit civil legal aid and

economic justice organization working to increase economic security, opportunity, and equity for people in Maine with deep knowledge and expertise on Maine's state agencies and local population.

166.     These attorneys (collectively, "Plaintiffs' Counsel") have identified and thoroughly investigated all claims in this action, and they have committed sufficient resources to represent the Class.

167.     Defendants have acted or failed to act on grounds generally applicable to the Class, necessitating declaratory and injunctive relief for the Class.   Plaintiffs' Counsel knows of no conflicts among class members.

168.     The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those raised by the putative class of children they seek to represent.   Each child in the Class relies on Defendants for their safety and well-being, including their physical and mental health.   The longstanding and well-known systemic deficiencies of DHHS and OCFS in relation to its centralized administration and oversight of psychotropic medications place all children in foster care custody at a common and ongoing risk of harm.

169.     Defendants have acted or failed to act on grounds generally applicable to all members of the Class, necessitating class-wide declaratory and injunctive relief.

170.     Questions of fact common to the Class include:

>     i.     Whether Defendants, through their actions and inactions, have demonstrated a uniform policy, pattern, custom and/or practice of inadequately monitoring and overseeing the administration of psychotropic medications to children in the custody of DHHS by failing to: (a) maintain complete, current, and reasonably accessible medical records, including

medication history for children in foster care, and to provide these records to foster caregivers and health care providers to facilitate the effective delivery of services; (b) operate a statewide secondary review system capable of timely identifying and addressing outlier prescribing practices to assure the safe administration of drugs to foster children; (c) ensure that adequate informed consent with adequate notice and a meaningful opportunity to be heard is obtained prior to and throughout the time that children in foster care are administered any psychotropic medications, or institute a procedure to ensure that all psychotropic medications are given appropriately and only when necessary; and (d) maintain a uniform policy, pattern, custom, and/or practice providing for periodic review or reconsideration of the prescription and administration of psychotropic medications to children in foster care.

    ii.    Whether these systemic failures result in harm or the substantial risk of serious harm to children administered psychotropic medications while in DHHS custody.

171.    Questions of law common to the Class include:

    i.    Whether Defendants' actions and inactions, policies, patterns, customs, and/or practices violate the Class's substantive due process rights to be free from an unreasonable risk of harm while in state custody, as guaranteed by the Fourteenth Amendment to the United States Constitution;

    ii.    Whether Defendants' actions and inactions, policies, patterns, customs, and/or practices violate the Class's procedural due process rights to be free

from the unnecessary and inappropriate administration of psychotropic medication as guaranteed by the Fourteenth Amendment to the United States Constitution, including whether the Class, through an independent adult, receives adequate notice and an opportunity to be heard;

iii.  Whether Defendants' actions and inactions, policies, patterns, customs, and/or practices violate the Class's rights under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA") to have their medical records kept up-to-date and timely delivered to their foster caretakers upon placement in their home; and

iv.  Whether the class members are entitled to declaratory and injunctive relief to vindicate the rights they have been denied.

## V. FACTUAL ALLEGATIONS

### A. Substantial Risks of Emotional, Psychological, and Physical Harm Attend the Use of Psychotropic Medications in Children.

172.  As a federal district court in Missouri recently explained in *M.B. v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 327767, at *2 (W.D. Mo. Jan. 8, 2018), "psychotropic drugs are powerful medications that directly affect the central nervous system. They are particularly potent when administered to children.  Children administered psychotropic medications are at particularly serious risk of long-lasting adverse effects. They are more vulnerable to psychosis, seizures, irreversible movement disorders, suicidal thoughts, aggression, weight gain, organ damage, and [] life-threatening conditions," among other things.  "Thus, due to the serious risks associated with psychotropic drugs, they should be administered to children only when necessary, and safely, and accordingly it is critical that children being administered these medications are monitored."  *Id.* at *3.

173.    The U.S. Food and Drug Administration ("FDA") has not approved the use of many psychotropic medication for children, as they have not proven safe and effective in children.  For those psychotropic medications that are FDA-approved for children or adolescents, FDA approval typically limits usage to children with specific serious diagnoses, such as schizophrenia and bipolar disorder, and older age groups.  For instance, not a single atypical antipsychotic—such as Aripiprazole/Abilify, Risperidone/Risperdal, Quetiapine/Seroquel and Paliperidone/Invega—has been approved for children under age 5.

174.    Little scientific research has been conducted on the safety and efficacy of psychotropic medications in children, in contrast to rigorous testing in the adult population.  Given this circumstance, the medical, legal, and child welfare communities have all deemed the use of psychotropic medications in children particularly risky.

175.    For instance, the American Bar Association has stated that "[l]ittle is known about how [psychotropic] medications impact children and adolescents in the short or long term.  Children are not just 'mini adults'; they cannot just be given a smaller dose because they have smaller bodies."

176.    More recently, the International Association for Child and Adolescent Psychiatry and Allied Professions ("IACAPAP") stated that "[p]harmacological treatment during human development [such as childhood and adolescence] may result in toxicities that are not seen in adults . . . and result in unwanted long-lasting changes."

177.    The Administration for Children and Families ("ACF"), the office within the U.S. Department of Health and Human Services charged with administering the federal Title IV-E foster care program, acknowledged in 2019 that "research on the safe and appropriate pediatric use of psychotropic medications lags behind prescribing trends. . . . In the absence of such research,

it is not possible to know all of the short- and long-term effects, both positive and negative, of psychotropic medications on young minds and bodies."

178.    All of these uncertainties have not stopped physicians or others from routinely prescribing these drugs to children "off-label," a term the FDA defines as the "[u]napproved use of an approved drug."  At least one study has shown that approximately 45% of medications to treat emotional or behavioral disturbances in children or adolescents are prescribed off-label.

179.    While some of the risks to children may not be well known, psychotropic drugs are already known to cause serious and sometimes irreversible side effects, even in adults.  These well-documented physical and mental harms include:

- Kidney, thyroid, liver and pancreas damage;
- Psychosis, suicidal thoughts, and agitation;
- Blurred vision;
- Nightmares and hallucinations;
- Drowsiness and dizziness;
- Irreversible movement disorders (such as tardive dyskinesia), rigidity, tremor and tics;
- Seizures; and
- Weight gain, diabetes and high cholesterol.

180.    Multiple expert research bodies, including the American Academy of Pediatrics ("AAP"), the Government Accountability Office, the IACAPAP, the American Association of Child and Adolescent Psychiatry ("AACAP"), and the Substance Abuse and Mental Health Services Association ("SAMHSA") have all stated the need for further research on the safety, effectiveness, and long-term effects of psychotropic medications in children.

181.    In the developing brain and body of a child, psychotropic medications may induce adverse effects more frequently and with greater severity. A 2019 medical review article that examined a decade (2007-2017) of FDA drug trial data for common antipsychotics and antidepressants found that adverse drug effects were significantly worse for children than adults

36

in over 60% of the studied combinations of medications.  Recent studies have linked psychotropic medications to the worsening of certain liver conditions in children, linked stimulant psychotropic medications to elevated cardiovascular risk factors, and demonstrated disturbing links between antipsychotics and unexplained deaths among youth.

182.  A 2018 psychiatry clinical trial concluded that the "potential benefits [of antipsychotic medications] should be carefully weighed against the risk for adverse changes in total and abdominal adiposity and insulin sensitivity, known contributors to the development of early-onset type 2 diabetes, cardiovascular disease, and other illnesses associated with premature morbidity and mortality."

183.  Many psychotropic medications—including all second generation antipsychotics and SSRIs—come with "black box" warning labels indicating that "their use requires particular attention and caution regarding potentially dangerous or life threatening side effects."  It is commonly recognized that these drugs may increase the risk of "suicidal thinking and behavior (suicidality) in children, adolescents and young adults," and that patients starting these drugs should be "monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior."  The stimulant class of psychotropics, commonly used to treat ADHD, carries a black box warning for abuse potential, sudden death, and serious cardiovascular events.  Black box warnings for mood stabilizing and anticonvulsant psychotropics also include potentially life-threatening complications.

184.  Given the numerous side effect profiles, there are strict recommended metabolic monitoring schedules for the various psychotropic drug classes that include baseline blood pressure, body mass index, blood glucose, and lipid panels, as well as follow-up monitoring every four weeks for the first twelve weeks, followed by quarterly measurements throughout treatment.

However, those monitoring schedules are often not followed. A 2018 review of Medicaid Analytic Extract data found that only approximately 8% of foster children on antipsychotics received baseline metabolic screening and only approximately 25% reported evidence of any annual metabolic laboratory monitoring. Given psychotropic medications' serious side effects, the failure to monitor them can have life-threatening consequences. Hence, strict monitoring and effective oversight policies are crucial.

185.    AACAP, the leading professional organization dedicated to promoting psychiatric care and healthy development of children and adolescents, posits that "[b]est practice does not involve psychotropic medication as the sole intervention for youth with complex mental health needs. Psychosocial interventions, particularly those that are evidence-based and systematically monitored, are also essential."

186.    An ACF report using data from the National Survey of Child and Adolescent Well-Being explained that "the use of medications without simultaneous use of psychosocial treatments" equates to potential inappropriate psychotropic medication use.

187.    SAMHSA describes the need for a two-step monitoring process prior to prescribing antipsychotics to youth and over the course of their care that answer the following questions:

> A) *Prior to initiation:* "Has the patient received an adequate trial of first-line, evidence-based psychosocial therapy and medication treatments before starting an antipsychotic?"
>
> B) *Over the course of care:* "What is the plan to monitor risks and benefits of treatment and timeframe that ineffective or poorly tolerated medication will be discontinued?"

188.    Too frequently, psychotropic medications are administered to achieve behavioral control rather than to treat an underlying trauma. For instance, for some mental health disorders such as Reactive Attachment Disorder or Disinhibited Social Engagement Disorder, no psychopharmacological intervention trials have been conducted to date, nor are there any

indications to prescribe medications to treat these disorders, yet children are still prescribed psychotropic medications to "treat" these disorders.

189.    Children in foster care are also particularly vulnerable to high-risk prescriptions because "the majority of physicians responsible for prescribing psychotropic medication to foster children are pediatricians or general psychiatrists without formal training in child and adolescent psychiatry and may not have an abundance of exposure to concerns specific to children in foster care."  AACAP practice guidelines makes clear that a comprehensive psychiatric evaluation of a child should be completed before any pharmacological intervention is considered.  Such an evaluation "increases the likelihood that medication interventions will be well conceptualized and hopefully reduce the likelihood of treatment failure and poor adherence."  However, despite these recommendations, a 2018 Medicaid data review study found that over 40% of foster children with antipsychotic prescriptions did not receive appropriate first-line psychosocial care prior to initiation of the medications.

190.    Given the lack of research on the safe and appropriate use of psychotropic medications in children, and the inherent vulnerabilities of this population, it is of particular concern when children in foster care are exposed to "outlier" prescribing practices.  In 2012, ACF issued guidance to states on implementing effective oversight of psychotropic medications for youth in foster care.  ACF defined "outlier practices" as "[p]atterns that may signal that factors other than clinical need are impacting the prescription of psychotropic medications."  As a federal judge noted in 2018, this means that "for many, if not most, of the affected children, psychotropic drugs are administered to treat a diagnosis that the drugs were never designed to address" in children.  *M.B. v. Corsi*, 2018 WL 327767 at *2.

191.    ACF has identified the following three outlier areas of concern that should trigger heightened scrutiny: "instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age," commonly referred to as "too many, too much, and too young."  Foster children have been found to be at increased risk of all three of these harmful practices.

192.    **Too many.**  Polypharmacy (the use of multiple psychotropic medications at once) is increasingly prevalent in the foster care population, despite long-standing awareness of "the lack of supporting evidence and the potential for adverse effects (e.g., side effects, drug interactions, metabolic effects, and potential that some medications may alter nervous system development)."  Evidence from a Medicaid data review shows that foster children are over two times more likely to be prescribed multiple concurrent antipsychotics than their non-foster Medicaid insured peers.

193.    There is "scant evidence" that using multiple psychotropic medications at once is effective in children, particularly of the antipsychotic class, and no research exists to support the use of five or more psychotropic drugs in tandem.  Leading medical guidance bodies including SAMHSA and AACAP both support the need to start "low and go slow" and ensure appropriate clinical monitoring throughout.

194.    Experts report that "increasing the number of drugs used concurrently increases the likelihood of adverse reactions and long-term side effects, such as high cholesterol or diabetes, and limits the ability to assess which of multiple drugs are related to a particular treatment goal."  For instance, medical research studying the incidence of type 2 diabetes among children administered an antipsychotic medication found that children given an antipsychotic were three times more likely than non-medicated children to suffer from diabetes.  Multiple studies show side effects increase with polypharmacy, with one study showing five times the risk of obesity with

two or more antipsychotics.  Additional research has found the risk of developing diabetes was even greater for children given an antidepressant concurrently with the antipsychotic.

195.    Another study gathering information from parents about adverse effects of one or more psychotropic medications given to youth found:

- The number of adverse effects increased with the number of medications being used.  In comparison with children taking one medication, those taking two drugs reported on average 17% more adverse effects while those taking three or more medications reported on average 38% more adverse effects.
- The side effect profile shifted for children depending upon the number of medications taken.  Suicidality and self-harm became more frequent with increasing numbers of medication.  Increased appetite, sleepiness/fatigue, and tics and tremors were approximately 200 to 300% more prevalent among children taking three or more medications than those taking only one drug.
- The number of adverse effects increased the longer the child was on the medication.
- Polypharmacy regimens including antidepressants (SSRIs) or antipsychotics were especially associated with adverse effects.

196.    Children in foster care are frequently subjected to polypharmacy practices.  For instance, they are frequently administered an antidepressant psychotropic and a stimulant psychotropic concurrently.  Data to substantiate the safety and efficacy of this combination of drugs is lacking.

197.    Additionally, a recent study found low rates of de-prescribing of antipsychotics among foster youth.  This means that once a provider prescribes a psychotropic medication, they are less likely to remove this drug in the future, even when clinically warranted.

198.    An ACF report using data from the National Survey of Child and Adolescent Well-Being stated that "the use of three or more medications simultaneously" constitutes a potentially inappropriate psychotropic use.

199.    **Too much.**  Because the majority of pediatric psychotropic medication is prescribed off-label, there are very few research-based guidelines for medication dosages, which

41

would typically be supplied by FDA prescription labels.  For this reason, it is a cause for concern when children are prescribed these medications at dosages that exceed recommendations.

200.    The above-mentioned 2018 ten-state Medicaid study showed that foster children, even when compared to other Medicaid-insured youth, are twice as likely to receive higher than recommended doses of antipsychotics.  Experts report that this practice "increases the risk of adverse side effects and does not typically increase the efficacy of the drugs to any significant extent."

201.    **Too young.**  Young children are particularly vulnerable to the possible adverse side effects of psychotropic medications.   For instance, experts have reported that there is "no established use [for psychotropic medications] for mental health conditions in infants [under age one]; providing them these drugs could result in serious adverse effects."  Moreover, it is generally accepted that drugs in the class of atypical antipsychotics, one of the most powerful psychotropic drug categories, should never be administered to children below the age of 5.  An ACF report using data from the National Survey of Child and Adolescent Well-Being concluded that "the use of medications in children under the age of 6 years" or "the use of any antipsychotic for all ages and, specifically, for children under the age of 6 years" consists of potential inappropriate psychotropic use.

> **B. Federal Law and Professional Standards Require That States Have in Place a System to Oversee the Administration of Psychotropic Medications to Children in Foster Care.**

202.    The vital need for rigorous and effective administration and oversight of psychotropic medication use for children in foster care is well-established.

203.    Under federal law, the "Maine Department of Health and Human Services[], Office of Child and Family Services" must develop "a plan for the ongoing oversight and coordination of

health care services for any child in a foster care placement," which must include "an outline of . . . the oversight of prescription medicines, including protocols for the appropriate use and monitoring of psychotropic medications." *See* 42 U.S.C. §§ 622(b)(15)(A), 622(b)(15)(A)(v).

204.    ACF has directed that "[s]trengthened oversight of psychotropic medication use is necessary in order to responsibly and effectively attend to the clinical needs of children who have experienced maltreatment" and urged "close supervision and monitoring . . . [and] careful management and oversight" in the use of psychotropic medications for children.

205.    "For the[ir] APSR [Annual Progress and Services Report] submission," ACF requires that:

> States must provide information on . . . [t]he protocols used to monitor the appropriate use of psychotropic medications for children and youth in the foster care system.  States must support their choice of protocols and provide additional information on how the child welfare workforce and providers are trained on the appropriate use of psychotropic medications.  The State's protocol must address:
>
> - Comprehensive and coordinated screening, assessment, and treatment planning mechanisms to identify children's mental health and trauma-treatment needs (including a psychiatric evaluation, as necessary, to identify needs for psychotropic medication);
> - Informed and shared decision-making (consent and assent) and methods for ongoing communication between the prescriber, the child, his/her caregivers, other healthcare providers, the child welfare worker, and other key stakeholders;
> - Effective medication monitoring at both the client and agency level;
> - Availability of mental health expertise and consultation regarding both consent and monitoring issues by a board-certified or board-eligible Child and Adolescent Psychiatrist (at both the agency and individual case level); and
> - Mechanisms for sharing accurate and up-to-date information related to psychotropics to clinicians, child welfare staff, and consumers.  This should include both data sharing mechanisms (e.g., integrated information systems) and methods for sharing educational materials.

206.    Additionally, AACAP has published recommended practices for child welfare agencies to implement in overseeing the mental health treatment of children in foster care, including active monitoring to assure safe utilization of psychotropic medications.  AACAP explained that children in state custody "often have no consistent interested party to provide informed consent for their treatment, to coordinate treatment planning and clinical care, or to provide longitudinal oversight of their treatment."  Thus, "[t]he state has a duty to perform this protective role for children in state custody."

207.    A 2019 Research Summary by the publicly-funded Patient-Centered Outcomes Research Institute ("PCORI") recommended that states implement six policies and practices concerning psychotropic medication and oversight for youth in out-of-home care, based on "current research and best practices":

- Implement a robust informed consent and informed assent policy that ensures consenters and youth have the information they need and access to consult a child and adolescent psychiatrist to make a truly informed decision;
- Create a centralized, up-to-date, accessible medical records system;
- Implement monitoring and oversight systems that will flag dangerous outlier prescribing practices for peer review both prospectively and retrospectively, and will seek to curb such practices moving forward;
- Promote safe prescribing practices, including by ensuring the availability of concurrent psychosocial services and closely tracking required bloodwork monitoring;
- Provide ready access to pertinent information for clinicians, foster parents, and other caregivers; [and]
- Collect, track, and analyze relevant data to evaluate the efficacy of various initiatives implemented.

208.    Over the past several years, Maine has repeatedly acknowledged these federal laws and standards, as well as the compelling need to implement a robust system to protect children in foster care from unsafe medication practices.

209.    For instance, Maine Citizen's Review Panel Recommendations for a Coordinated

Health Plan for Children in Foster Care told OCFS in as early as 2014 that "[t]he State of Maine,

in order to be in compliance [with federal law], needs to meet the requirements as stated in the

Federal Fostering Connections to Success and Increasing Adoptions Act of 2008," including a

system for "oversight of prescription medicines" that includes an "outline of 'protocols for the

appropriate use and monitoring of psychotropic medications.'"

### C. Maine Defendants Have Long Acknowledged the Risks Associated with the Improper Administration and Inadequate Oversight of Psychotropic Medications to Children As Well As Maine's Own Systemic Failures.

#### i.   Defendants Fully Understand the Dangers Associated with the Improper Use and Oversight of Psychotropic Medications in Children.

210.    For years, DHHS and OCFS have repeatedly acknowledged their awareness of the

serious risks accompanying the use of psychotropic medications in foster care populations.  In

doing so, they have openly endorsed the same scientific principles discussed above in Section

V(A).

211.    For instance, in 2012, several DHHS officials authored a report with the Maine

Independent Clinical Information Service detailing the serious harms associated with psychotropic

medication administration to children.  It stated that "[s]ide effects can lead to or exacerbate other

health problems.  Children on these drugs are prone to significant weight gain, which can lead to

diabetes and other weight-related issues, such as cardiovascular risks."

212.    That same year, then-OCFS Director Therese Cahill-Lowe and then-OCFS Medical

Director Lindsey Tweed attended the conference entitled "Because Minds Matter: Collaborating

to Strengthen Management of Psychotropic Medications for Children and Youth in Foster Care."

This conference taught state agencies the serious risks of harms associated with psychotropic

medications, the need for robust oversight mechanisms, and how to reform a state's oversight

system in order to adequately protect children.  It provided Defendants and other attendees many tools to protect foster children from harm.

213.   In 2013, the then-OCFS Director gave opening remarks at a conference that explored the trend of "skyrocket[ing]" psychotropic drug prescriptions for children and adolescents "in spite of the fact that there is an absence of valid research to support the practice." The conference brochure explained that "[u]nbiased scientific research indicates that these medications have questionable effectiveness and that their use poses serious long-term consequences to developing brains and bodies."

214.   In November 2019, OCFS Director Todd Landry and the acting Medical Director of OCFS acknowledged that "[p]sychotropic medications alone are often not the best treatment" for foster youth, and that "[t]hey should typically be used with non-pharmacological interventions, such as behavior interventions and behavioral health therapy, for long-lasting effects."

215.   At that time, they expressly admitted that outlier prescription practices of "[t]oo much," "[t]oo many," and "[t]oo young"—as well as "[t]oo long"—are all problematic "[c]oncerns in [f]oster [c]are" with respect to psychotropic medications.  OCFS also acknowledged the risks of "[m]edical side effect[s] [and] complication[s]" associated with psychotropic medications.

216.   Substantial numbers of children in DHHS foster care custody continue to be prescribed psychotropic medications in the absence of an oversight system that ensures their safety.  Despite their awareness of the risks, Defendants failed to implement an adequate system of safeguards and oversight of psychotropic medications to adequately protect Maine foster children from ongoing substantial risks of serious harm.

    ii. <u>DHHS and OCFS Fully Understand That Their Own System Lacks Adequate Safeguards and Oversight Mechanisms to Protect Hundreds of Maine Foster Children from Ongoing Substantial Risks of Serious Harm.</u>

217.   Besides acknowledging the substantial dangers associated with psychotropic medications, *supra* § V(C)(i), DHHS and OCFS have been made aware of and even expressly acknowledged their own system's failures that expose hundreds of foster children in their custody to those substantial dangers.  Nonetheless, DHHS and OCFS have still failed to implement a robust system of safeguards and oversight of psychotropic medications to adequately protect foster children.

218.   As early as 2010, DHHS and OCFS's then-Medical Directors publically highlighted some of Maine's oversight problems.  They acknowledged that children in Maine foster care are disproportionately prescribed psychotropics, stating that the rate of "foster children [] on mental health drugs [is] 3x the rate of non-foster children," and that as to antipsychotics, it is even higher at "4x the rate of usage in non-foster children."  They also highlighted Maine's unsafe polypharmacy practices, stating that "1 in 10 MaineCare [Medicaid] members [including foster children] under 19 is on 4 or more mental health medications in the course of a year."

219.   That same year, the Child Welfare Services Maine Ombudsman "brought a serious concern to the Department's Divisions of Child Welfare and Children's Behavioral Health regarding the use of anti-psychotic medication with children and youth in DHHS custody," and "the Department's [DHHS's] Medical Directors for child . . . mental health also raised this concern."  They warned that Maine "still rel[ies] too much on psychiatric medications like anti-psychotic drugs" that "have serious long-term side effects, and that state wards are much more likely to be prescribed this medication than other children and youth."

220.    In 2011, the following year, the Ombudsman again raised the same concern.  He found that the "use of psychotropic medications for youth in care" child welfare policies and practices within DHHS/OCFS required further development.  He classified the "[a]ppropriate use, and follow-up of psychotropic medication for youth in care" as challenges for DHHS, and he recommended that DHHS/OCFS reform their child welfare policies and practices as to "psychotropic medications for youth in care."

221.    Shortly thereafter in 2012, several Maine officials within DHHS authored a report on medication for children and youth in which they acknowledged that "there may be some overuse [of antipsychotic psychotropic medication] that can be reduced" in Maine.

222.    Also in 2012, a Maine DHHS official shared a 2009 study showing that 37% of foster children in Maine were on mental health drugs compared to only 12.3% of non-foster children, and that 19.2% of foster children were on four or more mental health drugs compared to only 12% of non-foster children.  As a result of these findings, the official stated that the Drug Utilization Review investigated and "found evidence that most prescribers writing for these medications were family practitioners and not providers that have the appropriate education to write prescriptions for these meds [sic]."

223.    Several years later, Maine's psychotropic oversight issues became the subject of national attention.  In 2018, the U.S. Department of Health and Human Services OIG issued a report entitled "Treatment Planning and Medication Monitoring Were Lacking for Children in Foster Care Receiving Psychotropic Medication."  The OIG investigated Maine because it was one of the worst states nationwide, with one of the five "highest utilization of psychotropic medications in their foster care populations."

224.    OIG conducted its review and issued the 2018 OIG Report because "[u]p to 80 percent of children enter foster care with significant mental health needs" and may be prescribed psychotropic "medications [that] can have serious side effects."  But even though "ACF suggests and the five States [including Maine] in [their] sample require [that psychotropics] [] be used in conjunction with treatment planning mechanisms and effective medication monitoring," there are still "serious quality-of-care concerns in the treatment of children with psychotropic medications."

225.    The 2018 OIG Report made clear that DHHS and OCFS's practices do not pass muster, not even by their own policies.  It concluded that Maine does not fully comply with its "own [s]tate requirements for treatment planning and medication monitoring for children in foster care receiving psychotropic medication."

226.    For instance, although Maine has written state requirements that foster care medication plans be reviewed quarterly, the 2018 OIG Report found that "26 percent of children in foster care [in Maine] had a medication plan that was not reviewed quarterly by the treatment provider."

227.    Although Maine acknowledges the importance of formal treatment planning, the 2018 OIG Report found that "28 percent of children in [Maine] foster care did not receive a treatment plan."

228.    And although Maine acknowledges the importance of medication monitoring, the 2018 OIG Report found that "11 percent of children in foster care did not receive medication monitoring by a prescribing professional."

229.    In addition, although Maine Defendants' policy requires the "caseworker to participate in medical or psychiatric appointments where antipsychotic medications are initially discussed and a determination is made to proceed or not, and then at least every 3 months

49

following," the 2018 OIG report found that a shocking "59 percent of children [prescribed antipsychotic medications] did not have a caseworker who participated in initial medical or psychiatric appointments and then at least every 3 months following."

230.    Besides identifying Defendants' overt failures to satisfy Maine's own policies, the 2018 OIG Report also revealed fundamental problems with the policies themselves.  For instance, it found that requirements "did not always include suggested professional practice guidelines designed to protect [] children."  As such, the OIG warned that "[i]mproved compliance and strengthened [s]tate requirements are imperative to provide protections for children who are at risk for inappropriate treatment and inappropriate prescribing practices."

231.    After the 2018 OIG Report's release in September 2018, Defendants expressed awareness of the report and Maine's specific issues highlighted therein.  For instance, in OCFS's December 2018 Children's Behavioral Services Assessment, DHHS and OCFS discussed the Report and its findings—admitting Maine's "lack of monitoring," its need to ensure that psychotropic medications are "appropriately monitored," and "need for service quality measures":

> In September 2018, the United States DHHS Office of Inspector General (OIG) produced a report concerning the medication management and treatment of youth entering foster care. This OIG report found that out of the 3,527 children in foster care in Maine, 1,155 of them (32.7 percent) were treated with psychotropic medications. The report also found that although Maine requires a treatment plan for children in foster care, 28 percent did not have treatment plans. Additionally, the report found that 26 percent of medication plans were not reviewed quarterly as required and that 11 percent of children in foster care did not receive medication monitoring by a prescribing professional. The lack of monitoring by a prescribing professional may be a result of the statewide shortage of child psychiatrists in Maine. This report highlights the importance of behavioral health providers and child welfare staff working together collaboratively to ensure these children receive needed treatment and that medication is appropriately monitored and the need for service quality measures particularly around the use of psychotropic medication.

232.     In a news article on the 2018 OIG Report entitled "Few Safeguards Exist for Foster Kids on Psych Drugs," the former OCFS Medical Director commented that "[i]t would be great [for Maine] to get more focus and more resources on treatment planning and treatment monitoring."

233.     In December 2018, the Public Consulting Group ("PCG") published an assessment of Maine DHHS's children's behavioral health services that highlighted the OIG Report and Maine's oversight problems.  PCG stressed the "importance of behavioral health providers and child welfare staff working together collaboratively to ensure these children receive needed treatment and that medication is appropriately monitored and the need for service quality measures particularly around the use of psychotropic medication."  PCG recognized the OIG Report's recommendations that DHHS must implement greater oversight to protect children from substantial risk of serious harm.

234.     In late 2019, former OCFS Medical Director Matt Lahaie gave a presentation to the Maine Chapter of the AAP concerning "Psychotropic Medication in Maine Foster Youth." He, too, referred to the 2018 OIG Report, which found that Maine has one of the highest rates in the country of young people in foster care being prescribed psychotropics.

235.     Despite having known for years of the risks associated with these medications and the large numbers of children in Maine foster care who are prescribed such medications, to this day, OCFS continues to fall short of its responsibility for protecting children from harm.  As further set forth below, Defendants have not implemented an adequate system of safeguards and oversight of psychotropic medications to protect Maine foster children from ongoing substantial risks of serious harm.

### D. Defendants Fail to Maintain Complete and Current Medical Records for the Class and to Provide These Records Promptly to Caregivers.

236.    The case plan and case review system requirements of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), under Title IV-E of the Social Security Act, require child welfare agencies to maintain and share up-to-date medical records as part of a written case plan for each and every child in care.

237.    The case plan is a written "plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to . . . address the needs of the child while in foster care."  By law, that plan must contain "the health . . . records of the child, including the most recent information available regarding . . . the names and addresses of the child's health . . . providers, . . . the child's known medical problems, the child's medications, and any other relevant health . . . information."

238.    Additionally, child welfare agencies must have a case review system and procedure to ensure their requirements that each "child's health record . . . is reviewed and updated" and that "a copy of the record is supplied to the foster parent or foster provider with whom the child is placed, at the time of each placement of the child in foster care."

239.    These requirements reflect the critical need for caregivers to have immediate access to a child's full medical history in order to ensure effective medical and mental health care for children, including the administration of psychotropic drugs when applicable.

240.    Defendants agree with this.  OCFS's own policy acknowledges the critical role of child and family health information in assessing health status, providing continuity of health care, avoiding duplication of services, and carrying out the DHHS's duties and responsibilities toward children in its custody.

241.    Unfortunately, however, DHHS and OCFS fail to adequately maintain and disseminate to the necessary individuals complete and current medical records including sufficient information on psychotropic medications.

242.    Defendants' written case plans that must contain health records are insufficient, and Defendants agree.  In the "Written Case Plan[s]" Item of Maine's most recent Child & Family Services Review ("CFSR"), Maine was labelled as "[n]eeding [i]mprovement."  In Maine's 2020-2024 Child & Family Services Plan, OCFS and DHHS wrote that "[h]istorically, OCFS has recognized [written case plans] as being a challenge."

243.    OCFS has a "Health Records" policy that is deficient and not implemented in practice.  Upon information and belief, this policy dates back to 1994 and has been unchanged since 2002—almost two decades—despite recommendations to OCFS in the interim to update its policies to ensure better oversight of psychotropic medications.  For instance, the 2009 Child Welfare Services Ombudsman Report "recommend[ed] the further development of policy . . . by OCFS, to ensure the safety and wellbeing of children in care who are prescribed these high-risk medications."

244.    That almost 20-year-old OCFS "Health Records" policy requires that a child's health history is "sought prior to any out-of-home placement."  Certain child health information, including serious medical conditions, allergies, and medications for chronic and acute conditions, must be provided directly to the foster parent or other child care provider at the time of the child's placement with them, or to the caseworker responsible for placing the child.  Additional child health information is to be gathered after the child has entered custody, and the child's health record is to be updated.

245.    The Child Welfare League of America ("CWLA") has promulgated widely-accepted standards that instruct public child welfare agencies to develop "an abbreviated health record, such as a medical passport, that accompanies the child throughout the child's stay in out-of-home care."  This critical record is to include, among other things: "[t]he child's health history prior to placement[;] . . . health status immediately before entering care[;] . . . [a]ny medical, dental, mental health, or developmental problems[;] . . . [c]urrent medications[;] . . . [and a]llergies. . . . [It] should [additionally] prominently identify . . . any medication allergies."  CWLA standards further provide that the agency should update this record "in a timely manner, entering information about the child's health status, services, and needs as soon as [it] becomes available."

246.    Similarly, AACAP recommends maintenance of "an ongoing record of diagnoses, height and weight, allergies, medical history, ongoing medical problem list, psychotropic medications, and adverse medication reactions that are easily available to treating clinicians 24 hours a day."  Review of these records "to assess past successful and unsuccessful treatments can . . . reduce the chance that previously ineffective treatments will be used again."

247.    OCFS's written policy requires portable health records for children in DHHS custody.  Among other requirements, the portable health record is supposed to move with the child from placement to placement and contain an on-going record of medical care sought and received while the child is in custody.  It is supposed to include medical diagnoses and treatment, psychiatric and psychological information, a brief history including traumatic events, an ongoing record of care and psychiatric treatment while in state custody, and medication history, such as the name, strength, dosage, frequency, start date, and stop date.  By policy, this portable health record for each child in custody is to be given to foster parents, residential facilities, caseworkers, and other

caregivers, and it must be updated by the caseworker every six months and each time the child moves placements.

248.     Despite its federal and policy obligations, OCFS fails to promptly prepare and deliver portable health records containing critical information on psychotropic medications at the time a child is placed in their foster home or other placement.

249.     Upon information and belief, instead of receiving critical written information about the child's health and psychotropics upon placement, foster placements often receive only a plastic bag filled with drugs.  Too often, they have little idea what to do with them, what side effects to look out for, and how to effectively care for that child's specific needs.

250.     OCFS recently admitted that portable health records do not, in practice, move with the child from placement to placement, and that they are not promptly provided to placements when the child arrives there.  Although their own policy expressly requires the state to provide a portable health record upon foster care placement, OCFS's 2015 Annual Report to the Legislature stated that "[f]oster parents shall request a medical history of [the] child at the time of placement."

251.     Even if OCFS were properly maintaining, reviewing, and updating medical records or portable health records in practice, they would be of no use if the individuals charged with caring for and, in some cases providing informed consent for medications being given to those children, do not have ready access to them.  OCFS often fails to provide the required medical records to foster caregivers, as required by law and policy.  Upon information and belief, foster caregivers are often provided incomplete health records and medication histories for children in their care, or are provided with no health or medication information at all—such that no essential psychotropic medication information arrives with the child or moves from placement to placement. Instead, upon information and belief, foster children often arrive with only a bag of medications.

252.    Without a system to ensure that foster caregivers are consistently provided with this information, caretakers are often left to conduct their own research into a child's health information, contacting physicians whose names are on pill bottles, with little guidance as to what medications to administer, when and how to administer them, potential risks and adverse effects, and how to respond when a child experiences adverse effects.  Defendants' failure to maintain complete and current medical records for the Class and to provide these records to caregivers harms children and subjects them to continuing and imminent risk of serious harm.

253.    Upon information and belief, Defendants do not have a quality assurance mechanism or other means of tracking their compliance with their federal obligations.

**E.  Defendants Fail to Assure a Meaningful Informed Consent Process.**

254.    A minimally adequate informed consent process generally requires that a doctor provide full information about the risks and benefits of a particular psychotropic medication before express authorization is given by an appropriate adult consenter for the medication to be administered to the child.

255.    In a 2012 Information Memorandum, the federal government identified the "need for written policies" with provisions for "[i]nformed and shared decision-making (consent and assent) and methods for on-going communication between the prescriber, the child, his/her caregivers, other healthcare workers, [and] the child welfare worker" as an element that is consistently included in guidelines and recommendations for the systemic monitoring and oversight of psychotropic medications in the foster care context.

256.    AACAP standards further clarify that "[a]lthough particularly important at the time of psychotropic medication initiation, informed consent and assent are ongoing processes. Informed consent involves discussion of target symptoms, likely benefits of a potential treatment,

potential risks of treatment, and risks of *not* pursuing the treatment in question. Documentation of the discussion is essential, to provide clear evidence of what occurred."

257.    OCFS's own policy acknowledges the importance of the informed consent process in delivering and assuring safe and appropriate care to children, stating that:

> All clients, including children and youth, have the right to participate in all service decisions, review their treatment, case or service plan, refuse any service unless mandated by law or court order and be informed about the consequences of refusal or disengagement with services. The client of mental health services should be provided with a copy of the Rights of Recipients of Mental Health Services published by DHHS. Clients must be informed of their right to choice in the selection of a service provider qualified to meet the assessed service or treatment need. Services are to be provided to meet the assessed need and should not go beyond the scope of that need unless requested by the client. The client is to be informed prior to any engagement in services of their rights regarding confidentiality and privacy protections by the provider. DHHS staff must comply with the DHHS confidentiality policy.

258.    OCFS has not promulgated a policy setting forth the informed consent process or procedures for all classes of psychotropic medications. Rather, OCFS has promulgated an informed consent policy only with respect to the class of antipsychotic medications, and that policy is wholly insufficient—even as to antipsychotics.

259.    That OCFS policy, titled "Use of Antipsychotic Medications for Youth in Foster Care," provides that absent certain emergency or urgent circumstances, youth over 14 can only be prescribed medication that they, their caretaker and their prescriber all consent to, but is silent as to who must provide consent for youth under 14. The policy includes an Antipsychotic Medication Consent Worksheet, which states that youth under 14 should assent to use of medication, and which, upon information and belief, is not consistently employed. The child's "caseworker is required to be present in person or by phone at the appointment with the prescriber at the first appointment and every three months following or as requested by the caregiver or provider to

57

attend."  "Prior to any consideration of medication to address a child's mental health needs[,] the treating provider must be given a full description of the circumstances of the child that follows a Casework Review."

260.    OCFS's existing informed consent policy on antipsychotics is deficient on its face in at least the following ways:

  i.     The policy addresses informed consent only for the administration of antipsychotics, rather than for all psychotropic medications.
  ii.    The policy does not provide for the involvement of a child's biological parent(s) in the informed consent process, even if the biological parents' rights have not been terminated.
  iii.   The policy does not include a process to resolve disagreements among caregivers, parents, caseworkers or providers over whether a medication should be administered.
  iv.    The policy lacks a complete list of the factors that should be considered before making a decision.
  v.     The policy does not adequately give a timeline for continuing, changing, and discontinuing prescriptions.
  vi.    The policy does not provide for a uniform system for tracking informed consent and assent both at an individual-case and aggregate level to facilitate oversight.
  vii.   The policy does not provide for or require any periodic review of the initial consent nor set forth factors that require a reconsideration of initial consent, which may result in foster children continuing on a regimen of medications for months or years without review.
  viii.  The policy lacks a detailed process for informed consent in emergency situations.
  ix.    It is unclear who is required to complete the Antipsychotic Medication Consent Worksheet and where it must be stored, if at all.

261.    This lack of a streamlined process to evaluate a refusal to consent or assent to the administration of psychotropic medications without a meaningful opportunity to be heard can result in a child being unwillingly subjected to medications with potentially serious side effects.

262.    Because the OCFS policy for Use of Antipsychotic Medications for Youth in Foster Care is so limited and ambiguous, it is often either misapplied, misunderstood, or entirely overlooked by caseworkers and caregivers in securing informed consent for children in DHHS custody.

263.    For instance, although Maine's antipsychotic policy requires caseworkers to attend appointments with prescribers where antipsychotics are discussed, it does not specify whether the caseworkers must attend appointments where other classes of psychotropics are discussed, and it does not specify whether and how the caseworkers should be involved in the informed consent decision-making process at any such appointments.

264.    Although their attendance is required by this policy, in practice, caseworkers are not routinely present at these meetings or involved in these consent conversations.  Tellingly, 59% of a sample of 39 Maine foster children prescribed antipsychotics did not have a caseworker who participated in initial medical or psychiatric appointments and then at least every 3 months following.

265.    Maine's antipsychotic policy also neglects to involve a child's biological parent(s) in the informed consent process, even if the parents' rights have not been terminated.  For instance, the antipsychotic policy does not require that biological parents receive notice when a healthcare provider recommends the prescription of a new psychotropic medication to the child.  Likewise, the policy does not require that other appropriate adults, such as a child's guardian ad litem or court-appointed special advocate, be notified of informed consent requests.  Nor is there a process set forth in the policy for resolving disagreements between caregivers, parents, caseworkers, or providers over whether the child should receive psychotropic medication.  And there is no process in the policy by which an alternative adult may seek to serve as the child's consenting authority.  Consequently, the lack of involvement of appropriate adults in the informed consent process can subject foster children to the administration of psychotropic medications without adequate notice and a meaningful opportunity to be heard.

266.    Similarly, although informed consent is an ongoing process, Maine's policy does not expressly provide a timeline for continuing, changing, and discontinuing prescriptions, or for the expiration of informed consent and assent.  The 2018 OIG Report found that in a sample of 120 Maine foster children prescribed psychotropic medications, approximately 26% did not have their medication plan reviewed quarterly by the treatment provider, and approximately 11% did not receive any medication monitoring by a prescribing professional.  These numbers indicate that a significant percentage of Maine foster children on psychotropics thus did not have a proper ongoing informed consent and assent process under the AACAP standards.

267.    Despite the critical importance of obtaining proper informed consent, upon information and belief, OCFS has no system to track compliance with the agency's informed consent policy across all children in care, betraying the widely recognized principle that "you cannot manage what you cannot measure."

268.    Specifically, OCFS has no system for tracking in the aggregate whether (a) the child's parents are engaged in medical decision-making when available, (b) the assigned caseworker is notified by the resource parents before they administer medication to a child for which the resource parents provided informed consent to the prescriber, (c) youth are given the opportunity for informed assent before going on a psychotropic medication regimen, or (d) when medication is refused, whether the appropriate procedures are followed and documented before OCFS overrides this refusal.  Absent this aggregate data, OCFS is unable to identify and timely correct areas of non-compliance with this important policy, leaving children at risk.

269.    Furthermore, the lack of comprehensive and up-to-date medical records for all children in care makes it likely that medications may be approved without the benefit of knowing

a child's health history, which could include allergies to medication, documented adverse effects to medications, or failed previous attempts with that very same drug.

270.     This risk is exacerbated by Maine's scarcity of prescribers with a scarcity of time to devote to each child.  In December 2018, the PCG report concluded that "there is a severe shortage of child and adolescent psychiatrists in Maine."  As such, Maine foster children are often prescribed psychotropic medications by others, such as pediatricians or nurse practitioners.

271.     In the absence of an effective informed consent process, OCFS has failed to institute any other procedures to ensure that informed consent is obtained for the administration of psychotropic medications to children in custody.

272.     Further, DHHS and OCFS's policies and practices further fail to ensure that the adult providing informed consent is appropriately positioned to exercise informed, objective judgment in the best interest of the child.

273.     For instance, although the antipsychotic informed consent policy requires that the treating provider must be given a full description of the circumstances of the child that follows a Casework Review prior to any medication administration, caseworkers who could have access to this information routinely do not attend these medication administration appointments, *supra* ¶¶ 263-64, and foster parents routinely do not receive vital information about their child's health and medication history and adverse reactions, *supra* ¶¶ 236-52.  Further, Maine's antipsychotic policy does not provide for the involvement of biological parents, guardians ad litem, court-appointed special advocates, or other appropriate adults in the informed consent process, and it does not set forth a process for resolving disagreements regarding whether the child should receive psychotropic medications.  DHHS and OCFS fail to provide foster children with a sufficient process for obtaining initial and ongoing informed consent, including adequate notice and a

meaningful opportunity to be heard prior to and throughout the time that children in foster care are administered psychotropic medications.

### F. Defendants Fail to Operate a Monitoring and Oversight System That Promptly Flags Outlier Prescriptions and Subjects Them to Secondary Review.

274.   Absent access to comprehensive medical records and effective informed consent, procedures to ensure that outlier prescription practices are timely identified and subjected to secondary review are particularly critical. The 2015 AACAP recommendations, as well as guidance from ACF and professional organizations, call for collaboration between child welfare agencies, Medicaid agencies, and mental health agencies to effectively monitor the safe administration of psychotropic medication to children in foster care.  In particular, AACAP calls for the systemic capacity to identify "red flag criteria triggering external reviews," and for "[m]andatory consultations with an identified child and adolescent reviewer" in response to identified red flags.  ACF guidance similarly calls for systems designed to flag outlier prescriptions, including "instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age:  too many, and too much, too young."

275.   OCFS currently fails to operate a monitoring and oversight system that adequately flags outlier prescriptions of psychotropic medications to children in its custody and subjects these prescriptions to a secondary review.

276.   A sizeable number of states, including several New England states, have established and published red flag criteria which trigger mandatory secondary reviews of designated outlier prescriptions.  Maine has not developed such red flag criteria, thereby failing to meet the minimal standard of care in the field.

277.     Additionally, Maine has failed to implement a secondary review system that utilizes child psychiatrists to undertake the secondary reviews.  In its "Practice Parameters for the Assessment and Management of Youth Involved with the Child Welfare System," AACAP stresses the unique, "important role" child and adolescent psychiatrists play in psychotropic medication oversight.   The use of child psychiatrists is vital, as they possess the requisite training and experience to conduct meaningful secondary reviews.  Oftentimes, the initial prescription to be subjected to a secondary review was written by a pediatrician or nurse practitioner who does not possess sufficient knowledge to assure safe practice vis-à-vis psychotropic medications for youth in foster care.  AACAP specifically instructs child welfare agencies to "establish[] programs administered by child psychiatrists to oversee and evaluate the use of medications for youth in state custody at the individual youth and population levels."

278.     Furthermore, in December 2020, DHHS and OCFS identified the elimination of "a group of staff dedicated to children's behavioral health quality assurance" as a "significant barrier to the goal of increasing the use of evidence-based models and evidence-informed interventions," and acknowledged that there is now "limited monitoring of the quality of [behavioral health] services delivered or their fidelity to evidence-based models."

279.     Defendants' failure to institute a comprehensive secondary review system places foster children at risk of remaining on inappropriate psychotropic medication regimens for months, or even years, without a proper review by a qualified medical professional.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: VIOLATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

**(Asserted on behalf of all Named Plaintiffs and the putative class
and against all Defendants)**

280.    Paragraphs 1 to 279 above are repeated and re-alleged as if fully set forth herein.

281.    A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from an unreasonable risk of harm once it takes that child into its foster care custody.

282.    The foregoing policies and practices of Defendants, in their official capacities, constitute a failure to meet their affirmative duty to protect the Named Plaintiffs and the Class from an unreasonable risk of harm.  These failures are a substantial factor leading to, and proximate cause of, the ongoing violation of the class members' constitutionally-protected fundamental liberty interests conferred upon them by the Fourteenth Amendment to the United States Constitution.

283.    Defendants are well aware of the policies and practices that constitute a failure to protect the Class from an unreasonable risk of harm.

284.    The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that are contrary to law and are substantial departures from any accepted professional judgment such that they are outside of that judgment.  Defendants' actions and inactions are also in deliberate indifference to their awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists for Named Plaintiffs and the Class.  As a result of Defendants' actions and inactions, Named Plaintiffs and the Class have been harmed or are at continuing and imminent risk of serious harm, and have been

deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

285.    These substantive due process rights include, but are not limited to: the right to protection from harm or unreasonable risk of harm while in state foster care custody; the right to necessary treatment, care, and services to protect class members from deteriorating or being harmed physically, psychologically, developmentally, or otherwise while in state foster care; and the right to adequate supervision and monitoring of class members' health and safety.

## SECOND CAUSE OF ACTION: VIOLATION OF PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

### (Asserted on behalf of all Named Plaintiffs and the putative class and against all Defendants)

286.    Paragraphs 1 to 279 above are repeated and re-alleged as if fully set forth herein.

287.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits Defendants from depriving any person of life, liberty, or property without due process of law.

288.    Foster children have a substantial liberty interest, protected by the Due Process Clause, in being free from the unnecessary administration of medical treatment, including the unnecessary administration of psychotropic medication.

289.    Defendants have a compelling interest in the protection of minor children.

290.    The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that deprive the Plaintiff Children and class members of this liberty interest without due process of law.

291.    Defendants' actions and inactions have interfered with the Named Plaintiffs and class members' liberty interest.

292.    Defendants' actions and inactions subject the Named Plaintiffs and class members to the unnecessary administration of psychotropic medication without having sufficient procedures for ensuring that these medications are appropriately administered to the Named Plaintiffs and the Class.

293.    Defendants' actions and inactions fail to provide the Named Plaintiffs and the Class a sufficient process for informed consent, including adequate notice and a meaningful opportunity to be heard, prior to and throughout the time that children in foster care are administered any psychotropic medications.

### THIRD CAUSE OF ACTION: VIOLATION OF PLAINTIFFS' RIGHTS UNDER THE FEDERAL ADOPTION ASSISTANCE AND CHILD WELFARE ACT ("AACWA"), 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*

**(Asserted on behalf of all Named Plaintiffs and the putative class
and against all Defendants)**

294.    Paragraphs 1 to 279 above are repeated and re-alleged as if fully set forth herein.

295.    The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that violate the statutory rights of the Plaintiff Children and class members under the federal statute AACWA, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*, and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357.

296.    These rights include, but are not limited to, the rights of the Plaintiff Children and class members to:  (a) have their own individualized "written" case plan "for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to . . . address the needs of the child while in foster care" that contain, inter alia, the health records of the child, which must "includ[e] the most recent information available regarding" the names and addresses of the child's health providers, a record of the child's immunizations, the

child's known medical problems, the child's medications, and any other relevant health information concerning the child determined to be appropriate by the State agency; and (b) have his or health records reviewed, updated, and supplied to the foster parent or foster care providers with whom the child is placed before or at the time of placement. 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1), 675(5).

297.    These rights created by AACWA are clearly and expressly intended to benefit the Plaintiff Children and class members, the rights are specific and concrete requirements that are neither vague nor amorphous such to strain judicial competence, and the statutory provisions noted above impose a mandatory, binding obligation on the states to fulfill these requirements.

## VII. PRAYER FOR RELIEF

298.    WHEREFORE, the Named Plaintiffs, on behalf of the putative Class they represent, respectfully request that this Court exercise its legal and equitable powers and award class-wide relief as follows:

a.   Assert subject matter jurisdiction over this action;

b.   Order that this action be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2);

c.   Declare pursuant to Federal Rule of Civil Procedure 57 that:

i.   Defendants' failure to maintain a minimally adequate oversight system in relation to the administration of psychotropic medications to the Class of children in DHHS foster care custody violates Plaintiffs' substantive due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be protected from serious harm or the substantial risk of serious harm while in state custody; and

ii.  Defendants' failure to institute procedures to ensure that psychotropic medications are being appropriately given to the Named Plaintiffs and the Class violates Plaintiffs' procedural due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from the unnecessary and inappropriate administration of psychotropic medication; and

iii.  Defendants' failure to (1) maintain complete and updated medical records, including, but not limited to, medication history and any history of adverse reactions and side effects, in the case plans of each child in the Class of children in DHHS foster care custody and (2) deliver such medical records to Plaintiffs' foster caretakers upon placement violates Plaintiffs' statutory rights under the Adoption Assistance and Child Welfare Act to: (a) a written case plan that contains, *inter alia*, the health records of the child, including the child's most recent health information available regarding the names and addresses of the child's health providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information concerning the child determined to be appropriate by the State agency; and (b) to have his or her health records reviewed, updated, and supplied to foster care providers with whom the child is placed before or at the time of placement.

d.  Permanently enjoin Defendants from subjecting the Class of children in DHHS custody to policies and practices that violate Plaintiffs' constitutional and statutory rights as set forth in subparagraph (c) above as follows:

i.   Medical Records: Order Defendants to: (1) implement and maintain a comprehensive and updated electronic healthcare record for all children in DHHS foster care custody; and (2) deliver to each child's foster caretaker upon placement of the child in the caretaker's home or licensed facility a complete medical history for the child including, but not limited to, the child's prescription medication history and any history of adverse reactions and side effects; and

ii.   Informed Consent Policy: Order Defendants to: (1) promulgate a clear, unambiguous and effective informed consent policy that extends to all psychotropic medications; (2) develop, maintain, and review a system of records that facilitates the tracking of aggregate compliance with the above informed consent policy; and (3) develop and implement a mandatory training program for all social workers and foster caretakers regarding the safe administration of psychotropic medications to children and compliance with DHHS policy in relation to these medications; and

iii.   Secondary Review System: Order Defendants to develop and implement a secondary review system that (1) establishes and tracks "red flag" criteria designating outlier or elevated risk prescription practices in relation to the administration of one or more psychotropic or antipsychotic medications to children in DHHS foster care custody; and (2) requires secondary review by a qualified child psychiatrist of all "red flag" prescription regimens to children in DHHS foster care custody and a feedback mechanism to the prescribing doctor and the adult authorized to provide informed consent on

behalf of the child regarding the findings of the secondary review and any

need for revision of the prescription;

e.  Award to Plaintiffs the reasonable costs and expenses incurred in the prosecution

of this action, including reasonable attorneys' fees pursuant to 28 U.S.C. § 1920

and 42 U.S.C. § 1988 and Federal Rules of Civil Procedure 23(e) and 23(h); and

f.  Grant such further equitable relief as the Court deems just, necessary, and proper

to abate the ongoing risk of harm and protect Plaintiffs from further harm while in

Defendants' custody and care.


DATED:  March 19, 2021

Respectfully Submitted,

BERNSTEIN, SHUR, SAWYER & NELSON, P.A.

/s/ *John A. Woodcock III*
John A. Woodcock III
Eben M. Albert
100 Middle Street
PO Box 9729
Portland, ME 04101
(207) 774-1200
(207) 774-1127 (fax)
jwoodcock@bernsteinshur.com
ealbert@bernsteinshur.com


CHILDREN'S RIGHTS

/s/ *Marissa C. Nardi*
Marissa C. Nardi (*pro hac vice* pending)
Samantha Bartosz (*pro hac vice* pending)
Stephen Dixon (*pro hac vice* pending)
Jonathan King (*pro hac vice* pending)
Madeleine M. Kinney (*pro hac vice* pending)
Claire R. Glasspiegel (*pro hac vice* pending)
88 Pine Street, Suite 800
New York, New York 10005

(212) 683-2210
(212) 683-4015 (fax)
mnardi@childrensrights.org
sbartosz@childrensrights.org
sdixon@childrensrights.org
jking@childrensrights.org
mkinney@childrensrights.org
cglasspiegel@childrensrights.org


MAINE EQUAL JUSTICE

Frank D'Alessandro
126 Sewall Street
Augusta, ME 04330
(207) 626-7058
(207) 621-8148 (fax)
frank@mejp.org

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2021, I electronically filed the foregoing with the Clerk of the

Court by using the CM/ECF system, which will send a notice of electronic filing to counsel for

all Defendants.

<u>/s/ John A. Woodcock III</u>

Attorney for Plaintiffs