## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| BRYAN C. and HENRY B. through their next friend Michael P. Dixon, et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) ) | Civil No. 1:21-cv-00005-NT |
| JEANNE M. LAMBREW in her official capacity as Commissioner of the Maine Department of Health and Human Services, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
## WITH INCORPORATED MEMORANDUM OF LAW

Defendants Jeanne M. Lambrew and Todd A. Landry move to dismiss Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Maine's foster care system is extremely complex, and its administration is one of several critical responsibilities entrusted to the Maine Department of Health and Human Services ("DHHS").  DHHS continues to invest considerable resources in improving its foster care policies and practices, while at the same time providing critical services to children in its custody under the watchful eye of the Maine District Court.

Plaintiffs ask this Court to sidestep both DHHS and Maine's courts, and to instead superintend broad swaths of Maine's foster care system.  They seek an order that both directs DHHS to change its policies and weighs in on the degree to which DHHS is adhering to them.

Plaintiffs' allegations warrant DHHS's prompt attention.  But a federal court is not the right forum, nor is the Constitution the proper lens, for addressing them.  Plaintiffs' First Amended Complaint should accordingly be dismissed.

## MEMORANDUM OF LAW

### I.  Background

####   A.  Current OCFS Practice and Policy

Maine's foster care system is administered by DHHS's Office of Child and Family Services ("OCFS").  As of December 2020, more than 2,000 children were in foster care in Maine.  First Am. Compl. ("FAC") (ECF No. 22) ¶ 161.[1]  A child enters foster care by judicial order as part of a child protective proceeding in Maine District Court.  *See generally* 22 M.R.S. §§ 4031-4039. The court both initially orders DHHS to take custody and meaningfully reviews the case— including the care being provided to the child—at hearings held no less than once every six months. *Id.* §§ 4036(1)(F); 4038(1).  In conducting such reviews, the court has broad authority to hear evidence, make findings, and order relief.  *See generally id.* §§ 4034(2), (4); 4035(3); 4036(1)(A)- (H); 4038(6); 4071(4); *see also* Maine Rules for Guardians Ad Litem ("M.R.G.A.L.") 4(c)(3), (6)- (7), (9); *In re Daniel T.*, 544 A.2d 1302, 1304 (Me. 1988) (describing § 4036(1)(H) as "a legislative recognition that the lawmakers could not foresee every eventuality" such that they "assigned [the district court] discretion to devise a protection order that would best fulfill the statutory purposes").

The Maine District Court also assigns each child a guardian ad litem ("GAL"), whose responsibility as an agent of the court is, *inter alia*, to regularly provide reports and "act in pursuit of the best interests of the child" in the child protective proceeding.  22 M.R.S. § 4005(1). Specifically, "[t]he guardian ad litem shall report to the court and all parties in writing at 6-month intervals, or as is otherwise ordered by the court, regarding the guardian ad litem's activities on behalf of the child and recommendations concerning the manner in which the court should proceed

---

[1]  The well-pleaded facts in Plaintiffs' First Amended Complaint are taken as true solely for purposes of this Motion. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018).

in the best interest of the child." 22 M.R.S. § 4005(1)(B).  The GAL may also move for judicial review by the court at any time and for any reason.  *See* 22 M.R.S. § 4038(2).

Consistent with its responsibilities under state law, and to ensure that Maine remains eligible for federal funding, OCFS has promulgated several policies governing the care of foster children in DHHS custody.  These policies are based on OCFS's own expertise, state and federal statutory requirements, recommendations from the U.S. Department of Health and Human Services' Administration for Children and Families, and best practices developed by professional organizations in the field.  *See, e.g.,* FAC ¶¶ 204-05, 236.

    1.  Antipsychotic Medications[2]

OCFS Policy IV-A(C) (Use of Antipsychotic Medications for Youth in Foster Care)[3] governs the administration of antipsychotic medications to children in foster care.  The policy provides that antipsychotic medications may only be authorized in the context of a case plan based on consideration of the impact on the child, relevant evaluations, medical reports, and therapists' progress reports.  Policy IV-A(C)(2).  Additionally, antipsychotic medications may only be used when "clinically indicated," i.e., when "the likely benefit from their use would outweigh their very

---

[2] While Plaintiffs are correct that OCFS Policy IV-A on its face covers antipsychotic medications specifically, rather than psychotropic medications generally, *see* FAC ¶¶ 258-60, Plaintiffs have not alleged that Policy IV-A is so-limited in practice.  OCFS publications, in fact, indicate the opposite.  *See* OCFS Annual Progress and Service Report FFY 2021 at 233-34 (indicating that "[p]olicy states that it is crucial to ensure that psychotropic medications are being used only when clinically indicated," and directing that the "OCFS Consent Worksheet is to be followed when psychotropic medications are currently prescribed or when they are being considered"), available at https://www.maine.gov/dhhs/ocfs/documents/State%20of%20Maine%20FFY%202021%20APSR_FINAL.docx Office of Child and Family Services, State of Maine, 2020-2024 Child & Family Services Plan 215 (same), available at https://www.maine.gov/dhhs/ocfs/documents/Maine%20OCFS%202020-2024%20CFSP%20-%20%20091219.docx.

[3] "Under certain narrow exceptions, some extrinsic documents may be considered without converting a motion to dismiss into a motion for summary judgment . . . . These exceptions include documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; [and] . . . documents sufficiently referred to in the complaint."  *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013) (cleaned up).  OCFS policies fall under the purview of these exceptions, and OCFS Policy IV-A(C) is available online at: https://www.maine.gov/dhhs/ocfs/cw/policy/iv-a_-c_-use-of-antipsychotic-.html.

substantial risk," and with proper monitoring and disclosure of potential side effects.  Policy IV-A(C)(4) & App'x A.  They likewise cannot be administered prior to a caseworker completing a "Casework Review" and sharing the results with the prescriber.  Policy IV-A(5).

OCFS Policy IV-A(C) also provides that foster children have the right to participate in, review, and refuse antipsychotic treatment unless mandated by law or court order.  Specifically, the policy prohibits, except in an emergency, the administration of antipsychotic medications absent consent of the caretaker, the prescriber, and the child if he or she is at least 14 years old.  Policy IV-A(C)(5) & App'x A.  For foster children under age 14, OCFS policy dictates that they "should assent" to the administration of medication.  Policy IV-A(C) App'x A.  To support the provision of informed consent or assent, OCFS policy contains a Child Welfare Consent Worksheet, which sets forth a series of steps and issues for consideration prior to the administration of antipsychotic medications.  Policy IV-A(C)(4) & App'x A.  A caseworker is likewise required to provide and review the Youth Guide, *Making a Choice*, with any child who may be prescribed antipsychotic medications, and to be present at the first appointment with the prescriber.  Policy IV-A(5) & App'x B.

Once an antipsychotic is prescribed, OCFS staff from both Child Welfare and Children's Behavioral Health must regularly review its administration.  Policy IV-A(C)(6).  OCFS policy also sets forth specific considerations for continuing the use of antipsychotic medications, including an assessment of risks and benefits, and requires caseworker attendance at appointments with the prescribing provider at least once every three months.  Policy IV-A(C)(5), (7).

The comprehensive nature of these requirements notwithstanding, Policy IV-A(C) does not reflect the full measure of OCFS's concern regarding psychotropic medication use in the foster care setting.  OCFS has vigorously sought to improve its process for administering and monitoring psychotropic medications, as set forth in the OCFS Annual Progress and Service Report FFY 2021

4

("2021 Progress Report").[4]  In addition to a series of changes designed to address deficiencies identified in a 2017 child and family services review,[5] in Spring 2018 OCFS began implementing a strategic plan aimed at reducing the prevalence of the prescription of psychotropic medication to foster children.  2021 Progress Report at 231.  That plan (1) requires quarterly reviews of all youth on psychotropic medications by caseworkers and supervisors; (2) reaffirms the need for quarterly attendance by caseworkers at medication appointments with children and their caregivers (as required by OCFS Policy IV-A); and (3) directs consultation with Children's Behavioral Health Services staff regarding medication questions or concerns.  *Id*.  Implementation of the plan has resulted in a reduction in the percentage of Maine foster children who have been prescribed at least one psychotropic medication from 24% in 2016 to 20.3% as of Q4 2019.  *Id.*; *see also* FAC ¶ 161 (noting reduction to 20.8% as of November 2019).

Further, in the same report, OCFS identified the oversight of psychotropic medication use as a priority in its health care plan.  2021 Progress Report at 233.  OCFS emphasized how it is "crucial to ensure that psychotropic medications are used only when clinically indicated," and that side effects are monitored.  *Id*.  To this end, OCFS utilizes (1) the aforementioned Child Welfare Consent Worksheet; (2) the aforementioned Youth Guide, which promotes ongoing communication between the prescriber, child, caregivers, and other stakeholders; and (3) an associated protocol for the prescription of psychotropic medication.  *See id*. at 233-34.  OCFS has also separately developed a checklist for the review of the administration of psychotropic

---

[4]  Available at:
https://www.maine.gov/dhhs/ocfs/documents/State%20of%20Maine%20FFY%202021%20APSR_FINAL.docx.

[5]  A 2019 DHHS report, for example, set forth a performance improvement plan that included more consistent utilization of Family and Child Plans; a statewide quality improvement process; and implementation of Structured Decision Making tools.  *See* Maine Department of Health and Human Services, Office of Child and Family Services, "2019 Annual Progress & Services Report" (June 2018), available at https://www.maine.gov/dhhs/ocfs/documents/Maine-Annual-Progress-Services-Report-2018.docx.

medications for youth in foster care.  *See* Office of Child and Family Services, State of Maine, 2020-2024 Child & Family Services Plan ("2020-2024 Services Plan") 131.[6]

> 2. Health Records

The health records of children in foster care are governed by OCFS Policy V(I-2) (Health Records).[7]  Consistent with federal and state statutes, the policy requires that child and family health histories be documented and maintained.  Upon entering DHHS custody, a caseworker must gather a snapshot of the child's health history—serious medical conditions, allergies, medications, immunizations, and the like—and provide that snapshot to the foster parent or other caretaker at the time of placement or to the caseworker responsible for placement.  Policy V(I-2).  Any information not provided as part of this initial report must be gathered and provided soon thereafter, and no later than sixty days after the child enters DHHS custody.  *Id*.  To facilitate the collection of this information, OCFS now requires that incoming foster children be assigned a primary care provider and receive a screening during which essential elements of each child's health history and immediate needs are documented according to a medical home and/or behavioral health home model.[8]  2021 Progress Report at 231-32.  The child's caseworker is likewise required to update the health record anytime there is a change in placement and at least every six months while the child is in DHHS custody.  Policy V(I-2).

OCFS Policy V(I-2) also requires the creation and maintenance of a "portable health record."  This record provides a "concise" health history, including an ongoing record of care

---

[6] Available at: https://www.maine.gov/dhhs/ocfs/documents/Maine%20OCFS%202020-2024%20CFSP%20-%20%20091219.docx.

[7] OCFS Policy V(I-2) is available at: https://www.maine.gov/dhhs/ocfs/cw/policy/v_-i-2_-health-records.html.

[8] A medical home is "a philosophy of health care delivery that encourages providers and care teams to meet patients where they are."  *See* "Defining the Medical Home," Primary Care Collaborative, pcpcc.org/about/medical-home (last accessed Mar. 6, 2021).  It is patient-centered, comprehensive, and coordinated across all elements of the health care system.  *Id*.

sought and received by foster children while in DHHS custody.  *Id*.  The caseworker who places the child is required to create the portable health record and provide it to the foster parent or other person responsible for the child at the time of placement.  *Id*.  Unlike the OCFS health record, however, the portable health record is updated by the foster parent or person responsible for the child.  *Id*.  If the child is moved to another foster parent or provider, the portable record must be returned to the caseworker for review and updating.  *Id*.

OCFS is working to establish a system-wide electronic health record system.  Currently, OCFS has electronic access to immunization histories, as well as access to electronic health records where the provider maintains records in that fashion.  2021 Progress Report at 233.  Nonetheless, OCFS has partnered with MaineCare to create a replacement system that enables full electronic health records access for *all* youth in DHHS custody.  *Id*. at 233.

**B.  Plaintiffs' Lawsuit**

On January 6, 2021, Plaintiffs—six foster children in the custody of DHHS, each represented in this action by their state court GALs as "next friend[s]"—filed this putative class action under 42 U.S.C. § 1983 alleging gaps in how psychotropic medications have been administered to foster children in DHHS's care.  *See* Compl. (ECF No. 1).  On March 19, 2021, Plaintiffs filed their First Amended Complaint[9] as a matter of course.  Fed. R. Civ. P. 15(a)(1) (ECF No. 22).  In particular, Plaintiffs allege four inadequacies in the current system:

> (1) failure to maintain complete and readily accessible medical records, and to provide them promptly to foster caregivers and prescribing physicians;

---

[9]  Hereinafter, references to the "complaint" are to Plaintiffs' First Amended Complaint.

(2) failure to maintain and enforce an informed consent process that ensures psychotropic medications are only administered after notice and an opportunity to be heard, or when necessary and appropriate;

(3) failure to maintain and operate a system of secondary review for the administration of psychotropic medications; and

(4) failure to periodically review or reconsider the administration of psychotropic medications.

*See* FAC ¶¶ 5, 170.

In support of these contentions, Plaintiffs' complaint relies heavily on a 2018 report of the Department of Justice's Office of the Inspector General entitled "Treatment Planning and Medication Monitoring Were Lacking for Children in Foster Care Receiving Psychotropic Medication" (the "2018 OIG Report"). *See, e.g., id.* ¶¶ 223-234.[10] Defendants do not contest that the 2018 OIG Report identified deficiencies in Maine's foster care system, together with issues in four other states. But that report was issued in September 2018, and it is based on data from 2014 and 2015. *See* 2018 OIG Report at 5 (identifying "review period" as "October 1, 2014, through March 31, 2015").[11] Maine has since made substantial progress addressing the concerns noted therein. *See generally* 2020-2024 Services Plan 131, 136, 211-13; 2021 Progress Report 230-35. Further, many of Plaintiffs' allegations stemming from the 2018 OIG report do not involve problems with DHHS policy, but rather are purported gaps in the implementation of those policies,

---

[10]  Given the report governs five states—not just Maine—aspects of the report quoted in the complaint are at times not Maine-specific. *Compare, e.g.,* FAC ¶ 230 *with* 2018 OIG Report 12, available at https://oig.hhs.gov/oei/reports/oei-07-15-00380.pdf.

[11]  Plaintiffs also rely on similarly outdated criticisms of DHHS. *See, e.g.,* FAC ¶ 250 (citing 2015 Annual Report).

*see e.g.*, FAC ¶¶ 247-48, and structural obstacles stemming from Maine's limited pool of behavioral health practitioners, *see id*. ¶¶ 222, 270.

Plaintiffs allege that each Named Plaintiff has been administered psychotropic medications, and that each allegedly suffered harm from the administration of these medications. Plaintiffs also contend that their medical histories have been insufficiently maintained and are not readily available, and that the informed consent process has been inadequate, either because full information has not been provided to the individual providing consent, or because no individual who was able to consent was present at all. *See generally* FAC.

As to the putative class, Plaintiffs contend that "hundreds" of those in foster care in Maine are at risk because they have been prescribed psychotropic medications. *Id*. ¶ 6. They define the class as all children who are or will be in DHHS custody and "who are or will be prescribed or administered one or more psychotropic medication[s] while in state care." *Id*. ¶ 160. Based on the number of children currently in foster care, and Defendant Landry's estimate in November 2019 that 20.8% of children in Maine foster care are administered a psychotropic medication, Plaintiffs contend that the size of the class is nearly 500 children. *Id*. ¶ 161.

Based on these allegations, Plaintiffs claim that DHHS has violated the Named Plaintiffs'—and class members'—substantive and procedural due process rights, and that it has failed to comply with the Federal Adoption Assistance and Child Welfare Act ("AACWA"). *Id*. ¶¶ 280-97. They seek declaratory and injunctive relief.

## Applicable Legal Standards

A motion to dismiss under Rule 12(b)(1) tests whether the Court has subject-matter jurisdiction over the claims asserted in a complaint. It is Plaintiffs' burden to clearly allege facts demonstrating that they may invoke federal jurisdiction. *Marcello v. Maine*, 464 F. Supp. 2d 38, 41 (D. Me. 2006). In deciding a motion brought under Rule 12(b)(1), the Court is not confined to

the pleadings, and may consider other reliable materials in the record that "illuminate[ ], supplement[ ], or even contradict[ ] . . . other materials in the … record." *See Aguilar v. U.S. Imm. & Customs Enf. Div. of Dept. of Homeland Sec.*, 510 F.3d 1, 8 (1st Cir. 2007).

A motion to dismiss brought under Rule 12(b)(6) concerns the legal sufficiency of a complaint.  When adjudicating such a motion, the Court "take[s] the complaint's well-pleaded facts as true" and "draw[s] all reasonable inferences in the plaintiffs' favor." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018).  Although a complaint need not contain detailed factual allegations to pass muster, the Plaintiffs must make "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . .  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)); *see also Barchock*, 886 F.3d at 48 ("Well-pleaded facts must be 'non-conclusory' and 'non-speculative.'" (cleaned up)).  The Court may consider not only the allegations in the complaint, but also documents referred to or attached to the complaint, documents integral to the complaint, and any relevant matter that can be judicially noticed, such as public records.  *See Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008); *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

## II.  Argument

### A.  The Court Should Abstain from Superintending Maine's Complex Foster Care System Under *Younger v. Harris*.

In service of bedrock principles of "comity and federalism," the *Younger* doctrine requires a federal court to abstain from exercising jurisdiction when the relief sought would (1) interfere with an ongoing state judicial proceeding that (2) "implicate[s] important state interests" and

10

(3) provides an adequate opportunity for the presentation of federal and constitutional claims. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 436 (1982); *see also O'Shea v. Littleton*, 414 U.S. 488, 500 (1974); *Rossi v. Gemma*, 489 F.3d 26, 34-35 (1st Cir. 2007). *Younger* represents a "longstanding public policy against federal court interference with state court proceedings." *Younger v. Harris*, 401 U.S. 37, 43 (1971); *see also Sprint Comms. v. Jacobs*, 571 U.S. 69, 73 (2013) (describing *Younger* as extending to "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions" (cleaned up)).

Federal courts have repeatedly held that state child welfare proceedings are "ongoing state proceedings" for purposes of *Younger* abstention. *31 Foster Children v. Bush*, 329 F.3d 1255, 1275 (11th Cir. 2003); *see also J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999) (holding that "the continuing jurisdiction of the [juvenile] court to modify a child's disposition . . . coupled with the mandatory six-month periodic review hearings . . . constitutes an ongoing state judicial proceeding"); *Carson P. v. Heineman*, 240 F.R.D. 456, 523 (D. Neb. 2007) (juvenile court's continuing jurisdiction over placement, including review every six months, constitutes ongoing judicial proceeding). The Maine District Court retains jurisdiction over the child protection cases of each of the Named Plaintiffs, and it reviews those cases at least once every six months. *See, e.g.,* 22 M.R.S. § 4038(1). There are thus pending, active cases in state court involving each of the Named Plaintiffs.[12]

That said, no specific state proceeding is necessary to trigger *Younger* abstention. The Supreme Court made clear in *O'Shea v. Littleton*, 414 U.S. 488 (1974), that *Younger* forbids

---

[12] In fact, the Maine District Court recently issued orders in each of these cases. *See* Exs. A-F. The Court may take judicial notice of these court records. *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

injunctions that would lead to "an ongoing federal audit of state . . . proceedings which would indirectly accomplish the type of interference that *Younger* . . . and related cases sought to prevent." 414 U.S. at 500.  It reinforced that concept in in *Rizzo v. Goode*, 423 U.S. 362 (1976), wherein the Court described the "well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," and that "federal courts must constantly be mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."  *Id*. at 378-79 (cleaned up).

Plaintiffs seek precisely the sort of "unwarranted anticipatory interference" that *Younger* prohibits.  *O'Shea*, 414 U.S. at 500; *see Rossi*, 489 F.3d at 35 (recognizing interference as a "threshold issue" for *Younger* abstention).  Specifically, Plaintiffs seek a broad injunction requiring, among other things, that the State: (1) implement comprehensive and updated electronic health records for all foster children; (2) develop a new informed consent policy, together with a supportive review and training program; and (3) adopt a psychotropic medication "secondary review system" involving red flag criteria and a child psychiatrist.  *See* FAC ¶ 298.

The scope of Plaintiffs' demand is problematic on its face.  As the Supreme Court recognized in the context of another jurisdiction's child welfare system, "[t]he breadth of a challenge to a complex state statutory scheme has traditionally militated in *favor* of abstention . . . reflect[ing] . . . sensitivity to the primacy of the State in the interpretation of its own laws . . . [in] an integrated statutory framework."  *Moore v. Sims*, 442 U.S. 415, 427 (1979)).  OCFS Policies IV-A(C) and V(I-2) address the precise issues that Plaintiffs have identified, and they form part of OCFS's broader approach to caring for children in DHHS custody.  Whether, consistent with these policies, DHHS is adequately keeping records, obtaining consents, or reviewing psychotropic medication administration are questions that are entrusted to the Maine District Court.  *See* 22 M.R.S. §§ 4036(1)(H), 4038; *cf*. M.R.G.A.L. 4(c)(3), (6)-(7), (9).

12

At bottom, the changes that Plaintiffs demand this Court order OCFS to make to its policies, and the judicial supervision inherent in enforcing such an injunction, necessarily "cannot be accomplished without substantial interference in affairs otherwise left to the state courts." *Laurie Q. v. Contra Costa Cty.*, 304 F. Supp. 2d 1185, 1206 (N.D. Cal. 2004). An injunction would intrude on the Maine District Court's authority to determine whether the administration of particular medications, or the nature of the consents that OCFS obtains, are consistent with the dictates of state and federal law and in the best interests of the child. Abstention is accordingly appropriate. *See 31 Foster Children*, 329 F.3d at 1278-79 (abstaining where plaintiffs sought "relief that would interfere . . . by placing decisions that are now in the hands of the state courts under the direction of the federal district court," e.g., an "amendment to a child's case plan that the state [may] not have approved"); *J.B.*, 186 F.3d at 1292 (abstaining where injunction would give federal control over decisions vested in the juvenile court, e.g., "whether to modify a treatment plan"); *Carson P.*, 240 F.R.D. at 525-29 (abstaining where injunction would infringe on authority of juvenile courts over "the supervision of the children while in HHS custody" and "the types of medical . . . and behavioral treatment a child may need").

The substantial interference intrinsic to Plaintiffs' prayer for relief also necessarily "implicate[s] important state interests." *Middlesex*, 457 U.S. at 432. The State has a historical and compelling interest in ensuring the proper care of its own children, particularly those in foster care. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 766 (1982) ("[T]he State has an urgent interest in the welfare of the child . . . . As *parens patriae*, the State's goal is to provide the child with a permanent home." (cleaned up)); *Moore*, 442 U.S. at 435 ("Family relations are a traditional area of state concern."). That interest is especially strong here, given OCFS's demonstrated attention to keeping its policies apace of the broader statutory and regulatory framework, the 2018 OIG Report, and Maine's other priorities. *See* 2021 Progress Report at 233-34; *Carson P.*, 240 F.R.D. at 524

(state's interest "evidenced by its current and ongoing welfare reform efforts" in foster care system); *cf. Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 56-57 (1st Cir. 2014) (noting that state may exercise "professional judgment in ordering improvements over time, or in deciding which deficiencies to address first").

Finally, the pending proceedings in Maine District Court "afford an adequate opportunity" for Plaintiffs "to raise the[ir] constitutional claims" and federal statutory claims, further supporting abstention. *Middlesex*, 457 U.S. at 432; *see Moore*, 442 U.S. at 430.[13]  Consistent with their obligation to report to the court and advocate for the best interests of the children for whom they are appointed, Plaintiffs' GALs can raise the issues they identified in their complaint in Maine District Court. *See* 22 M.R.S. § 4005(1); *see also* 4 M.R.S. § 1556(2)(E)-(F), (H).  Indeed, a GAL is specifically empowered to make recommendations and "advocate for appropriate services," including "[m]edical and mental health care," M.R.G.A.L. 1(b)(7), 4(c)(6)-(7); *accord id.* 4(c)(3). The GAL can likewise seek judicial review at will.  22 M.R.S. § 4038(2).  The Maine District Court, in turn, can review evidence, take testimony, and order appropriate relief.  *See id.* §§ 4036(1)(H), 4038(5)-(6); *see also* M.R.G.A.L. 4(c)(3), (6)-(7), (9).

Notably, while each of the next friends here alleges to have "observed Defendants' failure to oversee the administration of psychotropic drugs" to the Named Plaintiffs, FAC ¶¶ 152-54, they do not allege in their complaint that the issues identified in this lawsuit were ever brought to the attention of DHHS leadership or, as relevant here, raised in Maine District Court at all.  *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975) ("[A] necessary concomitant of *Younger* is that a party . . . must exhaust his state appellate remedies before seeking relief in the District Court . . . ."); *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 221 (1st Cir. 2004) (recognizing

---

[13]  It is Plaintiffs' burden to prove otherwise.  *J.B.*, 186 F.3d at 1292.

court's conclusion, in prior case, that failure to exhaust state judicial remedies in "ongoing" proceedings "mandated abstention").  Abstention is, accordingly, warranted here.  *Laurie Q. v. Contra Costa County*, 304 F. Supp. 2d 1185, 1203-04 (N.D. Cal. 2004) (juvenile court review of, and authority over, case plans supported abstention); *see also Allen v. McCurry*, 449 U.S. 90, 105 (1980) (noting confidence in state courts to adjudicate constitutional issues).

 *Younger*'s mandate may only be disregarded by the Court in "extraordinary circumstances," a tightly defined exception in which immediate federal relief is necessary to prevent irreparable harm.  *Moore*, 442 U.S. at 432-33.  Plaintiffs have not alleged such circumstances, and any such immediate need could—and should—be addressed in Maine District Court.  This Court should therefore abstain from exercising its jurisdiction over Plaintiffs' claims.

### B.  State Court Guardians Ad Litem Are Improper Plaintiffs in this Case.

 Under Fed. R. Civ. P. 17(c), a minor may sue in federal court only where, as relevant here, he or she does so through "a next friend or by a guardian ad litem."  The Named Plaintiffs are not suing through GALs appointed by this Court, however, but rather through GALs—designated "next friend[s]"—who were appointed by the Maine District Court overseeing each Named Plaintiff's corresponding child protective proceeding.  This is improper given the nature of Plaintiffs' lawsuit, such that dismissal is appropriate for lack of subject matter jurisdiction.

 "State law generally governs an individual's capacity to represent a minor . . . in federal court."  *Sam M. v. Carcieri*, 608 F.3d 77, 86 (1st Cir. 2010).  Maine's GALs are governed by statute, the Maine Rules for Guardians Ad Litem (the "GAL Rules"), and the orders appointing them.  In at least two ways, the duties of a Maine District Court GAL are incompatible with serving as a next friend in this lawsuit.

 *First*, under Maine law, a GAL "acts as the court's agent," 22 M.R.S. § 4005(1)(G); M.R.G.A.L. 1(b), and his or her responsibilities are limited to proceedings in that court,

M.R.G.A.L. 4(a)(4) ("An individual shall act in a case as a guardian ad litem only as authorized by . . . [a]n appointment order issued pursuant to . . . 22 M.R.S. § 4005.").[14]  The GAL "must tailor his or her work to the particular needs and circumstances of each case as identified in the court order appointing the [GAL]," M.R.G.A.L. 1(b), and "has no authority to perform and shall not be expected to perform any duties beyond those specified in the appointment order, unless subsequently ordered to do so by the court," M.R.G.A.L. 4(c).  Thus, when a state court GAL acts as a next friend in a federal court lawsuit against the State, he or she is acting (a) beyond his or her authority; and (b) against an entity to whom the GAL owes a duty.

*Second*, the GAL's primary function is to independently represent the best interests of the child subject to the child welfare proceeding.  22 M.R.S. § 4005(1)(B); M.R.G.A.L. 1(b)(1), 5(b).  Here, however, by acting as a next friend in this action, and especially given that the allegations in the complaint are based on the GALs' knowledge of the Named Plaintiffs, *see, e.g.,* FAC ¶¶ 43, 93, 117, 119, 123, 126, 141, 147, each GAL will be subject to discovery, *see generally* Fed. R. Civ. P. 23(b).  Each GAL may therefore be forced to disclose conversations or other information about the child even when it is not in the child's best interests to do so.  *Id.*

This conflict is evidenced by the GAL Rules, which forbid the release of confidential information outside the state-court child protective case "except as necessary to perform the [GAL's] duties."  M.R.G.A.L. 5(g).  The GAL Rules therefore require a GAL who "is a party to any case in court, other than in his or her capacity as a [GAL]," to immediately report that fact to the state district court and "request direction from the court as to . . . continued service as a [GAL]."  M.R.G.A.L. 5(i)(5).

---

[14]  A GAL may likewise be appointed by court order in certain other proceedings involving children when required or permitted by statute.  Such appointments are not at issue in this case.

The difficulty of Maine District Court GALs participating in this case while continuing to represent the best interests of the children for whom they were appointed is exacerbated by the case's putative class action posture.[15]   Representative parties are charged with "fairly and adequately protect[ing] the interests of the class." Fed. R. Civ. P. 23(a)(4). *Frost v. Weinberger*, 515 F.2d 57, 64 (2d Cir. 1975) (seeking "assurance[s] that the named plaintiff will vigorously represent the class"). But the interests of the class may conflict with the best interests of the Named Plaintiffs. They may, for example, require the disclosure of information, the advancement of arguments, or the continued prosecution of the case even when doing so is contrary to a particular Named Plaintiff's best interests. *See, e.g.,* M.R.G.A.L. 1(b)(4) (GAL must "[r]ecognize that timely resolution of each matter serves the best interest of the child"). A conflict of this type cannot be waived or consented to, and it should not be countenanced by the Court. *See* Br. of Amici Curiae the National Association of Counsel for Children, et al., *Sam M. v. Carcieri*, 2009 WL 6809239, at \*10 (Aug. 20, 2009) (explaining that given the "different role and . . . obligations" of "attorneys in dependency proceedings" and "Rule 17(c) representatives in class actions," "conflicts may arise that burden the rights of foster children").

The incompatibility of serving as both a state court GAL and next friend is also underscored by the very existence of this case. A GAL is obligated to "provide information to the court that assists the court in determining the best interest of the child," M.R.G.A.L. 1(b)(1), and is empowered to advocate for appropriate "medical and mental health care," M.R.G.A.L. 4(c)(6)-(7). While, as noted above, each next friend alleges knowledge of the issues identified in the complaint, *see, e.g.,* FAC ¶¶ 152-54, none has alleged that they ever even raised the issues identified here before the Maine District Court, whether as part of their regular six-month report, by motion for

---

[15] Defendants do not concede that class certification would be appropriate if the Court denies their motion to dismiss.

judicial review, or otherwise, *see* 22 M.R.S. §§ 4005(1); 4038(2). Yet the ongoing child protective proceedings would undoubtedly have offered a faster route to relief from the harms alleged in the complaint than this putative class action lawsuit. Indeed, even appeals from an order of the Maine District Court in a child welfare case are fast-tracked under Maine's appellate rules. *See* M.R. App. P. 7(b)(1).

Dismissal of the First Amended Complaint for lack of subject matter jurisdiction is therefore warranted.

### C. Plaintiffs' First Amended Complaint Fails on the Merits.

Plaintiffs' complaint takes "aspirational statutory, regulatory, and private standards as to a variety of topics within the overall complex of foster child care" and attempts to "convert each of them to constitutional requirements." *Connor B.*, 774 F.3d at 55. Plaintiffs have highlighted important aspects of Maine's foster care system that DHHS is actively addressing. Plaintiffs' concerns, however, do not implicate the Fourteenth Amendment. *See id.* at 48, 55 (affirming denial of relief where Plaintiffs failed to establish constitutional violations as to class of foster children).

> 1. Plaintiffs have not alleged facts that amount to a violation of their substantive due process rights.

An affirmative obligation to "provide for . . . basic human needs," including "safety and general well-being," arises under the Due Process clause when a state deprives an individual of the freedom to act on his own behalf. *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989). The First Circuit refers to this obligation as a "special relationship," and it has assumed, without deciding, that such a relationship exists between the state and children in foster care. *Connor B.*, 774 F.3d at 52-53; *see also J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010).

Courts have long recognized the need "to minimize undue 'interference by the federal judiciary with the internal operations of state institutions.'" *Connor B.*, 774 F.3d at 54 (quoting

*Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)).  Therefore, to defeat a motion to dismiss a substantive due process claim alleging a failure to provide basic human needs, Plaintiffs must allege facts that, taken as true, establish that: (1) Defendants deprived them of a cognizable constitutional right; (2) Defendants' policies and practices "shocked the conscience"; and (3) Defendants' conscious-shocking conduct caused the constitutional deprivation.  *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998); *accord Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017) (recognizing that deliberately indifferent behavior may suffice); *see also Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) ("[T]he shocks-the-conscience test . . . governs *all* substantive due process claims based on executive, as opposed to legislative, action.").

Demonstrating conscience-shocking conduct—conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847-48 n.8—is an exceedingly tall order.  *McConkie v. Nichols*, 446 F.3d 258, 260-62 (1st Cir. 2006); *see also Rivera v. Rhode Island*, 402 F.3d 27, 35 (1st Cir. 2005) (characterizing the standard as "onerous").  This is especially true in the child welfare context, where state action is treated as presumptively correct to permit child welfare agencies to operate despite the obstacles inherent to their work.  *Connor B.*, 774 F.3d at 55.  Demonstrating negligence is therefore insufficient: "The Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the states."  *Id.* at 54-55 (citing *Lewis*, 523 U.S. at 848-49 (cleaned up); *see also Hall v. Ramsey Cty.*, 801 F.3d 912, 918 (8th Cir. 2015) (explaining that "error in judgment and carelessness" does not violate substantive due process).

That said, there is "tension" in the case law between the "shocks the conscience" standard and the Supreme Court's indication in a prior case that "liability may be imposed" under the Due Process clause when there is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the

decision on such a judgment." *Connor B.*, 774 F.3d at 53-54 (quoting *Youngberg*, 457 U.S. at 323). Regardless of the exact test that applies, however, it is an exceptionally high bar in the foster care setting. *See Yvonne L. ex rel. Lewis v. New Mexico Dept. of Hum. Servs.*, 959 F.2d 883, 894 (10th Cir. 1992) ("As applied to a foster care setting we doubt there is much difference in the two standards. 'Failure to exercise professional judgment' does not mean mere negligence as we understand *Youngberg;* while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements.").

A foster child unquestionably has a right to "basic human needs." While the First Circuit has not defined the precise contours of this right, once a state takes a child into custody, it is at least responsible for providing "food, clothing, shelter, medical care, and reasonable safety." *DeShaney,* 489 U.S. at 200. One federal district court in Massachusetts added some detail to this list, concluding that foster children have the right to (1) a safe living environment, (2) services necessary to the child's physical and psychological wellbeing, (3) treatment and care consistent with the purpose of entry into the foster care system, (4) custody only for such time as in necessary; (5) treatment through the exercise of accepted professional judgment, and (6) the least restrictive placement. *See Connor B.*, 774 F.3d at 53 (summarizing, though not endorsing, Massachusetts district court's description of the rights of foster children in state custody).

While Maine's rules and statutes are more protective than the constitutional minimum, state mandates are not the equivalent of constitutional requirements. *Youngberg*, 457 U.S. at 319. While a "[s]tate may, through its courts and legislatures, impose such affirmative duties of care . . . as it wishes," not all "duties owed by government actors . . . [are] constitutionalized by the Fourteenth Amendment." *DeShaney,* 489 U.S. at 202. It is thus "well settled that violations of state law cannot provide the basis for a due process claim." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 134 (1984). And, of course, conduct that results in the denial of a

20

protected right does not gain constitutional dimension unless that conduct also shocks the conscience of the court, *Rivera*, 402 F.3d at 35, a showing that requires "stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law," *J.R.*, 593 F.3d at 80 (cleaned up).

Against this backdrop, Plaintiffs' substantive due process claim rests on an alleged "failure to . . . protect the Named Plaintiffs and the Class from an unreasonable risk of harm." FAC ¶ 282. The allegations Plaintiffs make to this end are serious. But none among them constitutes "stunning evidence of arbitrariness and caprice." *J.R.*, 593 F.3d at 80. Plaintiffs allege, for example, that caseworkers were not present when they should have been, FAC ¶ 29; records were not promptly kept or provided, *id.* ¶¶ 24, 52; the informed consent process was inadequate, *id.* ¶¶ 48-50, 115-18, 143-45; and medications were inappropriately prescribed by doctors, *id.* ¶¶ 59-60. These allegations, if true, state violations of OCFS policy and warrant attention from DHHS. But an alleged failure to adhere to OCFS policy does not constitute conscience-shocking conduct that violates the Fourteenth Amendment. *See, e.g., J.R.*, 593 F.3d at 80.[16]

OCFS has also made "concrete, good faith improvements" to its foster care system in the last few years, and particularly to its process for the administration and review of psychotropic medications. *See Connor B.*, 774 F.3d at 57. While there remains more work to do, "the Due Process clause does not require that the defendants instantly fix all deficiencies in the foster care system," *id.* at 56, and OCFS is not required to "choose between attacking every aspect of a problem or not attacking the problem at all," *Youngberg*, 417 U.S. at 317. Plaintiffs likewise

---

[16] Further, as in *Connor B.*, the lawsuit here "was not framed to bring relief to the named plaintiffs, but to obtain class-wide federal injunctive relief mandating federal court oversight of the enormously complex state foster care system." 774 F.3d at 55. But like in *Connor B.*, there are no allegations here that particular practices, *at present*, are "caus[ing] direct harm to the entire class or even a majority of the class." *Id.* at 55. In other words, the flaws that Plaintiffs have alleged, even if ultimately proven true, would "not establish that there has been a constitutionally cognizable increased risk of class-wide harm," much less a major departure from accepted professional judgment so substantial as to satisfy the shocks-the-conscience standard. *Id.* at 55-56.

21

have not alleged a "fail[ure] to exercise professional judgment" in choosing which improvements to prioritize across DHHS's wide range of responsibilities. *Connor B.,* 774 F.3d at 57. OCFS constantly works to improve Maine's foster care system, *see, e.g.,* 2021 Progress Report; 2020-2024 Services Plan, and the system's imperfection is not a constitutional violation.

Awarding injunctive relief of the type Plaintiffs seek would thus represent "precisely the kind of substitution of judicial judgment for professional judgment that *Youngberg* prohibits, especially in light of the 'sensitive federalism concerns' at play in institutional reform litigation." *Id.* (quoting *Horne v. Glores*, 557 U.S. 433, 448 (2009)). The problems identified by Plaintiffs, if true, "warrant attention from the legislative and executive branches," *id.* at 62, but not the exercise of federal judicial power.

2. The procedural protections provided to children in foster care are sufficient under the Due Process clause.

Alleged violations of procedural due process are evaluated in two steps. They require a determination of (1) "whether there exists a liberty or property interest which has been interfered with by the state," and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *González-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010) (quoting *Ky. Dept. of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Before a significant deprivation of liberty or property takes place at the state's hands, the affected individuals must receive notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The adequacy of the protections provided is evaluated according to the familiar *Mathews v. Eldridge* balancing test, which centers on: (1) the nature of the private and public interests involved; (2) the risk of erroneous deprivation accruing under the procedures used by the state; and (3) the probable benefit of demanding additional procedural safeguards. 424 U.S. 319, 335 (1976); *accord Connor B.*, 774 F.3d at 61.

Plaintiffs claim that they have a protected liberty interest in freedom from "unnecessary administration of medical treatment"—specifically, psychotropic medications—and that they were deprived of that interest "without . . . sufficient procedures for ensuring" the medical treatment was "appropriately administered."  FAC ¶ 292.  Even if this serious allegation were true, it would not amount to a violation of their procedural due process rights.

*First*, assuming, without admitting, that Plaintiffs' allegations describe a protected liberty interest, they have failed to allege that they have been deprived of that interest.  Plaintiffs make allegations about the medications that they were prescribed and their impacts, yet in all but one case—Trent W.'s administration of a stimulant for ADHD for a diagnosis that had allegedly been ruled out two years earlier, *see* FAC ¶¶ 59-74—they do not allege that they were administered *unnecessary* medications.  Neither disagreement among medical professionals, *see, e.g., id.* ¶¶ 27, 89, 117, 141, nor medication trials that are ultimately determined to not be clinically indicated, *see, e.g., id.* ¶¶ 87, 90, 95, 109-13, 119, 121, 137-40, amount to a prescription of "unnecessary" medication, such that Plaintiffs' allegations fall short of demonstrating the deprivation of a liberty interest.

*Second*, Plaintiffs have failed to allege that any deprivation of their liberty interests is attributable to Defendants.  While OCFS sets parameters for consent and follow-up, the decision to prescribe a psychotropic medication in each instance is made not by OCFS, but by a qualified medical professional based on his or her training and experience.  *Cf. Carillo v. United States*, 5 F.3d 1302 (9th Cir. 1993) (government not liable for doctor's actions where government agency did not "ha[v]e any control over [the doctor's] practice of medicine"); *Pelletier v. Magnuson*, 201 F. Supp. 2d 148, 168-69 (D. Me. 2002) (no liability for treatment decisions absent substantial role in those decisions).

Rather than describe how OCFS policies,[17] or any failure of training or oversight, have resulted in the unnecessary administration of psychotropic medication, Plaintiffs allege instances in which there was a failure to adhere to those policies, or physician error. *Compare, e.g.,* OCFS Policy IV-A(C) (requiring consent of child and DHHS caseworker) *with, e.g.,* FAC ¶¶ 49 (failure to include child in "meaningful informed consent conversations" about administration of psychotropic medications); *id.* ¶ 97 ("only record of consent resulted from a cursory process initiated by the healthcare provider"); *see also id.* ¶ 89 (clinicians prescribed Risperidone after being told by the child that it was counterproductive).[18]   In fact, in the one instance of alleged unnecessary medication noted above, Plaintiffs contend that Trent W. was prescribed a stimulant because the child's primary care physician *misdiagnosed* ADHD.   *See id.* ¶¶ 59-60.   These allegations do not state a viable due process claim against DHHS.   *See Connor B.*, 774 F.3d at 60 (no allegations that policies were inadequate, and deviations from policy were "mistakes" rather than violations of the procedural due process); *Howard v. Malac*, 270 F. Supp. 2d 132, 142 (D. Mass. 2003) (failure to comply with state and departmental regulations "is entirely beside the procedural due process point" given "a State's violation of its own laws or procedural rules, creating rights beyond those guaranteed by the Constitution, cannot support a federal due process claim").

---

[17]   The closest Plaintiffs come to identifying a policy problem are their repeated indications that there was no "secondary review process" for the prescription of psychotropic medications. *See, e.g., id.* ¶ 93.  But they at no point describe how any such process would have resulted in a different outcome for the Named Plaintiffs.

[18]   Plaintiffs also cite a "sample of 39 Maine foster children prescribed antipsychotics" in which 50% allegedly "did not have a caseworker who participated in initial medical or psychiatric appointments and then at least every 3 months following."   FAC ¶ 264.   Plaintiffs do not allege how—or when—this sample was gathered, or whether it is representative of the "almost 500 children" in foster care who are have been administered psychotropic medications. *Id.* ¶ 161.   Nonetheless, at best, it indicates that some caseworkers were erroneously not following OCFS policy, not that the policies themselves—or OCFS's oversight—were inadequate.

*Third*, even if Plaintiffs had adequately alleged a deprivation of liberty attributable to Defendants, the procedures available under state law are more than adequate to satisfy the dictates of due process. *See Amsden v. Moran*, 904 F.2d 748, 755 (1st Cir. 1990) (cleaned up) ("A reviewing court must . . . examine 'the procedural safeguards built into the statutory or administrative procedure . . . [a]ffecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.'"). Initially, there are a series of safeguards under OCFS policy, including (a) protocols and guidelines for when antipsychotic medications may be administered, OCFS Policy IV-A(C)(2), (4); 2021 Progress Report 233-34; (b) provisions for consent or assent from the caretaker, prescriber, and child, OCFS Policy IV-A(C)(5) & App'x A; 2021 Progress Report 233-34; (c) a requirement that a caseworker be present at the first prescriber appointment and every three months thereafter or when requested, OCFS Policy IV-A(C)(5); 2021 Progress Report 233-34; and (d) rules and guidelines for review of the administration of antipsychotic medications, OCFS Policy IV-A(C)(2), (5)-(7); 2021 Progress Report 233-34.

In instances where these safeguards fail, the child and/or GAL can bring their concerns to the Maine District Court overseeing their child protective case. As noted, even outside the regular six-month review period, the GAL may—and, when warranted, must—move for judicial review. 22 M.R.S. § 4038(2). The Maine District Court is then empowered to hear testimony, make findings, and order relief to address medication administration issues. *See generally id*. §§ 4036(1), 4038(5)-(6), 4041, 4071; *see also* M.R.G.A.L. 4(c)(3), (6)-(7), (9). Categorically, this is adequate process under the Due Process clause. *San Gerónimo Caribe Project, Inc. v. Acevedo–Vilá,* 687 F.3d 465, 478–81 (1st Cir. 2012) (en banc); *see also Herwins v. City of* Revere, 163 F.3d 15, 19 (1st Cir. 1998) ("[T]here is no denial of *procedural* due process . . . so long as the state provides an adequate means of redress. The Supreme Court has held this both where the official's

action is negligent, and where it is deliberate . . . .") (cleaned up); *Howard*, 270 F. Supp. 2d at 139–40 (no denial of procedural due process where judicial review is available).

As the First Circuit recognized, "the practical reality" is that "imposing a series of constitutional procedural requirements" in the context of a system with resource constraints that serves individuals with widely-varying needs "could prevent the institution from continuing to function." *Connor B.*, 774 F.3d at 61 (citing *Youngberg*, 457 U.S. at 321, 324)). Accordingly, by application of the *Mathews* test, OCFS Policy and state law provide adequate protections to prevent the unnecessary administration of psychotropic medication. While some errors may still occur—and again, Plaintiffs' allegations, if true, should be (and are being) addressed by DHHS—they do not collectively create a cognizable procedural due process violation.

### 3. Plaintiffs' AACWA Claims Fail on the Merits

Plaintiffs' final claim is that Defendants have run afoul of the AACWA, and the regulations promulgated thereunder. FAC ¶ 295. The claim stems from Plaintiffs' health-records-related allegations, specifically their contention that Defendants are (a) not providing individualized case plans that contain health records, and (b) failing to ensure each child's records are reviewed, updated, and supplied to the foster parent or other provider at the time of placement. *Id.* ¶ 296 (citing 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1), 675(5)).

As Spending Clause legislation, *see* U.S. Const. Art. I, Sec. 8, Cl. 1, the AACWA provides that a state "will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the requirements of the Act." *Suter v. Artist M.*, 503 U.S. 347, 351 (1992). Each state's eligibility for funds is thus predicated on adherence both to the AACWA's requirements as well as to regulations promulgated by the Secretary of the U.S. Department of Health and Human Services (the "Secretary"). Absent "substantial compliance" with these rules, the Secretary may—and sometimes must—withhold funding or take other

corrective measures.  *See* 42 U.S.C. §§ 670, 1420a-2a; *see also 31 Foster Children*, 329 F.3d at 1270–1271 (summarizing AACWA).

Taken together, the provisions on which Plaintiffs rely require, as a condition of federal funding, that each state "provide assurances" that, "to the satisfaction of the Secretary," it has a "case review system . . . for each child receiving foster care."  42 U.S.C. § 622(b)(8)(A)(ii).  That system must include a "case plan" for each child that is "approved by the Secretary" and sets forth "health and education records," specifically "the most recent information available regarding . . . the names of the child's health and educational providers; . . . a record of the child's immunizations; the child's known medical problems; the child's medications; and any other relevant health . . . information concerning the child determined to be appropriate by the state agency."  *Id*. § 675(1)(C).  The case review system must also ensure that each child's "health and education record" is "reviewed and updated," and that such record is "supplied to the foster parent or foster care provider" at the time of placement.  *Id*. § 675(5).

Plaintiffs' allegation that Defendants have run afoul of these provisions in the AACWA, and that they are therefore entitled to declaratory and injunctive relief, fails for two reasons.  First, the cited provisions cannot support a private right of action under Section 1983.  Second, even if they could, Plaintiffs' allegations do not establish any violation of the AACWA.

*No Section 1983 Cause of Action.*  Section 1983 "does not provide an avenue for relief every time a state actor violates a federal law."  *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 119 (2005).  A plaintiff seeking redress "must assert the violation of a federal *right*, not merely a violation of federal *law*."  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

A statute creates a private right enforceable under Section 1983 when three conditions are met.  *Colón-Marrero v. Vélez*, 813 F.3d 1, 17 (1st Cir. 2016).  First and foremost, Congress must have intended that the provision in question benefit the plaintiff.  *Blessing*, 520 U.S. at 340.

Satisfaction of this first factor creates a presumption of enforceability, *Vélez*, 813 F.3d at 16, but demonstrating as much is no simple feat. "[I]f Congress is silent or ambiguous, courts may not find a cause of action 'no matter how desirable that may be as a policy matter.'" *Planned Parenthood South Atlantic v. Baker*, 941 F.3d 687, 695 (4th Cir. 2019) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)). Thus, nothing short of "an unambiguously conferred right" will demonstrate the existence of a private right of action. *Gonzaga v. Doe*, 536 U.S. 273, 282-83 (2002).

The remaining two factors are of equal importance. Plaintiffs must demonstrate that "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence," and that the statute "unambiguously impose[s] a binding obligation on the States" by speaking "in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 340-41.

In *Suter v. Artist M.*, the Supreme Court ruled that Section 671(a)(15) of the AACWA, which requires that state case plans set forth reasonable efforts to preserve and unify families, is not enforceable under Section 1983 because the section's provisions are too vague and amorphous to support such an action. 503 U.S. at 362-64. Congress subsequently amended the AACWA to clarify that it was not "intended to limit or expand the grounds for determining the availability of private actions" that applied in cases prior to *Suter*, but nonetheless did not overturn *Suter's* holding. 42 U.S.C. § 1320a-2.

Following *Suter* and the associated AACWA amendment, there has been a considerable divergence among federal courts as to the degree to which the provisions of the AACWA can be enforced through Section 1983. *See, e.g., Marr. v. Me. Dept. of Hum. Servs.*, No. CIV. 01-224-B-C, 2002 WL 737651, at *4 (D. Me. Apr. 24, 2002), *report and recommendation adopted*, 2002 WL 1461826 (D. Me. July 9, 2002) (collecting cases). While the First Circuit has not offered a

conclusive, post-*Suter* view, *see Connor B.*, 774 F.3d 45 ("The district court held, and the defendants do not contest here, that the AACWA creates a privately enforceable right."), Defendants nonetheless submit that as to the case plan and case review system provisions cited by Plaintiffs, the AACWA is not enforceable under Section 1983.

The judicial branch does not sit to "oversee [Maine's] child welfare system to determine whether certain components are 'operating, to the satisfaction of the Secretary.'" *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 485 (D.N.J.) (quoting 42 U.S.C. § 42 U.S.C. § 622(b)(10)). Rather, as set forth above, it is up the Secretary to determine whether a state is in sufficient compliance with the AACWA to remain eligible for federal funding. *See Eric L. v. Bird*, 848 F. Supp. 303, 312 (D.N.H. 1994) (AACWA's provisions are, as in *Suter*, "feature[s] which the state plan must include to be approved by the Secretary" as a condition of continued funding such that they do not create enforceable rights (quoting *Suter*, 503 U.S. at 359 n.10)). Where, in this way, "statutory language primarily concerns itself with commanding how states are to function within a federal program, the statue is less likely to have created an individually enforceable right." *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013).

None of the provisions cited by Plaintiffs demonstrate otherwise. Section 675 is the definition section of the AACWA, and "[f]inding an enforceable right of action solely within a purely definition section is antithetical to requiring unambiguous congressional intent." *Kincade*, 712 F.3d at 1197; *see also 31 Foster Children*, 329 F.3d at 1271 (explaining that a definition section "alone cannot and do[es] not supply a basis for conferring rights enforceable under § 1983"); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 564-65 (S.D. Miss. 2004) (holding the plaintiffs had no enforceable rights under § 675, alone or in conjunction with either §§ 671(a)(16) or 622(b)). For Plaintiffs' claim to proceed, therefore, it must stem from § 622(b)(8)(a)(ii)—which requires that each state plan provide assurances that it is operating, to

the satisfaction of the Secretary, a case review system—or § 671(a)(16)—which requires that each state plan approved by the Secretary contain both a case plan and a case review system (as defined in Section 675). Neither of these provisions confers a right enforceable under Section 1983, however, for two reasons.

*First*, the provisions are not unambiguously structured to benefit individual claimants. Each is enforced by the Secretary both by its terms, *see* 42 U.S.C. § 622(b)(8) (case review system must be "to the satisfaction of the Secretary"); *id*. § 671 (requiring approval by the Secretary), and under 42 U.S.C. § 1320a-2a(a), which directs the Secretary to promulgate regulations for the review of state programs to determine "substantial conformity" with both the statute, implementing regulations, and the state's own plans. Thus, whether the AACWA and resulting state plans are followed is not a question of individual rights, but rather a question of funding eligibility directed to the Secretary's discretion. *See Blessing*, 520 U.S. at 343-44 (holding Title IV-D of Social Security Act did not support Section 1983 action because the statute mandates "substantial compliance").

The aggregate focus of the provisions cited by Plaintiffs is likewise determinative. *Gonzaga*, 536 U.S. at 288; *accord T.F. by Keller v. Hennepin Cty.*, No. CV 17-1826 (PAM/BRT), 2018 WL 940621, at *5-6 (D. Minn. Feb. 16, 2018); *Carson P.*, 240 F.R.D. at 543-44; *Whitley v. N.M. Children, Youth & Families Dept.*, 184 F. Supp. 2d 1146, 1164–65 (D.N.M. 2001); *Daniel H. v. City of New York*, 115 F. Supp. 2d 423, 428 (S.D.N.Y. 2000). They do not speak to wrongs visited upon individuals, but rather concern system-wide compliance enforced, for example, through audits and the provision (or withholding) of federal funding. This is, in fact, the nature of the recommendations in the 2018 OIG Report, in that OIG suggested that the federal Administration for Children and Facilities "[d]evelop a comprehensive strategy to improve States' compliance" and "[a]ssist states in strengthening their requirements for oversight of

psychotropic medication." *Id.* at 12-13.  The provisions at issue therefore do not create privately enforceable federal rights.  *See 31 Foster Children*, 867 F.3d at 1272 (case review system provisions have "an aggregate or system wide focus instead of one that indicates concern with whether the needs of any particular child are met"); *cf. Does v. Gillespie*, 867 F.3d 1034, 1041 (8th Cir. 2017) (no right to sue where provision is "phrased as directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries").

The language of these provisions also stands in stark contrast to statutes that *do* protect individual claimants.  Title IX, for example, uses "[n]o person . . . shall" directives in the context of sex discrimination.  *Kincade*, 712 F.3d at 1197.  Likewise, in another section of AACWA itself, Congress expressly forbid states from "deny[ing] to any person the opportunity to become a foster parent on the basis of . . . race, color, or national origin."  42 U.S.C. 671(a)(18); *see also* 42 U.S.C. § 674(d)(3)(A) (referring to "[a]ny individual aggrieved" by § 671(a)(18)).  The provisions that Plaintiffs cite contain no such language, and it is thus evident that Congress did not intend to include privately enforceable rights in those provisions.  *See T.F. by Heller*, 2018 WL 840621, at *6; *Charlie H.*, 83 F. Supp. 2d at 489.

Certainly, foster children benefit from the case-plan and case-review-system requirements.  But "the ability to locate a nexus between § 1983 plaintiffs and a benefit conferred by a statute is necessary but not sufficient" to establish a private right of action.  *Kincade*, 712 F.3d at 1199.  Unless the provisions at issue are "phrased in terms of the persons benefitted," no individual right is conferred.  *Gonzaga*, 536 U.S. at 284.  Here, they decidedly were not.

*Second*, even if Congress had clearly intended the relevant sections of the AACWA to benefit individual foster children, they are too ambiguous to be enforced by the courts.  *See Olivia Y.,* 351 F. Supp. 2d at 564.  Each sets forth vague requirements that, by design, must be interpreted

31

by the Secretary.  *See, e.g.,* 42 U.S.C. § 671(5)(D) (requiring that a child's health record be "reviewed and updated" on an undisclosed timeline).  The provisions at issue thus lack "objective benchmark[s]" against which compliance can be measured, *Del A. v. Romer*, 777 F. Supp. 1297, 1308 (E.D. La. 1991), such that they cannot be enforced under Section 1983, *see Daniel H.*, 115 F. Supp. 2d at 427 ("The Court . . . concludes that, to the extent these provisions of the Act may have been intended to confer an individual benefit, it is expressed in language too imprecise to be judicially enforced.").

*Failure to State a Claim.*  Even if Plaintiffs can maintain a private cause of action, DHHS policy plainly meets the dictates of the AACWA.  OCFS Policy V(I-2) directs that a caseworker gather pertinent "health and health care information" and "provid[e] it directly to the foster parent or other child care provider at the time of placement."  It likewise sets a minimum for included information that mirrors those set forth in the AACWA, including medications, the name of the child's physician, and a record of immunizations.  *Id.*  The policy also requires that additional information be provided within ten days, and that any remaining missing information be gathered and shared before the child is seen by a new physician, and at the latest within 60 days.  *Id.*  Finally, the policy requires that the child's caseworker continue to update this record every six months.  *Id.*

Given that OCFS policy is compliant with the AACWA—a fact underscored by Maine's continued receipt of federal funding—Plaintiffs' allegations about implementation of OCFS Policy V(I-2) straightforwardly do not state a violation of the AACWA.  Plaintiffs have not established a lack of "substantial conformity."  42 U.S.C. § 1320a-2a(a).

That said, Plaintiffs' most extensive records-related allegations involve Bryan C.  Plaintiffs contend that OCFS lacked results from an A1C blood test, FAC ¶ 24; that there was a three-month so-called "gap" during which no caseworker was updating Bryan C.'s file, *id.* ¶ 33; and that OCFS failed to provide an emergency room unit's clinicians with a list of his medications, *id.* ¶ 34.  But

Plaintiffs have not shown why OCFS itself was responsible for obtaining A1C test result; the responsibility for updating portable health records, which contain an ongoing record of care sought and received, falls with the foster parent or other provider, OCFS Policy V(I-2).  Further, federal law does not set a timeframe for the review and update of health records, and the AACWA is mum as to OCFS's responsibility to provide information to clinicians.  Plaintiffs otherwise do no more than allege, in conclusory fashion, that OCFS failed to "promptly provide[] . . . up-to-date medical record[s]" for Bryan C., which they contend were "poorly maintained."  FAC ¶ 32.

With respect to the remaining Named Plaintiffs, Plaintiffs allege that four of five also experienced record-maintenance issues, but once again none of their allegations withstands even minimal scrutiny.  As to Henry B., Plaintiffs contend that his "caregivers have not received a *portable* record of critical health information," and that his records were "poorly maintained." FAC ¶ 52 (emphasis added).  But it is OCFS Policy, and not federal law, that requires the creation of a *portable* health record, and is it clear from the complaint exactly what was inadequate about OCFS's record-keeping.  As to Grayson M., Plaintiffs allege only in conclusory fashion that Defendants failed to provide his caregivers and medical doctors an up-to-date medical record containing some items that are, and some which are not, required by federal law.  *Id*. ¶ 98.  As to Kendall P., Plaintiffs again allege the lack of a portable health record, and a lack of medical history from a prior placement in residential treatment centers without any allegation as to why such a gap in Kendall P.'s records exists (given, again, the foster parent or other provider's responsibility to update the portable record under OCFS Policy V(I-2)).  *Id*. ¶¶ 124-25.  Finally, as to Neville H., Plaintiffs allege in conclusory fashion that DHHS failed to provide his "caregivers and medical providers with a current, updated comprehensive medical and mental health record," and contend that a treating physician did not have his prior psychotropic medication history.  *Id*. ¶¶ 148-49.

But federal law does not impose on OCFS an obligation to provide records to treating physicians and, in any event, Plaintiffs do not allege that OCFS did not provide that information.

Plaintiffs' allegations, taken as true, thus do not demonstrate a failure by OCFS to act in substantial compliance with the AACWA. Plaintiffs offer neither evidence nor data regarding the broader group of children in foster care that have been prescribed psychotropic medications, beyond general assertions of "systemic failures," *see, e.g., id*. ¶ 4; a contention that OCFS "often" does not follow policy in practice, *see id*. ¶¶ 249-52; and repeated references to an OIG report based on data from 2014 and 2015. Their allegations thus do not state a cognizable claim under the AACWA. *Connor B.*, 774 F.3d at 61-62 (affirming characterization of failures as "gaps in record keeping," rather than "grave statutory error," such that no relief was warranted).

## CONCLUSION

For the reasons stated above, Defendants respectfully request that Plaintiffs' First Amended Complaint be dismissed, and that judgment be entered in Defendants' favor.

Dated: April 2, 2021

Respectfully submitted,

AARON M. FREY
Attorney General

/s/ Thomas A. Knowlton
Thomas A. Knowlton
Deputy Attorney General

Jason Anton
Sarah A. Forster
Stanley William Abraham
Assistant Attorneys General

6 State House Station
Augusta, ME  04333-0006
Tel: (207) 626-8800

## CERTIFICATE OF SERVICE

I hereby certify that on the date stated above, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notice of such filing to the Plaintiffs in this matter.

/s/ Jason Anton
Assistant Attorney General