UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BRYAN C. and HENRY B. through their next
friend Michael P. Dixon, et al.,

       Plaintiffs,

  v.

JEANNE M. LAMBREW in her official capacity as
Commissioner of the Maine Department of Health
and Human Services, et al.,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 1:21-cv-00005-NT

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION</u>**

**<u>TO DEFENDANTS' MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARDS ................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.   The Court Has, and Must Exercise, Jurisdiction over Plaintiffs' Federal Claims ............. 2

        A. Periodic Individual Child Welfare State Court Proceedings Fall Outside the Three "Exceptional" Categories of State Court Proceedings Warranting *Younger* Abstention ................................................................................................................ 2

        B. Even If This Case Fell into One of the Three "Exceptional" *Younger* Categories, Which It Does Not, None of the Three *Middlesex* Factors Are Met ... 4

    II.  Any Alleged Deficiencies of the Next Friends Do Not Remove the Plaintiff Children and Their Claims from This Court's Jurisdiction ......................................................... 9

    III. Plaintiffs Have Sufficiently Pled Their Substantive Due Process Claims ...................... 12

    IV. Plaintiffs Have Pled Cognizable Procedural Due Process Violations ............................ 18

        A. Plaintiff Children Have a Recognized Liberty Interest in Being Free from the Unwarranted Administration of Psychotropic Medication ................................... 19

        B. Plaintiffs Sufficiently Allege Inadequate Procedural Due Process Protections 20

        C. Defendants' Attempts to Eschew Any Responsibility or Accountability for Overseeing Plaintiff Children's Medical Care Should Be Rejected ..................... 23

    V.  Plaintiffs Have Stated a Claim Under AACWA for Defendants' Failure to Meet Case Plan and Case Review System Requirements ....................................................... 25

        A. It Is the Established Law of the Circuit That AACWA Case Plan and Case Review System Requirements Are Privately Enforceable Under Section 1983... 26

        B. Plaintiffs' AACWA Case Plan and Case Review System Claims Meet the *Blessing/Gonzaga* Standard for Enforceability .................................................... 28

            1. The AACWA Provisions Contain "Rights-Creating Language" .......... 29

            2. The AACWA Provisions Focus on the Needs of Individual Children . 31

            3. AACWA Has No Comprehensive Enforcement Mechanism Precluding Enforceability .......................................................................................... 32

        C. Plaintiffs' Factual Allegations Are Sufficient Under AACWA ...................... 33

CONCLUSION ............................................................................................................... 35

## INTRODUCTION

Plaintiffs are a putative class of children in the foster care custody of the Maine Department of Health and Human Services ("DHHS") who seek to compel Defendants to adequately oversee their administration of dangerous psychotropic medications consistent with federal Constitutional and statutory requirements.

Defendants now seek dismissal by challenging this federal Court's suitability to address Plaintiff Children's *federal* claims. As established by the vast majority of courts, however, including in this Circuit, this is not one of those "exceptional" cases warranting abstention. Similarly, Defendants' quibbling with the appropriateness of Plaintiff Children's Next Friends, who are their guardians *ad litem* ("GALs") in Maine state court, cannot be the basis for dismissal. Rule 17(c) is designed as the vehicle to ensure that children are allowed to vindicate their rights in this Court. Defendants would have this Court turn the Rule on its head to slam the courthouse doors in Plaintiffs' faces. This Court must exercise jurisdiction.

Defendants' alternative argument that "Plaintiffs' First Amended Complaint Fails on the Merits" (ECF No. 25 at 18) is procedurally premature and substantively meritless. Improperly arguing the merits at this pleading stage cannot obscure Plaintiffs' well-established Constitutional Substantive and Procedural Due Process claims as well as federal statutory claims under the Adoption Assistance and Child Welfare Act ("AACWA"). Plaintiffs have pled more than sufficient facts to survive Defendants' motion to dismiss.

## LEGAL STANDARDS

On a motion to dismiss for jurisdictional grounds under Federal Rule of Civil Procedure 12(b)(1), plaintiffs bear the burden of showing subject matter jurisdiction. *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993). In evaluating plaintiffs' showing, however,

the court must "construe the complaint liberally and treat all well-pleaded facts as true, according the plaintiffs the benefit of all reasonable inferences." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (cleaned up); *see Lawhorn v. Reg'l Sch. Unit 34*, No. 1:15-CV-159-NT, 2015 WL 4922293, at *4 (D. Me. Aug. 18, 2015) (Torreson, J.).

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court similarly "must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor." *Nichols v. Androscoggin Cty.*, No. 2:14-CV-421-NT, 2015 WL 2189844, at *2 (D. Me. May 11, 2015) (Torreson, J.). "[D]etailed factual allegations are not necessary to survive a motion to dismiss for failure to state a claim." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). Rather, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Nichols*, 2015 WL 2189844, at *1 (same).

ARGUMENT

I.   **The Court Has, and Must Exercise, Jurisdiction over Plaintiffs' Federal Claims**

"Federal courts have a virtually unflagging obligation to exercise the jurisdiction given them." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005) (cleaned up). "[O]nly exceptional circumstances justify a federal court's refusal to decide a case in deference" to states. *New Orleans Pub. Serv. v. Council of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*").

A.   **Periodic Individual Child Welfare State Court Proceedings Fall Outside the Three "Exceptional" Categories of State Court Proceedings Warranting *Younger* Abstention**

Maine state court individual child welfare proceedings cannot be classified as any of the three "exceptional" categories of state court proceedings that the Supreme Court has identified as

2

within the scope of the *Younger* abstention doctrine: "state criminal prosecutions," as in *Younger v. Harris,* 401 U.S. 37 (1971); "certain civil enforcement proceedings"; and "pending civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73, 82 (2013) (cleaned up) (quoting *NOPSI*, 491 U.S. at 368) (holding that applying *Younger* to all parallel state and federal proceedings where a party could identify a plausibly important state interest is "irreconcilable" with the instruction that abstention is the exception and not the rule). The Supreme Court "ha[s] *not* applied *Younger* outside these three 'exceptional' categories" and held that they "define *Younger*'s scope," such that *Younger* extends "no further" than these three "exceptional circumstances." *Id.* at 591, 594 (emphasis added).

In Maine, child protection proceedings are under the jurisdiction of the Family Division of Maine's state District Courts. 4 M.R.S. § 183. While the state courts arguably serve an enforcement role in determining whether to remove a child from their family home into state protective custody and making subsequent dispositional custody orders (*see* 22 M.R.S. §§ 4035-36, 4052), such adjudications of custody are not at issue here. Defendants instead point to the Maine District Court's review of whether "DHHS is adequately keeping records, obtaining consents, or reviewing psychotropic medication administration" as part of its periodic child welfare reviews. *See* Motion to Dismiss, ECF No. 25 (the "Mot.") at 12 (citing 22 M.R.S. §§ 4036(1)(H), 4038). But the Supreme Court has made clear that *Younger* abstention does **not** extend to state-court proceedings that review state agency action, stating that it has

> never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case.

3

*NOPSI*, 491 U.S. at 368 (cleaned up); *see also Rio Grande*, 397 F.3d at 70 ("Here, the state court action, like that in *NOPSI*, is judicial review of executive action, rather than an enforcement proceeding."). Indeed, in a similar federal class action challenging Missouri's systemic oversight failures as to the administration of psychotropic medications to youth in foster care, the court held that *Younger* abstention does not apply because it is "the executive's actions that are being questioned, not the power of the juvenile court." *M.B. v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 327767, at *6 (W.D. Mo. Jan. 8, 2018) (although medical care of individual children in foster care is within the ambit of the state court decisions, the complaint is "about the care, or lack thereof, the children receive [concerning psychotropics] while in [the department's] custody").

Here, too, as Defendants acknowledge, the state court's role is to review Defendants' executive actions related to the ongoing care of individual children in foster care.[1] *See* Mot. at 12. Such state court child welfare review proceedings are not of the type addressed by *Younger*. *See Connor B. v. Patrick*, 771 F. Supp. 2d 142, 154 (D. Mass. 2011) ("*Connor B.* MTD") ("this [child welfare] case does not involve the type of state proceeding that would require abstention").

### B. Even If This Case Fell into One of the Three "Exceptional" *Younger* Categories, Which It Does Not, None of the Three *Middlesex* Factors Are Met

Even where state court proceedings fall within a category that may implicate *Younger* abstention concerns—which is not the case here (*see supra*)—they must meet a three-prong test for *Younger* abstention to apply. The "*Middlesex* test" provides that the federal courts may abstain from exercising federal jurisdiction under *Younger* only if the injunctive or declaratory relief sought *interferes* with (1) ongoing state court enforcement proceedings, (2) that implicate an

---

[1] Notably, while children remain in foster care under DHHS custody, DHHS retains the right to make medical decisions for individual children. *In re Matthew W.*, 2006 ME 67, ¶ 4, 903 A.2d 333, 337 ("22 M.R.S. § 4037 grants the Department authority to make medical decisions on behalf of a child who is in its custody"), *overruled on other grounds*, *In re B.C.*, 2012 ME 140, 58 A.3d 1118.

important state interest, and (3) where there is an adequate opportunity for the plaintiffs to raise their federal claims in those state court proceedings. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 437 (1982). The question of "interference" is a "threshold issue." *Massachusetts Delivery Ass'n v. Coakley*, 671 F.3d 33, 40 (1st Cir. 2012). "Interference" in this context means a proceeding that either enjoins the state proceeding or has the "practical effect" of doing so. *Rio Grande*, 397 F.3d at 70; *see also Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 261 (1st Cir. 1987) ("abstention [is] unnecessary [where] the federal plaintiffs [do] not allege injury arising from, or seek relief directed to, an ongoing state proceeding"). Defendants do not, and cannot, demonstrate this interference threshold. They cannot possibly show that this class action litigation pursuing systemic changes to Defendants' policies and practices seeks "to use the federal courts to stop or nullify an ongoing [individual] state proceeding." *Id.*

As to the first prong, this case does not enjoin any ongoing state court enforcement proceedings. Instead, the Amended Complaint alleges only systemic and structural shortcomings in executive oversight by DHHS and its Office of Child and Family Services ("OCFS") over the administration of psychotropic medications, including their failures to: (a) maintain and properly disseminate complete and current medical records (AC ¶¶ 236–53); (b) assure a meaningful informed consent process (*id.* ¶¶ 254–73); and (c) operate a monitoring and oversight system to subject prescriptions to secondary review (*id.* ¶¶ 274–79).

Defendants have not explained how any of the proposed remedies targeted at systemic reform of executive action would impede or interfere with ongoing state court enforcement proceedings in individual cases.[2] *See* AC ¶ 298(d) (remedies). To the contrary, improving access

---

[2] Defendants' citation to *Moore v. Sims* is unavailing. Mot. at 12. Plaintiffs there challenged the "entire statutory scheme by which Texas attempts to deal with the problem of child abuse." 442 U.S. 415, 426 (1979). Further, those plaintiffs attempted to use the federal court to "attack collaterally state court rulings." *Marisol A. v. Giuliani*, 929 F.

to complete and updated medical records and health information could indirectly have a positive effect on the state court's ability to monitor the well-being and best interests of the children, and ensuring effective oversight over prescription of psychotropic medications generally will "support and further the [state] court's own mission of ensuring that children removed from their parents' custody because of abuse or neglect are not further harmed," among other things. *See Kenny A. v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) ("an order by this Court remedying such failures would not interfere in any way with ongoing [] court proceedings"); *see also Sam M. v. Chafee*, 800 F. Supp. 2d 363, 380 (D.R.I. 2011) ("*Sam M.* MTD") (remedies would not interfere but "assist in implementing the Family Court's orders"); *L.H. v. Jamieson*, 643 F.2d 1351, 1354 (9th Cir. 1981) ("relief may enrich the variety of dispositional alternatives available to a juvenile court judge, and, to this extent, [positively] affect pending and ongoing" state proceedings).

Federal court decisions rejecting the application of *Younger* to systemic federal class action lawsuits such as this one despite ongoing state juvenile or family court foster care jurisdiction are legion.[3] In the similar Missouri federal class action, the district court recently concluded:

---

Supp. 662, 688 (S.D.N.Y. 1996), *aff'd* 126 F.3d 372 (2d Cir. 1997) (*Moore* inapplicable to systemic child welfare case with no state collateral attack). Further, as these allegations and relief concern only executive action, contrary to the Motion's claims (Mot. at 12), the relief would not result in "an ongoing federal audit of state . . . proceedings." *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974).

[3] *See, e.g., Connor B.* MTD, 771 F. Supp. 2d at 157 ("[b]ecause Plaintiffs' requested relief threatens to impose limitations on DCF, not the juvenile courts, *Younger* is inapplicable"); *Sam M.* MTD, 800 F. Supp. 2d at 380 (requisite interference under *Younger* had not been established where proposed remedies regarding caseloads, caseworker training, and available placements were not within the province of the family court); *L.H.*, 643 F.2d at 1352-54 (*Younger* inapplicable where youth in state custody sought declaratory and injunctive relief for additional funding for private agencies that care for such youth); *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1038–40 (D. Ariz. 2015) ("requested relief[,] concern[ing] the systems for facilitating the provision of care" did "not involve or interfere with the interest of the state in enforcing the orders and judgments of state courts"); *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *6 (E.D. Mich. Apr. 17, 2007) (refusing to abstain under *Younger* because "[t]he relief sought here is not directed at the juvenile courts. It is directed at the executive branch."); *Kenny A*, 218 F.R.D. at 286 (*Younger* abstention improper because declaratory and injunctive relief sought was directed solely at executive branch officials and would not necessarily interfere with plaintiffs' ongoing review hearings in GA's juvenile courts); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) (refusing to abstain under *Younger*, because the litigation did not interfere with or enjoin ongoing and pending state proceedings concerning individual children in foster care); *Marisol A*, 929 F. Supp. at 689 (*Younger* abstention inapplicable though "[b]y definition, every child who is subject

6

> [T]here is not even a parallel action in a Missouri state court, juvenile or otherwise, dealing with the administration of psychotropic drugs. There is no remedy sought by the Plaintiffs that would interfere with any order that has been entered by the juvenile court. It would be absurd to conclude that because a juvenile court might someday enter an order related to some subject in this federal lawsuit, the *Younger* abstention applies. To so hold would mean that a federal court would always have to abstain on any dispute related to a foster child because the juvenile court has continuing jurisdiction over the child. This would indeed be a "mockery of the rule that only exceptional circumstances justify" *Younger* abstention.

*M.B.*, 2018 WL 327767, at *7 (citing *NOPSI*, 491 U.S. at 368).[4]

Abstention is also improper under the second prong of the *Middlesex* test because Plaintiffs do not seek relief related to an area where an important state interest predominates. "The goal of *Younger* abstention is to avoid federal court interference with *uniquely* state interests such as preservation of these states' peculiar statutes, schemes, and procedures." *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1150 (9th Cir. 2007). There is no such unique interest here where, in exchange for federal Title IV-E funding under the Social Security Act, Maine recognized an important federal interest in the oversight and regulation of the child welfare system.[5] *See Dwayne*

---

to New York's child protective system is also subject to a Family Court action in which the claims raised here can be litigated"); *LaShawn A. v. Kelly*, 990 F.2d 1319, 1322–23 (D.C. Cir. 1993) (holding *Younger* abstention inapplicable despite ongoing Washington D.C. family court neglect proceedings, review hearings, and termination proceedings).

[4] Defendants cite four cases that are easily distinguishable. Mot. at 11, 13. In *31 Foster Children v. Bush*, the plaintiffs sought to have the district court "appoint a panel and give it authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan," which would put the state court dependency proceedings under federal court control. 329 F.3d 1255, 1278. In *J.B. v. Valdez*, the court decided to abstain only after affirming the denial of class certification and dismissing a number of the individual named plaintiffs' claims as moot, where permitting the case to go forward with the remaining three individual children would give the federal court undue power over those individual children. 186 F.3d 1280, 1290–93 (10th Cir. 1999). In *Carson P. v. Heineman*, the plaintiffs' allegations concerned the placements of children in foster care, and the court found that per state law it was the state court that determined where the children could be placed. 240 F.R.D. 456, 523–29 (D. Neb. 2007). There are no similar concerns here. Lastly, in *Laurie Q. v. Contra Costa County*, the court found that, unlike here, the relief sought would run against more than internal practices and procedures of executive branch actors, because the court was asked to "overturn the Juvenile Court's orders regarding the care of foster children." 304 F. Supp. 2d 1185, 1205 n.13 (N.D. Cal. 2004).

[5] Maine executed a "State Plan for Child Welfare Services," and OCFS "is Maine's Title IV-E Agency." AC ¶¶ 156–57. "[A]s a condition of the receipt of Federal funds under Title IV-E," Maine agreed to "administer the [foster care] program in accordance with the provisions of this State plan, title IV-E of the Act, and all applicable Federal regulations and other official issuances of [HHS]." Program Instruction from Children's Bureau, Administration for Children and Families, to State, Tribal, and Territorial Agencies Administering or Supervising the Administration of

*B.*, 2007 WL 1140920, at *5 n.5 ("there are no 'comity' or 'federalism' concerns presented by this lawsuit because the State . . . has voluntarily agreed to federal oversight of its foster care system in exchange for federal funding").

Nor is the third prong of the *Middlesex* test met, which requires federal plaintiffs to have an adequate opportunity to present their federal claims in the state proceedings. *Middlesex*, 457 U.S. at 432. Plaintiffs' claims for systemic, structural remedies are "not of a sort that would be presented during the normal course of a state proceeding." *L.H*., 643 F.2d at 1354. Family and juvenile courts, like the Family Division of the Maine District Court, are "tasked with handling difficult questions of family law on an ad-hoc basis, not with crafting broad-based injunctive relief that could potentially revamp an executive agency."[6] *Connor B*. MTD, 771 F. Supp. 2d at 158. Accordingly, they do not afford plaintiffs an "adequate opportunity to seek relief for the systemic failures alleged in the complaint." *Id.*; *see also LaShawn A.*, 990 F.2d at 1322–23 (family court neglect proceedings, periodic review hearings, and termination proceedings are inadequate for raising a multifaceted, constitutional class action challenge to the administration of a child welfare system); *Dwayne B.*, 2007 WL 1140920, at *6 ("there is no pending judicial proceeding which could serve as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief based on the Constitution and on federal and state law") (internal quotation omitted); *Brian A.*, 149 F. Supp. 2d at 957 ("[a]lthough technically Plaintiffs could raise constitutional questions in their individual juvenile proceedings," no such proceeding

---

Title IV-E of the Social Security Act, Indian Tribes, Tribal Organizations and Tribal Consortia (Tribes), "Title IV-E Plan Pre-Print; Child and Family Services Improvement and Innovation Act; Case Plan; Case Review System; Adoption Assistance Program Reinvestment" (Dec. 9, 2011) (Log No. ACYF-CBPI-11-09), available at https://www.acf.hhs.gov/sites/default/files/documents/cb/pi1109.pdf.

[6] None of the exhibits, Maine statutes, or the GAL rules cited by Defendants (Mot. at 14) discuss widespread oversight failures with respect to medical records, informed consent, or a secondary review system for prescriptions of psychotropic medications, or even any system-wide oversight failures more generally.

could serve as an adequate forum for class action broad injunctive relief); *People United for Child. v. City of New York*, 108 F. Supp. 2d 275, 291 (S.D.N.Y. 2000) (the "Court does not believe that the Family Court can adequately consider plaintiffs' claims in the context of a multi-faceted lawsuit challenging a system-wide policy rather than [agency] actions in individual cases").

Finally, Plaintiffs in a Section 1983 class action such as this need not exhaust their state appellate remedies before seeking relief in federal court, as Defendants argue. Mot. at 14. The Supreme Court and the First Circuit have expressly held that "Section 1983 claimants need not avail themselves of state judicial and administrative remedies before going to federal court." *Kercado-Melendez*, 829 F.2d at 259–62 (citing *Patsy v. Florida Bd. of Regents*, 457 U.S. 496 (1982); *Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974)) (noting that the Supreme Court has held that the language cited by Defendants from *Huffman v. Pursue, Ltd.*, "applies only when a federal plaintiff seeks to avoid state judicial appeals and, instead, use the federal courts to annul the results of a state trial"). The Court must exercise its jurisdiction here.

## II.     Any Alleged Deficiencies of the Next Friends Do Not Remove the Plaintiff Children and Their Claims from This Court's Jurisdiction

Plaintiffs' Next Friends each serve as their GALs in Maine state court—one of the few, perhaps only, adults in each child's life that currently have both long-term knowledge of the child and a meaningful personal relationship with them to adequately represent their interests in federal court. *See* AC ¶¶ 152–54; *see also Dwayne B. v. Granholm*, 2007 WL 1140920 at *3 ("Because the named Plaintiffs, like other foster children, have been removed from home and have had their preexisting ties to family and friends effectively severed, they have few, if any, significant relationships with adults who are suitable and willing to act as 'next friends.'"). These Next Friends are decidedly proper representatives under Federal Rule of Civil Procedure 17(c). But even if, *arguendo*, any of the Plaintiffs' Next Friend representatives were found to be inappropriate, it

9

cannot be disputed that Plaintiff Children themselves have standing to sue, and any deficiencies

with their Next Friend representatives provide no basis to dismiss their claims for lack of subject

matter jurisdiction, as Defendants baldly assert.[7] *See* Mot. at 15.

Federal Rule of Civil Procedure 17(c)(2) provides:

A minor . . . who does not have a duly appointed representative *may sue by a next friend* or by a guardian ad litem. The court *must* appoint a guardian ad litem—or issue another appropriate order—*to protect a minor* or incompetent person who is unrepresented in an action.

Fed. R. Civ. P. 17(c)(2) (emphases added). The Rule thus liberally permits minors to sue by a next

friend, and mandates that the Court take appropriate action to ensure minor plaintiffs' protection.

Contrary to Defendants' upturning of Rule 17(c), the rule is intended to facilitate a minor child's

access to the federal courts, *not* as a means to dismiss otherwise meritorious claims brought on

behalf of and for the benefit of minors or persons otherwise incompetent.[8] *See Sam M. v. Carcieri*,

608 F.3d 77, 94 n.15 (1st Cir. 2010) ("*Sam M.* NF") (citing *Gardner v. Parson*, 874 F.2d 131, 140

(3d Cir. 1989) (holding that if a proposed next friend is inadequate, the appropriate remedy is for

the court to appoint a substitute next friend or hold a hearing on whether a next friend should be

appointed; the "purpose of Rule 17(c) is to further the child's interest in prosecuting or defending

a lawsuit" and "*not [] to be a vehicle for dismissing claims*") (emphasis added)). Whether these

Next Friends are appropriate representatives under Rule 17(c) is not a *jurisdictional* issue at all.

*See Sam M.* NF, 608 F.3d at 83, n.5 ("it is clear that the children are the real party in interest and

their standing to sue has not been challenged in this case") (citing *Morgan v. Potter,* 157 U.S. 195,

---

[7] Unsurprisingly, Defendants do not point to a single court decision supporting dismissal based on inadequate Rule 17(c) representation.

[8] Because Defendants' *jurisdictional* challenge to the Plaintiffs' Next Friends representatives is legally baseless, Plaintiffs only cursorily address Defendants' merits-based challenges to the Next Friends' appropriateness, and reserve the right to submit additional evidence and briefing at a proper stage, if necessary.

198 (1895) (a Next Friend is "neither technically nor substantially the party, but resembles an attorney, or a [GAL], by whom a suit is brought or defended in behalf of another")).

A Next Friend is appropriate whenever there is: "(1) an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action; and (2) a showing that the Next Friend is 'truly dedicated to the best interests of the person the Next Friend seeks to represent.'" *Sam M.* NF, 608 F.3d at 90 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 163 (1990)). Based on the allegations of the Amended Complaint, the Plaintiffs' Next Friend representatives easily meet the Rule 17(c) standard. The Plaintiff Children are all minors that have been removed from the legal custody of their biological parents and placed in foster care, in the legal custody of Defendants. *See* AC ¶¶ 36, 55, 81, 102, 128, 151. The Next Friends have observed firsthand Defendants' failure to adequately oversee the administration of psychotropic drugs to the Plaintiffs and are willing and able to act in the best interests of the Plaintiffs. *See id.* ¶¶ 152-54; *see also Sam M.* NF, 608 F.3d at 91–92 (to advance social interests, such as minors' "access to a judicial forum to vindicate their constitutional rights," it is sufficient that next friends have "a good faith interest in pursuing a federal claim on the minor's behalf; particularly where, as here, the minors seek relief for alleged violations of the guardian's duty to protect them").

Meanwhile, Defendants do not cite any precedent for having this Court's broad Rule 17(c) authority conscribed by limitations in state court GAL appointment orders, as they propose.[9] Defendants' further suggestions that conflicts may arise are speculative, at best. Any confidential information the Next Friends may be required to disclose about Plaintiff Children in discovery will be *to* the Defendants, who are the Plaintiff Children's legal custodians, and is subject to the Court's

---

[9] To the contrary, at least one Maine GAL statute expressly requires GALs to "protect the best interests of the child" in other hearings and proceedings where the child is a party or witness. *See* 19-A M.R.S. § 1507(8).

Protective Order. *See* Consent Confidentiality Order, ECF No. 33; *see also* Pseudonym Order, ECF No. 15. Moreover, any potential class conflicts can be addressed at class certification.

Finally, regardless of Defendants' opinion on this Court's ability to offer Plaintiffs relief in a timely fashion, Plaintiffs and their Next Friend representatives had no legal duty to first exhaust state court remedies, as noted above. *Kercado-Melendez*, 829 F.2d at 259. In short, there is no legal or factual basis to dismiss Plaintiff Children's federal claims because of the identity of the Plaintiff Children's designated Next Friends.

## III.   Plaintiffs Have Sufficiently Pled Their Substantive Due Process Claims

Plaintiffs have a well-established substantive due process right to be free from harm and the unreasonable risk of harm while in Defendants' foster care custody under the 14th Amendment of the United States Constitution. Where a state creates a "special relationship" by imposing limits on an individual's "freedom to act on their own behalf, its subsequent failure to protect that individual may amount to a substantive due process violation." *J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010) (cleaned up). As Defendants concede (Mot. at 18), the First Circuit has assumed that this affirmative constitutional duty under the Due Process Clause extends to children in government foster care custody due to the "special relationship" between the state and its wards. *See, e.g., id.* at 80 (assuming *arguendo* the special relationship because the state agency "affirmatively took responsibility for protecting [children in foster care] from harm"); *Connor B. v. Patrick*, 774 F.3d 45, 53 (1st Cir. 2014) ("*Connor B.* Post-Trial").[10]

---

[10] This special relationship and duty of care has long been recognized by most circuit courts. *See Doe v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 855–56 (5th Cir. 2012); *Doe Johnson v. S. Carolina Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010); *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 846–47 (9th Cir. 2010); *Ray v. Foltz*, 370 F.3d 1079, 1082–83 (11th Cir. 2004); *Nicini v. Morra*, 212 F.3d 798, 807–09 (3d Cir. 2000) (en banc); *Lintz v. Skipski*, 25 F.3d 304, 305 (6th Cir. 1994); *Norfleet v. Arkansas Dep't of Hum. Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Yvonne L. v. New Mexico Dep't of Hum. Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *K.H. v. Morgan*, 914 F.2d 846, 848-49, 850–53 (7th Cir. 1990); *Doe v. New York Dep't of Soc. Servs.*, 649 F.2d 134, 141–42 (2d Cir. 1981).

Defendants acknowledge, as they must, that "once a state takes a child into custody, it is *at least* responsible for providing . . . **medical care** and reasonable safety" to meet baseline substantive due process rights of children in their foster care custody. Mot. at 20 (cleaned up) (emphases added).[11] Federal courts have repeatedly recognized that the medical substantive due process rights of individuals in state care extend to appropriate monitoring and oversight of psychotropic medications. *See Henry A. v. Willden*, 678 F.3d 991, 997–98, 1001–02 (9th Cir. 2012) (plaintiff children in foster care "alleged violations of their clearly established constitutional rights" where plaintiffs "specifically [alleged] that Defendants failed to . . . monitor the administration of [psychotropic] medication" or "inform caregivers of essential information," and "provide[d] detailed factual allegations relating to the individual plaintiffs"); *M.B.*, 2018 WL 327767, at *7, *10 (denying motion to dismiss substantive due process claim where plaintiff children in foster care "alleged that Defendants are aware that Missouri foster children are being administered psychotropic drugs without adequate oversight and therefore are subject to a serious risk of substantial harm" through specific allegations on "medical records and the system for flagging outlying prescriptions"); *Thomas S. v. Flaherty*, 699 F. Supp. 1178, 1186–89, 1200–02 (W.D.N.C. 1988), *aff'd*, 902 F.2d 250 (4th Cir. 1990).

While Defendants openly acknowledge that Plaintiff Children's allegations are "serious" (Mot. at 21), they also propose an "onerous" articulation of the "shocks the conscience" standard. *See* Mot. at 19-21 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847-48, n.8 (1998) ("*Lewis*")

---

[11] *See Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (medical care is one of the "essentials" of care that the State must provide to wards of the state); *Connor B.* Post-Trial, 774 F.3d at 53 (assuming arguendo the "special relationship of foster care entails a duty on the state to provide for . . . services necessary for the children's physical and psychological well-being, [] treatment and care consistent with the purpose of their entry into the foster care system, . . . and receipt of care and treatment through the exercise of accepted professional judgment"); *Norfleet*, 989 F.2d at 293 (holding that the state has a constitutional "obligation to provide adequate medical care, protection and supervision," due to the special custodial relationship); *Eric L. v. Bird*, 848 F. Supp. 303, 306–07 (D.N.H. 1994) (children in foster care sufficiently stated due process claim for violation of right to "reasonable care and safety").

(when motorcycle passenger was killed in high-speed police chase aimed at apprehending a suspect, the test was whether the government conduct "shock[ed] the contemporary conscience")). While that articulation of the standard may be appropriate in the context of police chases like *Lewis*, the Supreme Court held in that case that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." 523 U.S. at 850-52 ("demand[ing] an exact analysis of circumstances").

Here, due to the state's "special relationship" with Plaintiff Children who are in the state's protective custody, Defendants violate Plaintiffs' substantive due process rights because their behavior is a "substantial departure from accepted professional judgment, practice, or standards."[12] *See Youngberg*, 457 U.S. at 314, 322–23; *Davis v. Rennie*, 264 F.3d 86, 98–100 (1st Cir. 2001) (drawing a distinction between police chases like *Lewis*, and situations where a plaintiff is "in the state's custody because of mental illness, not culpable conduct" and is thus "entitled to more considerate treatment and conditions of confinement") (citation omitted); *Yvonne L.*, 959 F.2d at 894 (holding that abdication of duty to act professionally is appropriate articulation of standard in cases involving constitutional right of foster children to reasonable safety; "the compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals") (quoting *Youngberg*, 457 U.S. at 321–22).

Regardless of the standard applied, the Amended Complaint demonstrates that Defendants violated Plaintiffs' substantive due process rights by exposing vulnerable children in Defendants' custody to the substantial risk of known, serious harms through the unnecessary administration of dangerous psychotropic medications without ensuring sufficient oversight and safety mechanisms.

---

[12] Defendants' reliance on *McConkie* and *Rivera* is thus entirely misplaced. Mot. at 19. Neither involved a plaintiff in state custody or in a "special relationship" triggered by state-imposed limits on individual freedom.

*See Doe v. Reg'l Sch. Unit No. 21*, No. 2:19-00341-NT, 2020 WL 2820197, at *3 (D. Me. May 29, 2020) (Torreson, J.) (allegations that "Defendants 'created an unreasonable risk of harm' that [minor plaintiff] would be deprived of [their] constitutional rights," where defendants were on notice of the danger yet failed to remedially act or enforce their own safety-promoting policies, were sufficient to survive motion to dismiss).[13] As alleged, Defendants have acknowledged their need to robustly protect children in foster care, who were subjected to known traumas and are disproportionately exposed to the serious risks associated with psychotropic medication. *See* AC ¶¶ 210–35. Moreover, the federal government and major standard-setting child psychiatry and child welfare organizations agree that to ensure safe administration of psychotropic medications to children in foster care, state agencies must: (1) ensure current and complete health records for children in foster care, *id.* ¶¶ 245–46; (2) have an effective and enforceable system for obtaining informed consent, ¶¶ 255–56; and (3) have a sufficient secondary review of outlier prescriptions and other dangerous prescribing practices, ¶¶ 274, 277. *See id.* ¶ 207.

Yet, while Defendants acknowledge the critical role of accurate and updated medical records in providing continuity of health care, avoiding duplication of services, and carrying out their duties and responsibilities towards children in foster care, *id.* ¶ 240, they admit that their health records do not, in practice, move from placement to placement, ¶ 250, and are not promptly provided to placements when children arrive. *Id.* Indeed, the Amended Complaint alleges that temporary foster caregivers with no background on or independent knowledge of a new child are often provided with incomplete or nonexistent health records on that child, such that the caregiver cannot properly administer and watch for adverse effects of dangerous psychotropic medication

---

[13] *See also* AC ¶¶ 4, 208–79 (alleging that Defendants acknowledge the risks of inadequate oversight of psychotropic medications as well as Maine's systemic failures, but without implementing meaningful reform), 172–207, 236–79 (alleging departure from professional understanding and practice related to prescription of psychotropics), 280–85.

prescribed to the child. *See, e.g.*, *id.* ¶¶ 30–31, 52–53, 98–100, 126, 148–49, 252. For instance, instead of receiving upon placement a child's up-to-date list of all psychotropic medications with their dosages, prior dosages, length of administration, associated DSM diagnoses, possible side effects, and prior side effects, caregivers are often handed only a plastic bag filled with drugs. *Id.* ¶¶ 247, 249–51; *see also id.* ¶¶ 24, 30, 32, 34, 53, 77, 78, 94, 98, 99, 124, 126, 148 (Named Plaintiff examples of inadequate medical records).

And while OCFS's policy with respect to antipsychotics (one type of psychotropic medication) includes words emphasizing the importance of informed consent for ensuring safe and appropriate care for children (*id.* ¶ 257), the Amended Complaint details how the policy is deficient on its face (*id.* ¶¶ 260, 266-68, 272–73), how the policy is misapplied (¶¶ 262–64), and the deficient policy's resultant harms (¶¶ 261, 266, 269). For instance, in practice, caseworkers are routinely not involved in consent conversations (*id.* ¶ 264), older youth frequently have no voice in the process (¶¶ 48-50, 115–17), and OCFS does not appear to have an adequate system to track informed consent compliance across all children in care (¶¶ 267–68). *See also id.* ¶¶ 29, 48-50, 80, 94, 97, 115, 117, 146 (Named Plaintiff examples of inadequate informed consent).

Furthermore, Plaintiffs allege that despite knowing the importance of a system of oversight (*id.* ¶ 209), Defendants failed to establish a meaningful secondary review system with appropriate guardrails, placing children in foster care at risk of remaining on inappropriate medication regimens for long durations (¶¶ 276–79). *See also id.* ¶¶ 16, 27, 65, 89 (Named Plaintiffs examples of inappropriate medication). For instance, there is no meaningful red flag criteria system to identify outlier prescriptions (such as when children are prescribed too much medication, or a medication at too young an age), and child psychiatrists do not regularly oversee and evaluate

prescriptions to conduct meaningful secondary reviews. *Id.* ¶¶ 274–79; *see also id.* ¶¶ 16, 42–43, 88-89, 93, 108–123, 134, 146–47 (Named Plaintiff examples of inadequate oversight).

As a result of these failures, Plaintiffs have suffered or will suffer substantial and often irreversible harm to their physical, emotional, and/or mental health. *See id.* ¶¶ 5, 279, 284; *see also id.* ¶¶ 179–201 (dangerous effects of psychotropic medication use in children, including organ damage, psychosis and suicidal thoughts, weight gain, elevated cardiovascular risk, among others); ¶¶ 18-25, 45–47, 68, 89-92, 95, 110–13 (describing harms that Named Plaintiffs have suffered from psychotropic medications, including increased aggression and irritability, weight gain, fatigue and lack of ability to focus, suicidal thoughts, and lethargy).

Though Defendants rush to weigh the facts before Plaintiffs can fully discover and develop them, the factual allegations in the Amended Complaint, with all reasonable inferences drawn in Plaintiffs' favor, easily make out a substantive due process claim entitling Plaintiff Children to proceed to the merits. *See Irish v. Maine*, 849 F.3d 521, 523-24 (1st Cir. 2017) (vacating dismissal of a non-custodial case, despite its "bare-bones complaint," because the Court could not determine whether substantive due process rights violations existed "at this very early [motion to dismiss] stage of the proceedings"); *Reg'l Sch. Unit No. 21*, 2020 WL 2820197, at *3, *5 (finding minor plaintiff stated a substantive due process claim where "more factual development" was necessary to determine whether actions constituted conscience-shocking behavior); *Connor B*. MTD, 771 F. Supp. 2d at 163 (denying motion to dismiss where children in foster care presented allegations that the state's actions and monitoring inactions created known risks of harm which, if proven, "may" entitle them to substantive due process relief; "all that is required here is that Plaintiffs demonstrate a plausible entitlement to relief"); *M.B.*, 2018 WL 327767, at *7, *10–11. Defendants' reliance at this initial phase on two circuit opinions that reviewed district court judgments *at the trial phase*

(Mot. at 21) is thus entirely misplaced. *See Connor B.* Post-Trial, 774 F.3d at 48 ("[a]fter the plaintiffs fully presented their evidence at trial"); *J.R.*, 593 F.3d at 78, 80 (noting that plaintiffs did not establish a claim based "on all of their evidence" during trial).

To the extent Defendants argue that Plaintiffs' complaint fails "on the merits," or make factual arguments about their "concrete, good faith improvements" (Mot. at 18, 21–22 & n.16), such factual arguments should be reserved for trial and are not appropriate on a motion to dismiss where, as here, the Amended Complaint makes well-pleaded allegations to the contrary.

## IV.   Plaintiffs Have Pled Cognizable Procedural Due Process Violations

Fourteenth Amendment procedural due process protects individuals from deprivations of liberty interests without adequate procedural protections. As detailed in the Amended Complaint and Section III above, Defendants' widespread oversight failures subject Plaintiff Children in their custody "to the unnecessary administration of psychotropic medication without having sufficient procedures for ensuring that these medications are appropriately administered" or a "a sufficient process for informed consent, including adequate notice and a meaningful opportunity to be heard, prior to and throughout" psychotropic medications' administration (AC ¶¶ 292–93), "whereby a clearly designated adult consents to the administration of any recommended psychotropic medication to a child only after receiving complete information, . . . assessing the intended benefits and potential risks associated with the drugs." *Id.* ¶ 5(b); *see also id.* ¶¶ 5(a), 242–43, 248–53 (inadequate medical record keeping process), ¶¶ 254, 258, 260–73 (no meaningful informed consent process), ¶¶ 5(c), 274–79 (absence of sufficient secondary-review system).

Whether Plaintiffs are afforded "sufficient process depends on a multifactor analysis that ordinarily requires an evidentiary record." *Condon v. Bouffard*, No. 1:16-cv-00372, 2017 WL 663530, at *7 (D. Me. Feb. 17, 2017) (Nivison, J.), *aff'd*, 2017 WL 3184719 (D. Me. July 26,

2017). Procedural due process, unlike other legal rules, "is not a technical conception with a fixed content, unrelated to time, place, and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, due process "is flexible and calls for such procedural protections as the particular situation demands" to "minimize the risk of erroneous decisions." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12-13 (1979) (cleaned up). Given the "broad spectrum of concerns" such protections address, "flexibility is necessary to gear the process to the particular need." *Id.* at 13. In other words, "the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." *Id.* (quoting *Mathews*, 424 U.S. at 3335). Plaintiff Children have plausibly alleged their due process rights have been violated by Defendants' actions and inactions, and their fact-intensive procedural due process claims should not be dismissed before any evidentiary record is developed.

### A. Plaintiff Children Have a Recognized Liberty Interest in Being Free from the Unwarranted Administration of Psychotropic Medication

Children in state foster care custody "possess a strong liberty interest in not being unnecessarily administered psychotropic drugs." *M.B.*, 2018 WL 327767, at *11. As the *M.B.* court explained,

> Psychotropic drugs are powerful medications that directly affect the central nervous system. They are particularly potent when administered to children. Children administered psychotropic medications are at particularly serious risk of long-lasting adverse effects. They are more vulnerable to seizures, irreversible movement disorders, suicidal thoughts, aggression, weight gain, organ damage, and other life-threatening conditions. . . . Children in foster care are at increased risk of being improperly or unnecessarily administered psychotropic drugs.

*Id.* at *2–3 (detailing foster care circumstances that create heightened risk); *see* AC ¶¶ 172–201 (detailing risks); *see also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("*Harper*") (although

medications may provide "therapeutic benefits" in certain circumstances, they also risk "serious" side effects).

The Supreme Court has recognized that individuals in government custody have "a significant liberty interest" in avoiding nonconsensual or unnecessary administration of psychotropic medications. *Harper*, 494 U.S. at 221–22, 229 (prisoners have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Riggins v. Nevada*, 504 U.S. 127, 134–37 (1992). The Supreme Court has also recognized generally that children, just like adults, have a "substantial" liberty interest in not being "confined unnecessarily for medical treatment." *Parnham v. J.R.*, 442 U.S. 584, 600-01 (1979) ("assuming that a minor child has a protectable interest not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some persons because of an improper decision by the state hospital") (cleaned up); *see M.B.*, 2018 WL 327767, at *11.

## B. Plaintiffs Sufficiently Allege Inadequate Procedural Due Process Protections

Three factors are considered to determine the exact process that is due under any particular circumstances: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335; *see M.B.*, 2018 WL 327767, at *11. While Defendants argue the sufficiency of procedural protections provided to children in foster care—a fact in dispute,[14] Plaintiffs have put forth sufficient facts to plausibly allege violation of their rights to procedural due process concerning the administration of psychotropic medication.

---

[14] Defendants' continued reliance on *Connor B.* Post-Trial underscores the point, as the First Circuit was evaluating the sufficiency of the procedural due process claim after Plaintiffs fully presented trial evidence. Mot. at 24, 26.

First, Plaintiff Children's liberty interest in being free from the unnecessary administration of psychotropic medication while in Defendants' care is substantial. *Supra* at 19–20. Indeed, each Named Plaintiff is alleged to have exhibited significant side effects associated with psychotropic medication while administered that medication in state custody: Bryan C. has experienced suicidal ideation and significant weight gain (AC ¶¶ 18–21); Henry B., movement disorders and aggression (¶¶ 44–47); Trent W., hyperactivity and sleep problems (¶¶ 66–68); Grayson M., self-harm, aggression, suicide ideation, and hallucinations (¶¶ 89–92); Kendall P., increased anxiety, depression, suicide ideation, and extreme weight gain (¶¶ 109–13); and Neville H., weight gain, suicide ideation, and aggression (¶¶ 137–41). Such severe side effects resulting from the administration of psychotropic medication to Plaintiff Children are akin to the "serious" side effects noted in *Harper* that the Supreme Court found implicated a "substantial interference" with a person's liberty. 494 U.S. at 230–31.

Second, as the Amended Complaint highlights, there are well-known serious and long-term risks attendant with the administration of psychotropic medication in children without adequate safeguards. *See* AC ¶¶ 172–201. Plaintiff Children, and foster care children in general, are at heightened risk of being prescribed unwarranted psychotropic medication through outlier prescribing practices, commonly referred to as the problem of "too many, too much, and too young." *See id.* ¶¶ 191–201, 214-215, 274. As alleged, Defendants themselves "have repeatedly acknowledged their awareness of the serious risks accompanying the use of psychotropic medications in foster care populations" (*id.* ¶¶ 210–216), as well as "acknowledged their own system's failures that expose hundreds of foster children in their custody to those substantial" risks. *Id.* ¶¶ 217–35. Plaintiffs' Amended Complaint thus alleges both: (1) the known harms of administration of psychotropic medication to children; and (2) the specific harms suffered by

Plaintiffs. *See, e.g.*, *id.* ¶¶ 17–27, 44–47, 65–79, 87–92, 109–13, 137–41. Moreover, as Plaintiffs allege, there are well-known and effective procedural safeguards that could have, and should have, been implemented years ago, as recommended by the Maine Child Welfare Services Ombudsman, Child Welfare League of America, American Academy of Child & Adolescent Psychiatry, the federal Administration for Children and Families, and the Patient-Centered Outcomes Research Institute. *See, e.g.*, *id.* ¶¶ 206–09, 255–56, 274. Reading the Amended Complaint as a whole and assuming the veracity of these well-pled allegations for purposes of a motion to dismiss, the Court should readily "draw the reasonable inference" that Plaintiffs are deprived of their liberty interests without due process. *Iqbal*, 556 U.S. at 678.

Third, the weight of governmental interests tilts strongly in Plaintiffs' favor. The state recognizes "that the health and safety of children must be of paramount concern." 22 M.R.S. § 4003; *see Child. of Mary J.*, 2019 ME 2, ¶ 16, 199 A.3d 231, 235–36 ("the State [of Maine] has a well-established *parens patriae* interest in the safety and well-being of the children within its jurisdiction"). This is particularly so for vulnerable children in foster care over whom the state has custody. *See Connor B.* Post-Trial, 774 F.3d at 53–54 (assuming district court's finding of a "special relationship" requiring heightened due process duty of care); *see also supra* at 14–15. Unlike cases assessing the due process rights of prisoners and involuntarily committed persons, there is no countervailing interest here in maintaining the institutional safety of a prison or a psychiatric hospital. *Cf., Harper*, 494 U.S. at 225; *Youngberg*, 457 U.S. at 324. Nor do Defendants proffer any other countervailing governmental interests at this stage, besides their conclusory and generic objection to being held to a series of constitutional procedural requirements. Mot. at 26. The specifics of any such alleged burdens are more appropriately addressed on a full evidentiary record.

**C. Defendants' Attempts to Eschew Any Responsibility or Accountability for Overseeing Plaintiff Children's Medical Care Should Be Rejected**

Defendants' explicit attempt to duck their established responsibility for the medical care of the Plaintiff Children in their custody should be rejected. First, Defendants would pass the buck entirely to prescribing physicians, despite their non-delegable duty as Plaintiff Children's custodians. *See* Mot. at 23.[15] The Supreme Court, however, has held that sufficient process for the administration of psychiatric drugs to a ward of the state must involve more than simple reliance on a sole medical professional where there are "no procedural safeguards to ensure the [ward's] interests are taken into account." *Harper*, 494 U.S. at 233 (requiring independent review so the persons with ultimate authority to administer medication were not involved in an inmate's "current treatment or diagnosis"); *see also Parnham*, 442 U.S. at 606, 615–16 (noting "making medical judgments in the best interests of the children" should be in a "neutral and detached fashion," and cautioning against procedures where a "single physician or other professional has the unbridled discretion") (cleaned up); *M.B.*, 2018 WL 327767, at *12 ("Defendants' argument that a physician's prescription of a given medication itself affords sufficient procedural protection to the Plaintiffs cannot defeat the procedural due process claim at this [motion to dismiss] stage").

Where, as here, Plaintiffs allege Defendants failed to "adequately maintain and disseminate to the necessary individuals complete and current medical records including sufficient information on psychotropic medications" to physicians and caretakers (AC ¶¶ 241, 248–52), the *Parnham* and *Harper* holdings direct that the judgment of a prescribing physician alone does not constitute sufficient process. *See M.B.*, 2018 WL 327767, at *12–13 ("In light of these precedents the Court

---

[15] Defendants' cited authority for this radical claim offers no support for it. *Carillo v. United States* does not address procedural due process; it was a tort suit brought under the Federal Tort Claims Act. 5 F.3d 1302, 1303 (9th Cir. 1993). Likewise, *Pelletier v. Magnusson* addressed a claim alleging cruel and unusual punishment under the Eighth Amendment. 201 F. Supp. 2d 148, 149–51 (D. Me. 2002). Moreover, both were summary judgment decisions and thus have no relevance to deciding a motion to dismiss.

cannot say on the basis of the allegations of the complaint that a physician's prescription of psychotropic drugs to a child in foster care by itself constitutes sufficient procedural protection.").

Second, Defendants' argument that OCFS policies provide adequate process *per se* does not survive a fair reading of Plaintiffs' Amended Complaint. Plaintiffs plainly allege that substantial deficiencies in OCFS policies result in children being subjected to overmedication of psychotropic medication with serious side effects. *See, e.g.*, AC ¶¶ 17–29, 43–51, 65–79, 87–97, 109–23, 137–47, 220, 225–31, 257–73, 275, 277–79. But even assuming, *arguendo,* that Defendants' policies were adequate, Plaintiffs also allege OCFS's long-standing failure to adhere to and implement its own policies. *See, e.g.*, *id.* ¶¶ 225–29, 257–73. Such allegations are "sufficient to state a claim for deprivation of procedural due process." *Rodi v. Ventetuolo*, 941 F.2d 22, 29 (1st Cir. 1991) (allegations that a "constitutionally sufficient" policy "on paper" was "swept under the rug" in practice sufficiently stated procedural due process claim).

Third, Defendants argue that the availability of state-court review adequately protects against the risk of harm associated with the administration of psychotropic medication. Mot. at 25–26. But, as the Supreme Court has noted, courts are ill-suited to this task. *See Harper*, 494 U.S. at 232–33 ("The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals."). Accordingly, there is "good reason" to conclude that "a judicial hearing will not be as effective, continuous, or as probing as administrative review using medical decisionmakers." *Id.* At this pleading stage, the prospect of periodic judicial review cannot be a panacea that, as Defendants argue, cures all of the procedural deficiencies Plaintiffs allege. *See, M.B.*, 2018 WL 327767 at *13 (rejecting argument that state court's "authority with regard to

foster care children provides an additional layer of protection that warrants dismissal of due process claim.").[16] Plaintiffs have sufficiently pled a viable procedural due process claim.

**V.      Plaintiffs Have Stated a Claim Under AACWA for Defendants' Failure to Meet Case Plan and Case Review System Requirements**

Plaintiffs seek to enforce two specific requirements of AACWA, which are parts of Titles IV-B and IV-E of the Social Security Act, and that are essential to facilitating fully informed, safe, and well-coordinated treatment for children in foster care who can move frequently to new foster homes, especially those who are prescribed psychotropic medications. *See* 42 U.S.C. §§ 621, 670 *et seq.*; AC ¶¶ 239, 296. The first is that Defendants must develop a *case plan* for each child that contains the child's health records, including the most recent information available regarding the child's known medical problems and medications. 42 U.S.C. §§ 671 (listing the requisite features of state plans for foster care and adoption assistance), 671(a)(16) (requiring states to provide for the development of case plans for each child in foster care), 675(1) (listing the required elements of a case plan). The second is that Defendants must develop a *case review system* to ensure that each child's health records are reviewed, updated, and supplied to the foster parent or foster care providers with whom the child is placed before or at the time of placement. 42 U.S.C. §§ 622 (listing the requisite features of state plans for child welfare services), 622(b)(8)(A)(ii) (requiring states to provide assurances that they are operating a case review system for each child in foster

---

[16] Defendants argue, in conclusory fashion, that judicial review is a "categorically" adequate process. Mot. at 25. But the lead case they cite for this proposition addressed a markedly different due process right, the "emergency powers granted by state law to stay a major construction project." *San Geronimo Caribe Project, Inc.*, 687 F.3d 465, 470 (1st Cir. 2012). Any similarities between the due process right at issue in *San Geronimo* and the due process rights at issue here could only be drawn by the most creative imagination. *Herwins v. City of Revere*, is similarly light years afield. 163 F.3d 15 (1st Cir. 1998). There, the procedural due process right involved was the closure of a building through administrative procedures. *Id.* at 17. And while Defendants cite to a foster care case, *Howard v. Malac*, that case addressed the parental rights and process due to biological parents investigated and reported for abuse and neglect of their children. *See* 270 F. Supp. 2d 132, 140 (D. Mass. 2003). Further, their quote from *Howard* is misleadingly taken out of context; "failure to comply with state and departmental regulations '[wa]s entirely beside the procedural due process point'" (Mot. at 24) only because "no protected liberty interested was implicated" by parental placement on a child abuse registry, so "no attendant process was constitutionally due." *Howard*, 270 F. Supp. 2d at 141.

care), 671(a)(16) (requiring states to provide for a case review system), 675(5) (listing the required elements of a case review system).

As the provisions at issue support a private right of action under 42 U.S.C. Section 1983, Plaintiffs' detailed allegations that Defendants violate these statutory requirements easily state a claim under AACWA. Defendants' arguments to the contrary are without merit.

### A.   It Is the Established Law of the Circuit That AACWA Case Plan and Case Review System Requirements Are Privately Enforceable Under Section 1983

More than three decades ago, the First Circuit concluded that AACWA's case plan and case review system requirements are privately enforceable by children in foster care via Section 1983, which imposes liability on anyone who, acting under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws. *Lynch v. Dukakis*, 719 F.2d 504, 509–14 (1st Cir. 1983) (affirming preliminary injunction requiring Massachusetts's child welfare agency to provide case plans and a periodic review of those plans to each child in its foster care system). In so doing, the First Circuit rejected the very argument Defendants make here (Mot. at 28–29)—namely, that these provisions are solely enforceable by the Secretary of the Department of Health and Human Services. *See Lynch*, 719 F.2d at 512 (citing §§ 671(a)(16), 675(1), and 675(5) of AACWA).

Defendants completely ignore *Lynch*, but it continues to be the law in the Circuit. "[T]he right to a case plan was clearly upheld in *Lynch*." *Connor B*. MTD, 771 F. Supp. 2d at 170 (denying motion to dismiss §§ 671(a)(16) and 675(1) claims); *see also Sam M*. MTD, 800 F. Supp. 2d at 385 (citing *Lynch* in recognizing claims for adequate case plans under §§ 671(a)(16) and 675(1)). Indeed, the "majority of federal courts" have held that foster youth's rights to adequate case plans

are privately enforceable under Section 1983. *Henry A.*, 678 F.3d at 1006–09 (recognizing case plan and case review system claims, citing *Lynch*).[17]

Defendants' reliance on the Supreme Court's decision in *Suter v. Artist M.* is misplaced. 503 U.S. 347 (1992); *see* Mot. at 28–29. The Supreme Court held in *Suter* that Section 671(a)(15), a different provision of AACWA requiring "reasonable efforts" to prevent removal of a child from their home or facilitate reunification, did not create a private right of action enforceable under Section 1983. *Id*. at 359–63. Congress, however, subsequently enacted what is referred to as the "*Suter* Fix." *See* 42 U.S.C. § 1320a-2. This fix provided that "[i]n an action brought to enforce a provision of this chapter, such provision is *not to be deemed unenforceable* because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." *Id.* (emphasis added). Legislative history shows that a primary purpose of this amendment was to "preserve[] private rights of action as they existed before the *Suter v. Artist M.* Supreme Court decision," and to "restore to an aggrieved party the right to enforce, as it existed prior to [*Suter*], the Federal mandates of the State plan titles of the Social Security Act in the Federal courts." H.R. Rep. No. 102-631, at 365–66 (1992).

Courts have since explained that "although the ruling in *Suter* regarding . . . [reasonable efforts] was unaltered by the '*Suter* fix,' the amendment also expressed Congress's intent *not* to preclude courts from determining whether *other* provisions of the AACWA allowed private enforcement actions." *Sam M.* MTD, 800 F. Supp. 2d at 388. As such, courts have reaffirmed the

---

[17] *See L.J. v. Wilbon*, 633 F.3d 297, 307–10 (4th Cir. 2011) (case plan & case review); *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988) (case plan); *Elisa W. v. City of New York*, No. 15-CV-5273, 2016 WL 4750178, at *5–7 (S.D.N.Y. Sept. 12, 2016) (case plan & case review); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *10–12 (D. Nev. May 14, 2007) (case plan & case review); *Kenny A.*, 218 F.R.D. at 290–93 (case plan & case review); *Brian A.*, 149 F. Supp. 2d at 945–49 (case plan & case review); *Occean v. Kearney*, 123 F. Supp. 2d 618, 625 (S.D. Fla. 2000) (case plan); *Marisol A.*, 929 F. Supp. at 683 (case plan); *Jeanine B. v. Thompson*, 877 F. Supp. 1268, 1283–85 (E.D. Wis. 1995), *rev'd in part on other grounds*, 967 F. Supp. 1104 (E.D. Wis. 1997) (case plan & case review).

private right of action recognized in *Lynch*.[18] These post-*Suter* decisions apply the proper legal framework announced in *Blessing v. Freestone*, 520 U.S. 329 (1997), and *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), as explained below.

Defendants' citation to *Eric L. v. Bird*, in which a district court found that claims under AACWA were "foreclosed by the decision in *Suter*," thus also misses the mark. 848 F. Supp. 303, 312 (D.N.H. 1994). The *Eric L.* court acknowledged that Congress was considering, but had not enacted, the *Suter* Fix and that the court was constrained by *Suter* "[i]n the meantime." *Id.* at 311. And because the court viewed the plaintiffs' claims as categorically foreclosed, the court did not even apply the Supreme Court's private right of action *Blessing/Gonzaga* standard.

Defendants' reliance on *Marr* is similarly unpersuasive. *See Marr v. Me. Dep't of Hum. Servs.*, No. CIV. 01-224-B-C, 2002 WL 737651 (D. Me. Apr. 24, 2002), *aff'd*, 2002 WL 1461826 (D. Me. July 9, 2002). Although it found AACWA Section 671 not privately enforceable under Section 1983, it failed to address *Lynch*. *Id.* at *3–4. Moreover, *Marr* was an action solely for *money damages*, and the court acknowledged that the result might be different in an action like this for injunctive relief. *Id.* at *4 (citing *Brian A.*, 149 F. Supp. 2d at 947 (provisions requiring a written case plan with mandated elements and a periodic review system create enforceable Section 1983 rights in an injunctive action) and *Jeanine B.*, 877 F. Supp. at 1282–84 (finding private right of action with respect to case plan and case review system provisions in an injunctive action)).

## B. Plaintiffs' AACWA Case Plan and Case Review System Claims Meet the *Blessing/Gonzaga* Standard for Enforceability

The Supreme Court established a three-part test to determine whether federal statutory provisions create rights enforceable under Section 1983. *Blessing*, 520 U.S. at 340–42; *Gonzaga*,

---

[18] *See, e.g.*, *Henry A.*, 678 F.3d at 1006–09; *L.J. v. Wilbon*, 633 F.3d at 307–10; *Elisa W.*, 2016 WL 4750178, at *5–7; *Sam M.* MTD, 800 F. Supp. 2d at 388; *Connor B.* MTD, 771 F. Supp. 2d at 168–72; *Clark K.*, 2007 WL 1435428, at *10–12; *Kenny A.*, 218 F.R.D. at 290–93.

536 U.S. at 290; *see also Rio Grande*, 397 F.3d at 73. It requires courts to consider: (1) whether the provision contains "rights-creating language;" (2) whether the provision has an aggregate as opposed to an individualized focus; and (3) the other enforcement provisions that Congress has provided. *Rio Grande*, 397 F.3d at 73.[19] Where plaintiffs "satisf[y] the threshold inquiry and demonstrate[] that Congress intended to confer an individual right, the right is presumptively enforceable by § 1983." *Colón-Marrero v. Vélez*, 813 F.3d 1, 16 (1st Cir. 2016). To overcome the presumption, defendants must show that Congress "shut the door to private enforcement either expressly in the statute creating the right, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (cleaned up).

Here, "application of the *Gonzaga* factors makes it clear that Congress intended to create privately enforceable rights to individualized case plans . . . under the AACWA." *Connor B.* MTD, 771 F. Supp. 2d at 172; *see also Sam M.* MTD, 800 F. Supp. 2d at 387–88 (applying the "relevant inquiry" "[f]ollowing *Gonzaga*" to find case plan provisions create privately enforceable rights); *Henry A.*, 678 F.3d at 1008 ("We disagree with th[e] analysis [of *31 Foster Child.*] and instead join the federal courts that have found the records provisions of [AACWA] to be privately enforceable along with the case plan provisions.") (citing *Lynch*).[20]

### 1. The AACWA Provisions Contain "Rights-Creating Language"

"Rights-creating language" (1) speaks in "mandatory, rather than precatory, terms;" (2) unmistakably focuses on the benefited class; and (3) contains "individually focused terminology."

---

[19] *Gonzaga* "tightened up the *Blessing* requirements" and "relied on several somewhat different factors in determining whether a right existed." *Rio Grande*, 397 F.3d at 73. The First Circuit has "appl[ied] the more recent analysis used in *Gonzaga* rather than the *Blessing* test," but has found that satisfaction of the *Gonzaga* factors has also satisfied the earlier *Blessing* test. *Id.* at 73 n.10. The earlier *Blessing* test asked: (1) whether Congress "intended that the provision in question benefit the plaintiff;" (2) whether the right supposedly protected by the statute is vague and amorphous so that its enforcement would strain judicial competence;" and (3) whether the provision unambiguously impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 340–41; *see also Connor B.* MTD, 771 F. Supp. 2d at 168 n.8.

[20] Defendants cite a number of other cases outside of the First Circuit that are similarly unpersuasive given the relevant precedent within the First Circuit. *See* Mot. at 29–31.

*Connor B.*, 771 F. Supp. 2d at 170–71 (quoting *Gonzaga*, 536 U.S. at 284, 295). Such language is contained in both the case plan requirements under Sections 671(a)(16) and 675(1) and the case review system requirements under Sections 622(b)(8)(A)(ii), 671(a)(16), and 675(5):

- o Section 671(a) requires that "[i]n order for a State to be eligible for payments under this part, it **shall** have a plan approved by the Secretary which . . . (16) provides for the development of a case plan (as defined in section 675(1) . . . ) for **each child** receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section[] 675(5) . . . with respect to **each such child**." (emphases added).

- o Section 675(1) defines "case plan" as "a written document" that "**includes at least the following** . . . (C) [t]he health and education records of **the child**, including the most recent information available regarding . . . (i) the names and addresses of **the child's** health and education providers; . . . (iv) a record of **the child's** immunizations; (v) **the child's** known medical problems; (vi) **the child's** medications; and (vii) any other relevant health and education information concerning **the child** determined to be appropriate by the State agency." (emphases added).

- o Section 622 requires that "(a) . . . [i]n order to be eligible for payment under this subpart, a State **must** have a plan for child welfare services which has been developed jointly by the Secretary and the State agency designated pursuant to subsection (b)(1), and which meets the requirements of subsection (b)," including the requirement that "(b) [e]ach plan for child welfare services under this subpart **shall** . . . (8) provide assurances that the State . . . (A) is operating, to the satisfaction of the Secretary . . . (ii) a case review system (as defined in section 675(5) . . . ) for **each child** receiving foster care under the supervision of the State." (emphases added).

- o Section 675(5) defines "case review system" as "a procedure **for assuring that** . . . (D) **a child's** health and education record . . . **is reviewed and updated,** and a copy of the record **is supplied** to the foster parent or foster care provider with whom **the child** is placed, at the time of each placement of **the child** in foster care . . . ." (emphases added).

These requirements are "explicitly mandatory," rather than merely providing an incentive for state compliance through funding. *Sam M.* MTD, 800 F. Supp. 2d at 388. For example, Section 671(a)(16) requires that "a State . . . *shall* have a plan approved by the Secretary which . . . provides for the development of a case plan." *Id.* (quoting § 671(a)(16)). Section 622(b) uses similarly

mandatory language, requiring that "[e]ach plan for child welfare services . . . *shall* . . . (8) provide assurances" of the State's operation of a case review system. 42 U.S.C. § 622(b)(8)(A)(ii) (emphasis added). Section 671 further incorporates the requirement of a "case review system which meets the requirements described in section[] 675(5)." *Id.* § 671(a)(16). As the *Connor B.* court concluded, provisions like these "express[] a clear mandate" and therefore reflect "rights-creating" language. *Connor B.* MTD, 771 F. Supp. 2d at 170–71.

Moreover, the case plan and case review system provisions benefit a particular class— children in foster care—and contain individually focused terminology. *Id.* at 171; *Henry A.*, 678 F.3d at 1006–09. Specifically, the provisions mandate a case plan with respect to "'*each child*' . . . . who has been removed from his or her family." *Sam M.* MTD, 800 F. Supp. 2d at 387–88 (emphasis added) (quoting §§ 671(a)(16), 675(a)(1)). Likewise, Section 622 requires states to operate "a case review system (as defined in section 675(5) . . .) for *each child* receiving foster care under the supervision of the State." 42 U.S.C. § 622(b)(8)(A)(ii) (emphasis added). Courts have repeatedly found that this recurring reference to "each child" in foster care is "individually focused" language that identifies a discrete beneficiary group, satisfying the first prong.[21]

### 2.   The AACWA Provisions Focus on the Needs of Individual Children

The AACWA case plan and case review system provisions also satisfy the second *Blessing/Gonzaga* prong because they focus on the individualized needs of each child. AACWA "contains very specific requirements for an individualized case plan for each eligible child." *Sam M.* MTD, 800 F. Supp. 2d at 388 (citing § 675(1)'s list of "required numerous and detailed

---

[21] *See, e.g.*, *Connor B.* MTD, 771 F. Supp. 2d at 171 (§ 671(a)(16) is "unmistakably focused on the benefited class, *i.e.*, foster children"); *Sam M.* MTD, 800 F. Supp. 2d at 387–88 (children in foster care are the intended beneficiaries of case plan requirements under §§ 671(a)(16) and 675(a)(1)); *Henry A.*, 678 F.3d at 1006–09 (the case plan and case review system requirements under §§ 671(a)(16), 675(1), and 675(5)(D) focus on and refer repeatedly to the children in foster care benefitted); *see also Colón-Marrero*, 813 F.3d at 17–18 ("Language that directs state officials in the implementation of statutory objectives may still create an enforceable right where it 'mentions a specific, discrete beneficiary group within the statutory text'") (quoting *Rio Grande*, 397 F.3d at 74).

elements of case plan[s]"). Those requirements include the child's health records, including the most recent information available regarding the names and addresses of the child's health providers, the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information for the child. *See* § 675(1)(C); AC ¶ 296.

AACWA's required "case review system" is similarly framed in terms of specific assurances for each individual child. For example, Section 622(b)(8)(A)(ii) requires states to provide assurances that they are operating "a case review system (as defined by section 675(5) . . . ) for *each child* receiving foster care under the supervision of the State." § 622(b)(8)(A)(ii) (emphasis added); *see also* § 675(5)(D) (requiring that a state ensure that "*a child's* health . . . record" is reviewed, updated, and supplied "to the foster parent or foster care provider with whom *the child* is placed" before or at the time of placement) (emphases added). Repeated reference to "each child" illustrates an individualized, rather than aggregate, focus. *Connor B.* MTD, 771 F. Supp. 2d at 171; *see also Henry A.*, 678 F.3d at 1008–09 (explaining that the provisions state what must be done for "each child," using singular and definite language throughout).

### 3. AACWA Has No Comprehensive Enforcement Mechanism Precluding Enforceability

Plaintiffs' AACWA claim satisfies the third *Blessing/Gonzaga* factor because AACWA lacks an alternative, comprehensive enforcement mechanism through which harmed children in foster care could assert and seek to remedy statutory violations. *See Connor B.* MTD, 771 F. Supp. 2d at 168, 171–72 (noting that the case plan and case review system provisions do not "contain[] another enforcement mechanism through which an aggrieved individual can obtain review") (citing *Gonzaga*, 536 U.S. at 287–90); *Sam M.* MTD, 800 F. Supp. 2d at 388. Contrary to Defendants' arguments, the mere ability of the U.S. Secretary of Health & Human Services to withhold federal funds is *not* a comprehensive remedial scheme that would preclude private

enforcement of statutory rights. *See Lynch*, 719 F.2d at 510–11 (collecting Supreme Court rulings holding Social Security Act provisions enforceable under Section 1983 notwithstanding remedies analogous to the Secretary's withholding of federal funds); *Connor B.* MTD, 771 F. Supp. 2d at 171–72 (periodic review of state compliance "is not the same as an individualized enforcement mechanism"). Nor is there any indication that Congress intended the possible withholding of federal funds by the Secretary to be an exclusive remedy. *Sam M.* MTD, 800 F. Supp. 2d at 388.

Thus, Defendants' argument that the provisions are not privately enforceable because they are enforced by the Secretary and concern "a question of funding eligibility directed to the Secretary's discretion" (Mot. at 30) is without merit. As the First Circuit made clear, "the fact that a statutory command is directed at state officials as part of a broader plan for implementation does not preclude it from likewise creating privately enforceable rights." *Colon-Marrero*, 813 F.3d at 17, 20 ("rarity" of a "deliberate exclusion" of private rights of action under Section 1983); *Lynch*, 719 F.2d at 510–11. Accordingly, the provisions here satisfy all three prongs for enforceability.[22]

### C.  Plaintiffs' Factual Allegations Are Sufficient Under AACWA

Plaintiffs allege in detail that Defendants fail to adequately maintain complete and current medical records, including sufficient information on psychotropic medications, as required by AACWA case plan Sections 671(a)(16) and 675(1). *See, e.g.*, AC ¶¶ 5(a), 24, 32–34, 53, 77, 98–100, 124–26, 148–49, 241–42. Plaintiffs similarly allege that Defendants lack an adequate system to ensure that each child's health record is reviewed, updated, and disseminated to the necessary

---

[22] Application of the pre-*Gonzaga* factors under *Blessing*, which some courts have considered even post-*Gonzaga*, requires the same conclusion. The specific case plan and case review system requirements for each individual child mean the "provisions cannot be said to be so vague and amorphous that [their] enforcement would strain judicial competence." *Sam M.* MTD, 800 F. Supp. 2d at 388 (quoting *Blessing*, 520 U.S. at 340–41) (cleaned up); *see also Kenny A.*, 218 F.R.D. at 292. Additionally, the mandatory language throughout demonstrates the provisions "clearly impose a binding obligation on the States." *Id.*

individuals as required by AACWA case review system Sections 622(b)(8)(A)(ii), 671(a)(16), and 675(5). *See, e.g.*, AC ¶¶ 5(a), 30–32, 52, 78, 98–100, 124–26, 148-49, 241, 248–53.

Defendants argue the factual merits again, however, in a misguided attempt at dismissal. Tellingly, the sole authority Defendants offer for their argument regarding the sufficiency of Plaintiffs' statutory allegations is, again, the First Circuit's review of the district court's decision on those claims *after* "extensive discovery" *and* a bench trial. *Connor B.* Post-Trial, 774 F.3d at 48–49 (affirming judgment on the record after "plaintiffs fully presented their evidence at trial").

Defendants propose to show that Defendant DHHS's written policy meets the requirements of AACWA. Besides this being a disputed fact, it ignores that the heart of Plaintiffs' statutory claims is that, no matter what is policy on paper, it is Defendants' *actions and inactions* that constitute the actual policies, patterns, practices and/or customs that violate Plaintiffs' federal statutory rights.[23] AC ¶¶ 295–96. For example, Plaintiffs allege facts showing Defendants' failure to develop an adequate case plan for each child that contains the child's health records, including the most recent information available regarding the child's known medical problems and medications, as required by Sections 671(a)(16) and 675(1). *See, e.g.*, AC ¶ 34 (Bryan C.'s caseworker lacked access to his basic psychotropic medication records when requested by clinicians treating him for an acute crisis), and ¶ 53 (Henry B.'s health records so poorly maintained by OCFS that it is unclear what his mental health diagnoses are); *see also* AC ¶¶ 5(a), 24, 30-33, 52–53, 77–78, 98–100, 124–26, 148–49, 241, 248–52 (Defendants fail to adequately maintain and disseminate to the necessary individuals complete and current medical records, including sufficient information on psychotropic medications). Plaintiffs similarly allege facts

---

[23] Defendants argue that, under their policy, it is supposedly foster parents' or other provider's responsibility to update health records. Mot. at 33–34. Again, such arguments miss the point that it is ultimately Defendants' duty as the Title IV-E agency to ensure AACWA requirements are met for children in their foster care custody. *See* AC ¶¶ 155–57, 236–38.

showing Defendants' failure to implement an adequate case review system to ensure that each child's health records are reviewed, updated, and supplied to the foster parent or foster care providers with whom the child is placed before or at the time of placement, as required by Sections 622(b)(8)(A)(ii), 671(a)(16) and 675(5). *See, e.g.*, AC ¶ 100 (no known, up-to-date summary of Grayson M.'s medical and mental health history and treatment that has moved with him between placements), and ¶125 (no medication history or any record of Kendall P.'s treatments from prior placements at residential facilities that is accessible to those charged with her care).

Plaintiffs' clear and specific allegations are more than sufficient at this preliminary stage. "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29–30 (1st Cir. 2010) (vacating dismissal of federal statutory claims for equitable relief where the district court "demanded more than plausibility" in assessing the complaint's adequacy) (citing *Twombly*, 550 U.S. at 556). Accordingly, there is no basis to dismiss Plaintiffs' AACWA claims.

CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion on all grounds.


Dated: May 14, 2021

Respectfully Submitted,

BERNSTEIN, SHUR, SAWYER & NELSON, P.A.

/s/ *John A. Woodcock III*
John A. Woodcock III
Eben M. Albert
100 Middle Street
PO Box 9729
Portland, ME 04101
(207) 774-1200
(207) 774-1127 (fax)

35

jwoodcock@bernsteinshur.com
ealbert@bernsteinshur.com

CHILDREN'S RIGHTS

Marissa C. Nardi (*pro hac vice* pending)
Samantha Bartosz (*pro hac vice* pending)
Stephen Dixon (*pro hac vice* pending)
Jonathan King (*pro hac vice* pending)
Madeleine M. Kinney (*pro hac vice* pending)
Claire R. Glasspiegel (*pro hac vice* pending)
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
(212) 683-4015 (fax)
mnardi@childrensrights.org
sbartosz@childrensrights.org
sdixon@childrensrights.org
jking@childrensrights.org
mkinney@childrensrights.org
cglasspiegel@childrensrights.org

MAINE EQUAL JUSTICE

Frank D'Alessandro
126 Sewall Street
Augusta, ME 04330
(207) 626-7058
(207) 621-8148 (fax)
frank@mejp.org

**ATTORNEYS FOR PLAINTIFFS**