## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BRYAN C., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 1:21-cv-00005-NT |
| | ) | |
| JEANNE M. LAMBREW, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Before me is the Defendants' motion to dismiss the Plaintiffs' First Amended Complaint ("**FAC**"). For the reasons stated below, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND[1]

The Plaintiffs are foster children currently in the custody of the State,[2] each of whom is represented by his/her state-appointed guardian ad litem as his/her next friend (the "**Next Friends**").[3] The Plaintiffs seek to bring a class action against Jeanne Lambrew, the Commissioner of the Maine Department of Health and Human Services ("**DHHS**"), and Todd Landry, the Director of the Office of Child and Family

---

[1]     The facts below are drawn from the allegations in the First Amended Complaint ("**FAC**"), which I take as true for the purposes of deciding a motion to dismiss. *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

[2]     The Plaintiffs are identified by pseudonyms.

[3]     Several of the Plaintiffs share the same guardian ad litem, so there are three next friends representing the six plaintiffs.

Services ("**OCFS**"), both in their official capacities. The putative class consists of "all children who are or will be in DHHS foster care custody and who are or will be prescribed or administered one or more psychotropic[4] medication while in state care." FAC ¶ 160 (ECF No. 22).

The Plaintiffs allege that DHHS's system of administering psychotropic drugs to foster children violates the Constitution and that DHHS's recordkeeping violates the federal Adoption Assistance and Child Welfare Act ("**AACWA**"). The factual allegations are detailed and voluminous, but, in sum, the Plaintiffs generally allege that the Defendants have failed to: (1) "maintain readily accessible, comprehensive, and up-to-date medical records"; (2) provide all medical records to foster caregivers promptly upon placement, or to all prescribing physicians for purposes of treatment; (3) establish an adequate informed consent process both prior to and throughout administration of psychotropic medications; and (4) maintain and operate a system of secondary review by a child psychiatrist to ensure the safety of any psychotropic medications, and combination of psychotropic medications, administered. FAC ¶ 5.

## I.   The Plaintiffs

### A.   Bryan C.

Plaintiff Bryan C. has been prescribed dosages of medications inappropriate for a child of his size and age (seven). FAC ¶¶ 11, 16. For example, an outside doctor

---

4        "Psychotropic medications are powerful drugs that impact emotions and behavior, such as anti-anxiety agents, antidepressants, mood stabilizers, stimulants, and antipsychotics." FAC ¶ 2 (ECF No. 22). These drugs can have serious side effects, including seizures, psychosis, suicidal ideation, self-harm, aggression, diabetes, organ damage, and even sudden death. FAC ¶ 2. These drugs are particularly potent in children. FAC ¶ 2.

not normally in charge of Bryan's care determined that his prescription for Vyvanse (a stimulant) was "entirely inappropriate" and should not have been prescribed to Bryan at all, much less in the dosage he was receiving. FAC ¶¶ 13, 16. At one point, a hospital directed that three of Bryan's prescriptions should be discontinued, but shortly thereafter, his prior prescriber reinstated two of these medications. FAC ¶ 27. Bryan has suffered a number of severe side effects from these medications, some of which have been treated by the administration of additional psychotropic drugs. FAC ¶¶ 17–24, 26.

There has been no "effective informed consent process through which an objective decision-maker can consent to medication for Bryan," his caseworkers are not typically present at appointments when psychotropic medications are prescribed, and Bryan's caseworkers are sometimes only notified of a new prescription after the medication has already begun to be administered. FAC ¶¶ 28–29. His Vyvanse prescription was not subject to any secondary review. FAC ¶ 16.

The Plaintiffs also allege deficiencies in Bryan's medical records. He has no medical passport that has moved with him from placement to placement. FAC ¶ 31. His caseworkers, clinicians, and advocates do not have ready access to his prior and current medical records, impairing their ability to monitor his medications. FAC ¶¶ 32–33. And his caregivers, advocates, and treating physicians have not always had access to updated medical records. FAC ¶¶ 30, 34. For example, Bryan received a blood test months ago to screen for diabetes, but OCFS has been unable to produce the records related to that test, and the results remain unknown. FAC ¶ 24.

**B.    Henry B.**

Plaintiff Henry B. has been administered as many as six psychotropic medications at a time without any secondary review of the propriety of this practice. FAC ¶¶ 42–43. Henry has suffered serious side effects from these medications. FAC ¶¶ 44–47. There is no adequate informed consent process for the administration of psychotropic medications to Henry. FAC ¶ 48. In particular, the Defendants failed to inform Henry that he was entitled to have a meaningful role in the decision-making process with regard to his prescriptions. FAC ¶ 49. And despite OCFS policy requiring individuals over the age of fourteen to consent to prescriptions in almost all circumstances, Henry has not been included in informed consent conversations even after turning fourteen. FAC ¶¶ 49, 259. Henry's medical records are so poorly maintained, it is not even clear what his mental health diagnoses are. FAC ¶ 53.

**C.    Trent W.**

While in state custody, Plaintiff Trent W. was misdiagnosed with ADHD and was administered psychotropic medication as a result of this misdiagnosis. FAC ¶¶ 59–60, 64–65. Trent continued to be administered medication for his ADHD while in state custody even after it was confirmed that he did not have ADHD. FAC ¶¶ 63–65, 69. In November 2020, Trent was hospitalized following an acute crisis, but at the time of his hospitalization, the hospital lacked any medical records for him. FAC ¶¶ 70, 77. Trent's guardian ad litem tried to obtain these medical records but was not able to obtain all of them. FAC ¶ 78.

However, the Plaintiffs never allege that any of these issues are the fault of the Defendants. That is, it is never alleged whether the Defendants played any role

in Trent being administered medication for his ADHD when he did not have ADHD or in the hospital lacking medical records for Trent when he was hospitalized. The Plaintiffs only vaguely allege that the Defendants have violated Trent's rights, FAC ¶ 80, which is not enough to sustain a claim. However, rather than dismiss Trent's claims outright, I will allow the Plaintiffs leave to amend. Should Trent file amended claims and the Defendants consider those amended claims to still be deficient, the Defendants are free to renew their motion to dismiss as to Trent W.

### D.   Grayson M.

Prior to entering the custody of the State, Plaintiff Grayson M. had been prescribed psychotropic medications that had an adverse effect on him, including Risperidone (an antipsychotic). FAC ¶¶ 13, 88–89. Grayson informed his clinicians of this, and his biological mother (who maintained parental rights) also expressed concern about him being prescribed Risperidone. FAC ¶ 89. Nevertheless, Grayson was prescribed—and continues to be prescribed—Risperidone. FAC ¶ 89. Grayson has experienced serious side effects from his psychotropic medications. FAC ¶¶ 87, 90–91. Grayson and his biological mother have reported some of these side effects to his clinician and caseworker, but no secondary review process has occurred. FAC ¶¶ 92–93. After Grayson tried to refuse his medications and after his biological mother objected to his continued use of them, OCFS required Grayson to continue to take them FAC ¶ 95. The informed consent process prior to the administration of these medications was inadequate, and Grayson and his biological mother have had little to no involvement in the decision-making process with respect to his medications. FAC ¶¶ 94, 96.

5

The Defendants have also failed to provide complete and accurate medical records to Grayson, his caregivers, or his doctors. FAC ¶¶ 98, 99.

### E.    Kendall P.

Plaintiff Kendall P. was administered psychotropic medications without an adequate process of informed consent. FAC ¶¶ 114–15. Despite her repeated requests to stop or revisit her medications, these pleas were often ignored. FAC ¶¶ 116–17. Kendall is often notified of changes in her medication only after the changes have already been made even though she is seventeen and thus her informed consent is required under OCFS policy. FAC ¶¶ 103, 118–19, 121. She has suffered multiple adverse side effects from the psychotropic medications administered to her. FAC ¶¶ 109–14, 119, 121. No secondary review process has been triggered by any of Kendall's objections or the side effects that she has suffered. FAC ¶ 123.

The Defendants have not provided Kendall, her caregivers, or her doctors complete, updated medical records, and she has no portable record that can move with her from placement to placement. FAC ¶¶ 124, 126.

### F.    Neville H.

Plaintiff Neville H. was administered psychotropic medications without an adequate process of informed consent. FAC ¶¶ 143–46. Neville has experienced adverse effects from his psychotropic medications. FAC ¶ 137–41. After Neville was placed on Prozac (an antidepressant) at age five, his therapist expressed anger and confusion about this decision to OCFS, but the Defendants did nothing to follow up with the prescriber or conduct any secondary review. FAC ¶ 134. No meaningful secondary review process has been conducted for any of Neville's medications. FAC

¶ 147. The Defendants have not provided complete, updated medical records to Neville, his caregivers, or his medical providers, which has impaired his doctors' ability to treat him. FAC ¶¶ 148–49.

## II.   The Claims

The Plaintiffs put forth three causes of action: a substantive due process claim, a procedural due process claim, and a statutory claim. The substantive due process claim is premised on the Defendants' duty to protect the children in their care, which the Plaintiffs contend has been violated by the aforementioned actions. FAC ¶¶ 280–81. In particular, the Plaintiffs contend that the Defendants have violated the putative class members' rights: (1) to protection from harm or unreasonable risk of harm; (2) to necessary treatment, care, and services to protect them from harm; and (3) to adequate supervision and monitoring of their health and safety. FAC ¶ 285.

With regard to the procedural due process claim, the Plaintiffs allege that they have a substantial liberty interest in being free from the unnecessary administration of psychotropic medication and that they have been deprived of this liberty interest without sufficient procedural protections. FAC ¶¶ 288, 292–93.

The Plaintiffs also allege that the Defendants have violated their rights under the AACWA to (1) have an individualized written case plan and (2) have their health records reviewed, updated, and supplied to a foster parent or foster care provider at the time of placement. FAC ¶ 296.

In their prayer for relief, the Plaintiffs request injunctive relief ordering the Defendants to: (1) "implement and maintain a comprehensive and updated electronic healthcare record for all children in DHHS foster care custody; (2) provide each child's

foster caretaker with the child's complete medical history upon placement; (3) promulgate an effective informed consent policy for psychotropic medications; (4) develop, maintain, and review a system to track compliance with that informed consent policy; (5) train all social workers and foster caretakers regarding the safe administration of psychotropic drugs; (6) implement a secondary review system to flag outlier or elevated risk prescription practices; and (7) require secondary review by a child psychiatrist of all flagged prescription regimens. FAC ¶ 298(d).

## III.   The Briefing

The Defendants put forward three reasons why they contend the FAC should be dismissed. Their primary argument is that the Court should abstain under *Younger v. Harris* because the Plaintiffs' cases are supervised by the state courts. Defs.' Mot. to Dismiss ("**Defs.' Mot.**") 10–15 (ECF No. 25). Second, they argue that the Plaintiffs' guardians ad litem are not proper representatives of the Plaintiffs and that this deprives the Court of subject matter jurisdiction. Defs.' Mot. 15–18. Third, the Defendants contend that the FAC fails to state any claim upon which relief can be granted. Defs.' Mot. 18–34. The Plaintiffs dispute each of these points.

## LEGAL STANDARD

In reviewing a motion to dismiss, I must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). "[A] complaint will survive a motion to dismiss when it alleges 'enough facts to state a claim to relief that is plausible on its face.' "

*Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" if the facts alleged give rise to a reasonable inference of liability. *Id.* "Plausible" means "more than merely possible" but does not require all facts necessary to establish a prima facie case. *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717–18 (1st Cir. 2014) (internal quotation marks omitted).

## DISCUSSION

### I.  *Younger* Abstention

I first address the Defendants' argument that I should abstain under *Younger v. Harris,* 401 U.S. 37 (1971), because exercising jurisdiction would interfere with the state judicial system.

### A.  Legal Background

*Younger* abstention is one of the few doctrines that either requires or allows federal courts to defer to state proceedings, and it embodies the principle that federal courts should "refrain from interfering with certain state proceedings." *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 191 (1st Cir. 2015) (citation omitted). But the Supreme Court's "dominant instruction" to lower federal courts is that "even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.' " *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81–82 (2013) (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)). "Federal courts . . . have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' " *Id.* at 77 (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). "[F]ederal courts ordinarily should entertain and resolve on

the merits an action within the scope of a jurisdictional grant, and should not 'refuse to decide a case in deference to the States.' " *Id.* at 73 (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans* (*NOPSI*), 491 U.S. 350, 368 (1989)).

"Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Id.* at 72. Only "exceptional circumstances" warrant deviation from the general rule that federal courts must exercise the jurisdiction that is given to them. *Id.* at 78 (quoting *NOPSI*, 491 U.S. at 368). Those exceptional circumstances arise in three—and only three—contexts: (1) an ongoing state criminal prosecution, (2) certain civil enforcement proceedings, and (3) "pending 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.' " *Id.* (quoting *NOPSI*, 491 U.S. at 368).

The first category (stemming from the facts of *Younger* itself) encompasses state criminal prosecutions. *See id.* at 72. The second encompasses "state proceedings 'akin to a criminal prosecution' in 'important respects.' " *Id.* at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). Cases of this kind typically arise from an investigation that culminates in the filing of a formal complaint or charges by a state actor "to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act." *Id.* at 79–80.

To illustrate the third category—"pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions"—the *Sprint* Court cited to two cases: *Juidice v. Vail*, 430 U.S. 327, 336 n.12 (1977) (plaintiffs who were held in contempt by state court judges sought relief

in federal court), and *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13 (1987) (plaintiffs challenged constitutionality of Texas bond provisions). *See id.* at 78–79. Both of those cases rested on the importance of the States being able to enforce the orders and judgments of their own courts. *See id.* at 79 (describing this category as "touch[ing] on a state court's ability to perform its judicial function"). Unlike cases involving the validity of a state court judgment, "it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *NOPSI*, 491 U.S. at 368.

The analysis as to whether *Younger* abstention is appropriate begins with examining whether a particular state proceeding falls within one of these three defined categories. *Sirva*, 794 F.3d at 192–93. If the state proceeding at issue does "fall[ ] within the *Younger* taxonomy," the court next evaluates "whether the [so-called] *Middlesex* factors support abstention." *Id.* at 193. That is, the court looks to whether there is "an ongoing state judicial proceeding," whether "the proceedings implicate important state interests," and whether "there is an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). "[I]f these two steps leave the case on track for abstention," the court then looks to whether any of the limited exceptions to the *Younger* doctrine apply. *Sirva*, 794 F.3d at 193.

It is important to emphasize that *Sprint* narrowed the scope of *Younger* to the three specified categories. *Id.* at 189. Previously, many lower courts treated the *Middlesex* factors as the dispositive test, regardless of whether a case fell into one of the three specified categories. *Id.* at 192. In *Sprint*, the Supreme Court clarified that this was not correct, emphasizing that a strict application of the *Middlesex* factors "would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." 571 U.S. at 81. The Court noted that such a result is not consistent with its repeated admonition that "abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.* at 81–82 (quoting *Midkiff*, 467 U.S. at 236).

### B.   Maine's Foster Care System

Maine law gives the Maine District Court jurisdiction over child protection proceedings. 22 M.R.S. § 4031(1)(A). As a part of these proceedings, the Maine District Court makes a determination as to whether the child is in "jeopardy," meaning whether the child has been the victim of serious abuse or neglect. *Id.* §§ 4002(6), 4035. The court must review any case in which it has made a jeopardy determination at least once every six months, although the court or the child's guardian ad litem may otherwise move for judicial review. *Id.* § 4038(1), (2). During such a review, the court must assess "[t]he safety of the child" and other factors regarding the placement of the child. *Id.* § 4038(5).

The Maine District Court has broad authority regarding what it can order in a child protection proceeding, including "[n]ecessary emergency medical treatment for the child" when the person who has custody of the child is unwilling or unable to

consent. *See generally id.* § 4036. DHHS, a doctor, or the chief medical administrator of a hospital may petition the court for a medical treatment order, and the court may order such treatment if it "is necessary to treat or prevent an immediate risk of serious injury." *Id.* § 4071(1), (4).

### C.    Analysis

In arguing for abstention, the Defendants rely on the outdated *Middlesex* framework as being the dispositive test for whether abstention is appropriate. Defs.' Mot. 10–11. The cases cited by the Defendants—all of which pre-date *Sprint*—do the same. *See, e.g.*, *31 Foster Children v. Bush*, 329 F.3d 1255, 1274–82 (11th Cir. 2003); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999); *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 523 (D. Neb. 2007); *Laurie Q. v. Contra Costa Cnty.*, 304 F. Supp. 2d 1185, 1194 (N.D. Cal. 2004). The Supreme Court eschewed this approach in *Sprint*.[5] *See Sirva*, 794 F.3d at 192.

The Plaintiffs contend that periodic individual child welfare state court proceedings do not fit within any of the three *Younger* abstention categories. Because the Defendants address only the *Middlesex* factors—that is, step two of the three-step analysis laid out in *Sirva*—they fail to address how the state proceedings fit into one of the three categories within the *Younger* taxonomy. *See id.* at 193. Even after the Plaintiffs clearly raised the issue in their response, the Defendants did not address

---

[5]    The Defendants make a cursory "*see also*" cite to *Sprint*, but their analysis relies only on pre-*Sprint* cases. *See* Defs.' Mot. to Dismiss FAC ("**Defs.' Mot.**") 11 (ECF No. 25).

the question in their reply brief, continuing to rely exclusively on the *Middlesex* factors.

Because the state proceedings are not criminal cases, there can be no argument that the first *Younger* abstention category applies. Nor does this case fall into the second category, which involves quasi-criminal cases. As Justice Ginsburg explained in *Sprint*, the quasi-criminal category of cases "are characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act." 571 U.S. at 79. While it is true that a state-initiated proceeding to gain custody of children allegedly abused by their parents could fall into this category,[6] here, the state proceedings are beyond the custody determination and are not attempts to sanction a party by removing parental rights for some wrongful act. The parallel proceedings involving the Plaintiffs may involve periodic reviews by the state court, but they lack any element that would put them into the quasi-criminal category. *See Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 154 (D. Mass. 2011) (holding that *Younger* abstention was not warranted where "[p]laintiffs' claims

---

[6]     The Defendants contend that *Moore v. Sims*, 442 U.S. 415 (1979) supports their contention that abstention is required. Defs.' Reply Mem. in Further Supp. of Mot. to Dismiss First Am. Compl. ("**Defs.' Reply**") 4 n.2 (ECF No. 42). But *Moore* is a very different type of case from this one. In *Moore*, parents brought suit in federal court after the state of Texas took temporary custody of their children following a report of child abuse. 442 U.S. at 418–21. Notably, the Supreme Court found abstention to be warranted because the State's temporary removal of a child due to potential abuse was similar in kind to the pending criminal proceedings at issue in *Younger*. *Id.* at 423. That same pursuit of a state enforcement action occurring in the shadow of potential criminal conduct is lacking here. *See M.B. ex rel. Eggemeyer v. Corsi*, No. 2:17-cv-04102-NKL, 2018 WL 327767, at *6 (W.D. Mo. Jan. 8, 2018) ("[T]he operative fact here is not that the juvenile court *placed* a given child into [state] custody, but that [the state] *has custody* over the child . . . .").

14

relate only to alleged injuries suffered while in [the Defendants'] custody"), *aff'd*, 774 F.3d 45 (1st Cir. 2014).

The third category involves federal plaintiffs seeking to undo state court orders—such as a contempt or bond order—that are "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 491 U.S. at 78 (quoting *NOPSI*, 491 U.S. at 368). The Defendants make no effort to explain how they would fit into this category. The Defendants identify no existing state court order that this case would interfere with, let alone any order that is "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* This lawsuit is about the care that the Plaintiffs are receiving in the Defendants' custody; it has nothing to do with the rightness or wrongness of any order of the Maine District Court or its authority to adjudicate any matters in the Plaintiffs' cases. *See M.B. ex rel. Eggemeyer v. Corsi*, No. 2:17-cv-04102-NKL, 2018 WL 327767, at *6 (W.D. Mo. Jan. 8, 2018); *Connor B.*, 771 F. Supp. 2d at 155 ("Plaintiffs' claims do not implicate the proceedings themselves, only the aftermath of the proceedings."); *Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363, 377 (D.R.I. 2011). "It is the executive's actions that are being questioned, not the power of the juvenile court." *M.B.*, 2018 WL 327767, at *6; *accord Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003). And *Younger* has no applicability where state court involvement is limited to a review of executive action. *Connor B.*, 771 F. Supp. 2d at 154; *see also NOPSI*, 491 U.S. at 368 (explaining that requiring *Younger* abstention "in deference to a state judicial proceeding reviewing legislative or executive action . . . would make a mockery of the rule that

15

only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States"). Because the Defendants fail to explain how they fit within any of the *Younger* categories, their argument for *Younger* abstention falters at step one.

The Defendants contend that the Plaintiffs' requested relief will interfere with the Maine District Court's ongoing review of the Plaintiffs' cases, Defs.' Mot. 11, but they fail to explain why. They argue that their administration of psychotropic medications and their medical recordkeeping are "questions that are entrusted to the Maine District Court." Defs.' Mot. 12 (citing 22 M.R.S. §§ 4036(1)(H), 4038; M.R.G.A.L. 4(c)(3), (6)–(7), (9)). But their cited statutes and rules do not speak to the Maine District Court's authority to alter the Defendants' recordkeeping practices or administration of medicine. The statutes barely allude to the Maine District Court's authority in the realm of medical care, and their discussion of medical care only pertains to emergency treatment. The Defendants identify no order issued in any of the Plaintiffs' cases—or, frankly, in the case of *any* foster child—pertaining to medical recordkeeping or the use of psychotropics despite the alleged pervasiveness of psychotropics in foster care.[7]

The Defendants fail to show how any order from this Court would interfere with any existing or potential order in the State court. "It would be absurd to conclude

---

[7]      A 2018 report by the Office of Inspector General for the United States Department of Health and Human Services found that 32.7% of the children in foster care in Maine—1,155 children—were treated with psychotropic medications in fiscal year 2013. FAC ¶ 231; U.S. Dep't of Health & Hum. Servs. Off. of Inspector Gen., *Treatment Planning and Medication Monitoring Were Lacking for Children in Foster Care Receiving Psychotropic Medication* app. B (2018).

that because a juvenile court might someday enter an order related to some subject in this federal lawsuit . . . *Younger* abstention applies. To so hold would mean that a federal court would always have to abstain [in] any dispute related to a foster child [solely] because the juvenile court has continuing jurisdiction over the child." *M.B.*, 2018 WL 327767, at *7; *see also Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 71 (1st Cir. 2005) ("[T]he mere possibility of inconsistent results in the future is insufficient to justify *Younger* abstention."). Moreover, the relief requested in this case may well further the Maine District Court's "own mission of ensuring that children removed from their parents' custody because of abuse or neglect are not further harmed when the juvenile court orders them into the custody of the state." *Kenny A.*, 218 F.R.D. at 286.

Finally, it is worth noting how different this case is from the cases relied on by the Defendants.[8] In *31 Foster Children*, for example, the Eleventh Circuit found that the plaintiffs' requested relief would directly interfere with the plaintiffs' juvenile court proceedings "by placing decisions that [were previously] in the hands of the state courts under the direction of the federal district court." 329 F.3d at 1278. The Tenth Circuit came to a similar conclusion in *J.B.* 186 F.3d at 1292. That is not so

---

[8]     The Defendants also complain that the Plaintiffs have not first raised these issues in state court. And they appear to accuse the Plaintiffs' guardians ad litem of "withholding" information from the Maine District Court "in anticipation of bringing federal litigation." Defs.' Reply 5–6. Even assuming the truth of this accusation, the Defendants identify no legal authority that says that claims that *can* be raised in state court *must* be raised in state court prior to bringing a federal lawsuit. The cases that the Defendants cite in an effort to justify their grievance involve a failure to pursue an appeal, *see Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975), and a failure to exhaust an administrative process, *see Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 221 (1st Cir. 2004); *Maymó-Meléndez v. Álvarez-Ramírez*, 364 F.3d 27, 34–35 (1st Cir. 2004). Defs.' Mot. 14–15. Those cases have no application here.

here. The Defendants fail to identify any decisions that the Plaintiffs are requesting this Court to make that would normally be made by the Maine District Court. *See Kenny A.*, 218 F.R.D. at 287–88 (distinguishing *31 Foster Children*—which was binding precedent—based on the far-reaching relief the plaintiffs had requested in that case and the potential for conflicting state and federal court orders if those requests had been granted). As the Plaintiffs point out, numerous district courts have held in cases challenging the administration of a state's foster care system that *Younger* abstention is not appropriate,[9] including the only case that either of the parties cite involving a state's system of administering psychotropic drugs to foster children, *see M.B.*, 2018 WL 327767, at *1, *6–7.[10]

## II. The Plaintiffs' Next Friends

### A. Legal Background

A minor plaintiff may bring a lawsuit in federal court through a representative, such as a guardian. Fed. R. Civ. P. 17(c)(1)(A). "A minor . . . who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem." *Id.* 17(c)(2). An individual's capacity to represent a minor in federal court is governed by state law. *Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 86 (1st Cir. 2010). "The

---

[9]        *See, e.g.*, *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1034, 1041 (D. Ariz. 2015); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp.2d 142, 156 (D. Mass. 2011), *aff'd*, 774 F.3d 45 (1st Cir. 2014); *Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363, 380 (D.R.I. 2011); *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *7 (E.D. Mich. Apr. 17, 2007); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 285 (N.D. Ga. 2003); *Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000); *Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662, 688 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997).

[10]        The Defendants do not offer any way to distinguish *M.B.* and cite to it only once in a footnote discussing the Plaintiffs' procedural due process claim. *See* Defs.' Reply 10 n.8.

burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court." *Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990).

Typically, the authority and responsibilities of a guardian ad litem are limited "to child welfare and dependency matters brought before the court in which the [guardian ad litem] is appointed." *Sam M.*, 608 F.3d at 86 n.8. Where state law does not confer general authority on a guardian ad litem to represent a child outside of family court proceedings, the guardian ad litem is not considered to be a representative who can sue on behalf of a minor pursuant to Federal Rule of Civil Procedure 17(c)(1). *Id.* at 87. However, a federal court can appoint a state-appointed guardian ad litem as an unrepresented child's representative pursuant to Rule 17(c)(2) if the guardian ad litem petitions the federal court to represent the child and the court concludes that he/she is an appropriate next friend. *Id.* at 87 n.11.

In evaluating the suitability of a next friend for a foster child, the court should examine whether the next friend is acting in good faith, is genuinely motivated to help the child seek relief, is familiar with the child's situation, understands the role of a next friend, is able and willing to litigate on the child's behalf, and is familiar with the realities that foster children face. *See id.* at 92–94. The next friend need not have a particularly close relationship with the child. *See id.* at 93–94 (allowing professor who studied child maltreatment to act as next friend for children whom he had never met where it was apparent that he was knowledgeable about the issues and problems children face in foster care, he was familiar with what the plaintiffs

19

had been through, and he had demonstrated a good faith desire to pursue the children's best interests).

### B.    Maine Law Pertaining to Guardians Ad Litem

The Maine District Court must appoint a guardian ad litem in most child protection proceedings. 22 M.R.S. § 4005(1)(A). The guardian ad litem is obligated to "act in pursuit of the best interests of the child," meaning in a way that prioritizes the child's safety and well-being. *Id.* §§ 4002(1-C), 4005(1)(B). To fulfill this obligation, the guardian ad litem must be given access to all relevant medical records of the child. *Id.* § 4005(1)(B). The guardian ad litem is also charged with providing biannual reports to the Maine District Court "regarding the guardian ad litem's activities on behalf of the child and recommendations concerning the manner in which the court should proceed in the best interest of the child." *Id.* The guardian ad litem acts as an agent of the Maine District Court. *Id.* § 4005(1)(G).

Guardians ad litem are also subject to various rules promulgated by the Supreme Judicial Court. *See* 4 M.R.S. § 1554(2). These rules "are designed to govern and define the services provided by guardians ad litem to the [Maine District Court] and to promote the best interests of the children whose interests they are appointed to represent." M.R.G.A.L. 1(b). The rules are to "be construed to secure the just, speedy, and inexpensive determination of every action." *Id.*

An individual appointed as a guardian ad litem may act only within the confines of his/her appointment order and has no authority to perform any other duties unless ordered by the Maine District Court. *Id.* 4(a)(4), (c). A guardian ad litem may "advocate for appropriate services" for the child, including medical and mental

health care. *Id.* 4(c)(7)(E). The guardian ad litem must always act in the best interests of the child and must "exercise his or her independent judgment on behalf of the child in all relevant matters." *Id.* 5(b). Guardians ad litem are bound by confidentiality requirements that prohibit them from disclosing information related to a case "to any person who is not a party to the case, except as necessary to perform [their] duties, or as may be specifically provided by law." *Id.* 5(g). Guardians ad litem must disclose to the Maine District Court if they are "a party to any case in court, other than in [their] capacity as a guardian ad litem." *Id.* 5(i)(5).

### C.   Analysis

The Defendants raise seven objections to the Plaintiffs' guardians ad litem serving as their next friends: (1) guardians ad litem act as agents of the Maine District Court; (2) their responsibilities are limited to proceedings in the appointment order, and they have no authority to act beyond the appointment order; (3) the duty of a guardian ad litem is to represent the best interests of the child, and their obligations as next friends will force them to violate that duty; (4) in order to comply with their discovery obligations, the guardians ad litem will be forced to disclose confidential information that they are prohibited from disclosing; (5) the interests of the Named Plaintiffs may conflict with the interests of other members of the putative class; (6) the guardians ad litem have not alleged that they have disclosed their participation in this lawsuit to the Maine District Court; and (7) the Next Friends have not alleged that they have raised any of these issues in the Maine District Court. Defs.' Mot. 15–18.

At bottom, the Defendants misunderstand the role of the Next Friends in this Court. While these three individuals happen to be the Plaintiffs' guardians ad litem in their foster care proceedings, they are not acting as guardians ad litem in this case. They are acting as the Plaintiffs' next friends. To be sure, the Next Friends are qualified to serve as the Plaintiffs' next friends because of their experience as the Plaintiffs' guardians ad litem, but that does not mean that they are acting as the Plaintiffs' guardians ad litem in this action. To put it differently, even if the Plaintiffs were to get different guardians ad litem tomorrow, that would not change the ability of the Next Friends to serve as the Plaintiffs' next friends in this litigation.

Rather, what matters is that all three be genuinely motivated to help the Plaintiffs seek relief, be familiar with the Plaintiffs' situation, understand the role of a next friend, be able and willing to litigate on the Plaintiffs' behalf, and be familiar with the realities that foster children face. It is apparent from the FAC and the Plaintiffs' opposition that the Next Friends meet all of these criteria. The Defendants dispute none of this.

Most of the Defendants' objections are rooted in the contention that the Next Friends are violating—or might violate—the Maine Rules for Guardians Ad Litem ("**MRGAL**") in bringing this action. But the Defendants fail to explain what relevance that has to their ability to act as the Plaintiffs' next friends in this proceeding. If the Next Friends are in fact violating the MRGAL, the Defendants are free to raise this issue with the Maine District Court and to give it the opportunity to decide whether the Next Friends remain suitable guardians ad litem. That is not something to be

litigated here.[11] The Defendants conflate federal law requirements to act as a next friend (which govern in this Court) with state law requirements to act as a guardian ad litem (which do not).

The only one of the Defendants' arguments that is not based on the Next Friends' purported violations of the MRGAL is the contention that the Named Plaintiffs' interests might conflict with the interests of the putative class and that the Next Friends will not be able to represent all of the interests of the plaintiffs in the putative class. This objection is premature and is more properly made in response to a motion to certify the putative class.[12]

---

[11]    It is worth noting, however, that it is not clear that the Plaintiffs' next friends ("the **Next Friends**") *have* violated—or are likely to violate—any of the Maine Rules for Guardians Ad Litem ("**MRGAL**"). First, the Defendants contend that because the Next Friends are agents of the Maine District Court, they are acting against an entity to whom they owe a duty. That is not true. Guardians ad litem are agents of the *court*, not the *government*. This action is against the State, not the Maine District Court.

Second, the Defendants contend that the Next Friends might have to violate their duties to act in the best interests of the Plaintiffs by disclosing information in discovery even when it is not in the Plaintiffs' best interests. This may be true, although it seems that the Plaintiffs' guardians ad litem might be subject to discovery even if they were not acting as Next Friends. Regardless, it may be the case that this lawsuit is in the Plaintiffs' best interests, regardless of what information might need to be disclosed in discovery. And the ultimate duty of the guardians ad litem is to act in the best interests of the children they represent.

Third, although the MRGAL generally prohibit the release of confidential information, this only extends *to any person who is not a party to the case.* As the Plaintiffs point out, any confidential information required to be disclosed in discovery will be disclosed to the Defendants, who *are* parties to the proceedings in the Maine District Court. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("**Pls.' Opp'n**") 11–12 (ECF No. 36). In addition, this prohibition has exceptions for disclosures required by law, and disclosures in discovery would seem to fall within that category.

Fourth, the Defendants complain that the Plaintiffs have not alleged that the Next Friends notified the Maine District Court that they were bringing this suit or that they have raised any of these issues in Maine District Court. But the Plaintiffs were not required to make those allegations in their FAC, since they are not a component of any of their causes of action. It is unknown whether they have provided any such information to the Maine District Court. It is also unknown whether the guardians ad litem have sufficient information about all of the Plaintiffs' cases to petition the Maine District Court, since the Plaintiffs allege that some of their guardians ad litem (e.g., in the cases of Bryan and Trent) have been unable to obtain the Plaintiffs' medical records.

[12]    The Defendants also cite to an amicus brief filed in *Sam M.* by the National Association of Counsel for Children for the proposition that guardians ad litem may have unwaivable conflicts. Defs.' Mot. 17 (citing Br. for Nat'l Ass'n of Couns. for Child. et al. as Amici Curiae in Supp. of Pls.-Appellants

"Important social interests are advanced by allowing minors access to a judicial forum to vindicate their constitutional rights through a Next Friend . . . particularly where, as here, the minors seek relief for alleged violations of the[ir] guardian's duty to protect them." *Sam M.*, 608 F.3d at 91–92. The burden is on the Next Friends to prove their suitability, and I conclude that they have met their burden. I also note that it is the Defendants who are in the best position to find someone to represent the Plaintiffs since they "effectively control the children's lives as the children's legal custodian." *Id.* at 88 n.12. It is difficult to think of who could better act as the Plaintiffs' next friends than their guardians ad litem, and the Defendants do not identify any alternatives.[13] The Next Friends may permissibly act as next friends in this lawsuit.

---

("**NACC Brief**") at 10, *Sam M. ex rel. Elliot v. Carcieri*, 608 F.3d 77 (1st Cir. 2010) (No. 09-1759), 2009 WL 6809239, at *10). The Defendants take this argument out of context. This amicus brief was filed to argue that foster children should not be *required* to be represented by their state-appointed guardians ad litem in federal court because, for example, unwaivable conflicts may arise. NACC Brief at 28–30, 2009 WL 6809239, at *28–30. But the amicus brief acknowledges that a guardian ad litem *can* sometimes be an appropriate representative for a foster child in federal court. NACC Brief at 19, 30, 2009 WL 6809239, at *19, *30.

[13]     The Defendants argue that a lack of a suitable next friend warrants dismissal for lack of subject matter jurisdiction, but the support for this proposition is thin. The three cases that the Defendants cite for support were all brought by next friends who were acting at odds with either the party they were purporting to represent or that party's legal guardian. In the first case, an activist sought to sue on behalf of two incompetent plaintiffs, each of whom had a natural guardian (for one, his mother; for the other, her brother). *Developmental Disabilities Advoc. Ctr., Inc. v. Melton*, 689 F.2d 281, 284–86 (1st Cir. 1982). Both guardians opposed the lawsuit. *Id.* at 285–86. Rule 17(c) of the Federal Rules of Civil Procedure only allows the appointment of a next friend if a minor or incompetent person *lacks* a proper guardian, unless the interests of the guardian and the minor or incompetent plaintiff conflict. *Id.* The First Circuit affirmed the district court's findings that the plaintiffs were adequately represented by their guardians, who opposed the lawsuit, and that dismissal was warranted. *Id.* at 286.

      In the second, the plaintiff sought to bring a lawsuit, *pro se*, on behalf of her mother. *Gibson-Kennedy ex rel. Gibson v. Slutsky*, Civ. No. 13-4324, 2014 WL 317871, at *1 (E.D. Pa. Jan. 29, 2014), *aff'd* 650 F. App'x 122 (3d Cir. 2016). However, the Complaint was dismissed because not only was the plaintiff not her mother's guardian, but the court also found that a guardian cannot represent an incompetent adult without the assistance of counsel. *Id.* at *4.

24

### III.   Substantive Due Process

#### A.   Legal Background

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf" that creates the "deprivation of liberty" that triggers the protections of the Due Process Clause. *Id.* "Whether the state deprived an individual of 'freedom to act on his own behalf,' and is so subject to a correlative

---

In the third, a son, on behalf of his mother, sought to sue various defendants, including his mother's guardian, alleging that his mother's involuntary placement in a nursing home and the appointment of the guardian violated her constitutional rights. *Bak v. Niagara Rehab. & Nursing Ctr.*, No. 13-CV-215S, 2014 WL 297346, at *1–2 (W.D.N.Y. Jan. 27, 2014). The court was suspicious of the complaint, concluding that the son had named the guardian as a defendant in order to create a conflict of interest such that the guardian could not represent his mother in the lawsuit. *Id.* at *5. And the court was also suspicious of the fact that although the lawsuit was purportedly brought by the son to protect his mother's well-being, the lawsuit was seeking only monetary relief rather than injunctive or declaratory relief related to his mother's well-being. *Id.* The court thus concluded that the son was not motivated by a sincere desire to seek justice on his mother's behalf and that he could not permissibly proceed as his mother's next friend. *Id.*

It makes sense that a lawsuit would be dismissed for lack of jurisdiction where a person purporting to represent the plaintiff was acting antagonistically toward the plaintiff or her legal guardian and thus the plaintiff did not have a proper representative. This is analogous to a situation where one person files a lawsuit on behalf of another person without that person's knowledge or permission. That lawsuit would, of course, be summarily dismissed. That is not the case here. The Defendants cite to no case where plaintiffs were represented by representatives who were acting in their best interest and the case was dismissed for lack of proper representation.

The short of it is that it cannot be the case that the Plaintiffs can be shut out of court merely because they are minors. There must be someone who can suitably represent each of the Plaintiffs, and their guardians ad litem appear to be in the best position to do so.

constitutional duty, is often described as whether a 'special relationship' exists between the state and the individual." *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 53 (1st Cir. 2014) (quoting *J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010) (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005)) (internal quotation marks omitted).

The First Circuit has tread lightly when faced with questions involving substantive due process in the foster care context. *See, e.g.*, *id.* at 52. It has assumed, without deciding, that a child's entry into foster care creates a special relationship,[14] and it has assumed *arguendo* that the special relationship of foster care requires a state to provide, among other things, a safe living environment and "care and treatment through the exercise of accepted professional judgment." *Id.* at 53. I conclude that a child's entry into foster care does create a special relationship triggering at least some constitutional duty by the State to care for the children in its custody.

In *Connor B.*, the First Circuit also sidestepped the question of what standard applies to a substantive due process claim in the foster care context. *See id.* at 54. The court explained that two different standards have arisen in evaluating substantive

---

[14]     The unanimous consensus among the circuits is that a child's entry into foster care does create a relationship of constitutional significance. *See Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008); *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 856 (5th Cir. 2012) (en banc); *Lintz v. Skipski*, 25 F.3d 304, 305 (6th Cir. 1994); *Reed v. Palmer*, 906 F.3d 540, 552 (7th Cir. 2018); *Norfleet ex rel. Norfleet v. Ark. Dep't of Hum. Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012); *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012); *Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004); *cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 n.9 (1989) (noting that placing a child in a foster home might "give rise to an affirmative duty to protect").

due process violations: the "shocks the conscience" test from *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), and the absence of professional judgment test outlined in *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). *See id.* at 53–54. The First Circuit recognized that there might be some "tension" between the two tests but decided that it did not need to reconcile these tests because it found that the plaintiffs could not meet the *Youngberg* standard. *See id.* at 54.[15]

The First Circuit has stated that the "shocks the conscience" test "governs all substantive due process claims based on executive . . . action." *Martínez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) (emphasis deleted). The "shocks the conscience" standard requires an evaluation of "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. "In order to shock the conscience, the conduct must be 'truly outrageous, uncivilized, and intolerable.' " *McConkie v. Nichols*, 446 F.3d 258, 260 (1st Cir. 2006) (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)).

"[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking

---

[15]     In the district court, the court had concluded that "to establish a substantive due process claim, Plaintiffs must show that Defendants' conduct represented a substantial departure from accepted professional judgment, which deprived them of conditions of reasonable care and safety, *and* that such conduct shocks the conscience." *Connor B.*, 771 F. Supp. 2d at 163. Requiring proof of an absence of professional judgment makes sense because "administration of a foster care system is a matter of professional judgment . . . involving specialized expertise and professional norms." *Connor B.*, 774 F.3d at 54 n.10. And the Tenth Circuit has pointed out that there is not much difference between these two standards in the foster care context. *See Yvonne L. ex rel. Lewis v. N.M. Dep't of Hum. Servs.*, 959 F.2d 883, 894 (10th Cir. 1992).

level." *Lewis*, 523 U.S. at 849. Although the assessment is more difficult for conduct that is not intentional, deliberately indifferent behavior can also shock the conscience. *Id.* at 849–52. A plaintiff can establish conscience-shocking deliberate indifference by showing that the state actor "knew of a substantial risk of serious harm and disregarded that risk" in a situation where the state actor had the opportunity to make an unhurried judgment. *Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020). Deliberate indifference is most pronounced "where the state official performs multiple acts of indifference" that collectively create a "risk of acute and severe danger." *Id.* This analysis is necessarily fact-intensive. *Lewis*, 523 U.S. at 850. "Deliberate indifference that shocks in one environment may not be so patently egregious in another . . . ." *Id.*

The "professional judgment" standard demands that a reviewing court "show deference to the judgment exercised by a qualified professional." *Youngberg*, 457 U.S. at 322. Decisions made by a professional are "presumptively valid" and may result in liability "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. "[A] substantial departure from accepted professional judgment may shock the conscience under some circumstances but not others." *Connor B.*, 771 F. Supp. 2d at 163.

### B.    Analysis

In support of their substantive due process claim, the Plaintiffs have alleged that the Defendants are facilitating the administration of potentially harmful

medications without consent or adequate medical justification and without ensuring sufficient oversight. The Plaintiffs allege serious deficiencies in informed consent, FAC ¶ 254, which is a fundamental aspect of medical care, *see Woolley v. Henderson*, 418 A.2d 1123, 1128 n.3 (Me. 1980) (noting the fiduciary character of the physician-patient relationship). They allege that the Defendants have forced them to take medications to which they have expressed their opposition, that are medically improper, that are inappropriate for their age, and that are excessive in dosage and in the number of medications administered. The Plaintiffs also allege that the Defendants are aware not only of the harms that have been caused to the individual Plaintiffs but also of the general harms caused by the Defendants' administration of psychotropic drugs. FAC ¶¶ 210–16.

The Plaintiffs further allege that the Defendants have provided caregivers and medical providers with inaccurate medical records. *See M.B.*, 2018 WL 327767, at *10. Failure to provide medical records to caregivers and medical providers means that those charged with caring for the Plaintiffs are less aware of what drugs the Plaintiffs are taking, what side effects to look out for, and how to take care of that particular child. FAC ¶¶ 70, 77 (describing how Trent was hospitalized following an acute crisis but the hospital lacked any medical records for him), 249.[16]

---

[16]    The Defendants argue that their conduct was *per se* constitutional because they relied on the professional judgment of doctors to diagnose the Plaintiffs and to prescribe them medications. This argument ignores the allegation that the Plaintiffs' medical providers had inaccurate medical records. Because the Plaintiffs have alleged that the Defendants failed to provide accurate medical records to their doctors, the Defendants cannot necessarily rely on the professional judgment of the allegedly ill-informed doctors.

The Defendants concede that the allegations the Plaintiffs make "are serious," but they contend that the allegations do not rise to the conscience-shocking level. Defs.' Mot. 21. The Defendants have not persuaded me that as a matter of law the Plaintiffs cannot succeed. Rather the Defendants are asking me to assess the merits of the claim. Defs.' Mot. 18 ("Complaint Fails on the Merits").  At this stage, the Plaintiffs need only include allegations that state a *plausible* claim; they are not required to win on the merits. The Plaintiffs' allegations plausibly allege a substantive due process claim regardless of whether the "shocks the conscience" or "professional judgment" standard (or both) applies.

## IV.   Procedural Due Process

### A.      Legal Background

The procedural due process analysis is a two-step inquiry. The reviewing court "first asks whether there exists a liberty or property interest which has been interfered with by the State." *González-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010) (quoting *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). The second question, then, is "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (quoting *Thompson*, 490 U.S. at 460). As a part of answering that second question, the Court balances three factors to determine what process is constitutionally due: (1) the private interests at issue, (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value of any additional or substitute procedural safeguards, and (3) the governmental interests at stake. *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 66 (1st Cir. 2019). "[T]he quantum and quality of the process due in a particular situation depend upon

the need to serve the purpose of minimizing the risk of error." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 13 (1979).

### B.   Analysis

The Defendants argue that the FAC fails to state a viable procedural due process claim for three reasons. First, they contend that the Plaintiffs allege that they have been deprived of a protected liberty interest in freedom from unnecessary administration of psychotropic medications but that they have not alleged that they have been "administered *unnecessary* medications." Defs.' Mot. 23. Second, the Defendants contend that the Plaintiffs have failed to allege that any deprivation of their liberty interests is attributable to them. They point out that it is the medical professionals, not the Defendants, who are prescribing the medications allegedly in violation of OCFS policy. Defs.' Mot. 23–24. Finally, the Defendants argue that even if the Plaintiffs have alleged a deprivation of liberty attributable to them, the existing procedures available under state law satisfy due process. Defs.' Mot. 25.

The Defendants' first argument misrepresents the FAC, which fairly can be read to be asserting a liberty interest in "avoiding nonconsensual *or* unnecessary administration of psychotropic medications." Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("**Pls.' Opp'n**") 20 (ECF No. 36). Individuals have a significant liberty interest in not being forced to take psychotropic drugs regardless of whether a medical professional thinks that they are necessary.[17] *Washington v. Harper*, 494

---

[17]    In *Washington v. Harper*, the Supreme Court weighed a prisoner's right to refuse psychotropic medications against the State's interest in prison safety and security. *See* 494 U.S. 210, 214, 223 (1990). The Court emphasized that the prisoner's "interest in avoiding the unwarranted administration of antipsychotic drugs [was] not insubstantial" because "[t]he forcible injection of

U.S. 210, 221–22 (1990). This, of course, includes foster children.[18] *See M.B.*, 2018 WL 327767, at \*11; *cf. Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 847 (9th Cir. 2010) (concluding that foster children have a protected liberty interest in a safe foster care placement). This liberty interest is heightened where psychotropic drugs are being administered in a manner that is not medically appropriate and not for purposes of treatment. *Cf. Harper*, 494 U.S. at 222 n.8, 233.

As to the Defendants' argument that the Plaintiffs have not alleged that they have been forced to take *unnecessary* medication, the Defendants miss the point. The FAC alleges that children in the foster care system from preschool to high school are being administered too many psychotropic medications and that they are receiving improperly high dosages despite adverse side effects and the potential for dangerous long-term effects. The FAC fairly alleges, therefore, that the Defendants are using

---

medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229. In a later case, the Court concluded that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification *and* a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (emphasis added). That is, once the defendant in that case sought to terminate administration of the medication, it was incumbent upon the state to establish not only the medical appropriateness of the medication, but also an "overriding justification" for it. *See id.* In particular, the *Riggins* Court took issue with the district court's failure to make any determination of need or to make any findings as to reasonable alternatives to forced medication. *Id.* at 136.

[18]     Not only do foster children have greater rights than the prisoners involved in *Harper* and *Riggins*, *see Connor B.*, 771 F. Supp. 2d at 160; *Yvonne L.*, 959 F.2d at 894, but the countervailing security interest that exists in prisons or mental institutions is not at play in the foster care context. And while the Supreme Court has not examined the issue of forced administration of psychotropic drugs in the foster care context, it has concluded that children have "a substantial liberty interest in not being confined unnecessarily for medical treatment." *Parham v. J.R.*, 442 U.S. 584, 600 (1979). Because involuntary confinement for purposes of medical treatment is analogous to the forced administration of medication, it follows that children have an equally substantial interest in not being forcibly administered medication.

excessive psychotropic drugs both across the purported class and as to the named Plaintiffs.

Further, the Plaintiffs allege that the Defendants have failed to use an adequate informed consent procedure, that they did not have a say in the prescriptions they were being given, and that they were not given sufficient information to provide informed consent. The liberty interest in not being forcibly administered medication extends to medications about which the Plaintiffs or their caretakers have been insufficiently informed (i.e., a lack of informed consent). *See M.B.*, 2018 WL 327767, at *12.

Turning to the Defendants' second argument—that the deprivation is not attributable to the Defendants, since the psychotropic medications administered to the Plaintiffs were prescribed by medical professionals—the Plaintiffs are alleging widespread systemic failures in informed consent and the absence of secondary review procedures that have as much to do with the Defendants as the medical providers actually prescribing the medication. Further, the Plaintiffs allege that medical providers have not been operating with sufficient information because they lack up-to-date medical records. This alleged information void is also directly attributable to the Defendants. "[E]ven if a fully informed physician's assessment that a child should be medicated might constitute sufficient process, [such process] arguably cannot be sufficient" where "a full picture of the child's medical history and social profile," is absent. *Id.* Finally, I note the fact that a prescription does not take into account the heightened risk of a caregiver acting against the best interests of the

child by using medication to make the caregiver's job easier rather than to address a genuine medical need.[19] *Id.* In other words, the Defendants' participation in, and motivations for, seeking these prescriptions are relevant, too.

As for the Defendants' last argument—that the existing procedural protections are constitutionally sufficient—the Defendants rely on OCFS's policies,[20] but, because the Plaintiffs allege multiple violations of these policies, their adequacy does not carry the day. *See Rodi v. Ventetuolo*, 941 F.2d 22, 29 (1st Cir. 1991).

---

[19]    The Supreme Court addressed this conflict in *Parham* in the course of its examination of Georgia's procedure for the involuntary institutionalization of children. The Court noted the potential "risk of error inherent in the parental decision to have a child institutionalized for mental health care" and thus determined that a neutral factfinder was required to assess whether the statutory requirements for admission had been satisfied, and to conduct periodic reviews thereafter. 442 U.S. at 606. That risk is even greater in the foster care context where there is no natural bond of parental affection and where "the exigencies of accommodating numerous children with limited resources may incentivize medically unnecessary medication." *M.B.*, 2018 WL 327767, at *12. Critically, in *Parham*, a single medical professional did not have the unbridled discretion whether to commit a child. *See id.* (citing *Parham*, 442 U.S. at 615). And in *Harper*, the Supreme Court mandated that the person ultimately making the decision about what medication could be forcibly administered could not be involved in the inmate's current diagnosis or treatment. *See id.* (citing *Harper*, 494 U.S. at 233). Neither safeguard appears to be present here. Rather, there is no indication that there is any check on a doctor's ability to prescribe any psychotropic medications requested by the Defendants before a child is forced to take that medication.

[20]    OCFS has a policy entitled "Authorization of the Use of Antipsychotic Medications for Youth in Foster Care" (the "**Psychotropic Medication Policy**"). OCFS Policy IV.A-C. This policy sets forth that all youth in foster care "have the right to participate in all service decisions"; to "review their treatment, case or service plan"; to "refuse any service unless mandated by law or court order"; and to "be informed about the consequences of refusal or disengagement with services." *Id.* at 1. Pursuant to the policy, antipsychotic medications may be "used only when clinically indicated," and when they are used, their side effects must be properly monitored. *Id.* at 2. Administration of medication to youth fourteen and over without the consent of the youth is prohibited except in the event of imminent danger of bodily harm. *Id.* at 3. When a child moves to a new placement, the caseworker must identify for the new care provider the medications the child is taking and who the prescribers are. *Id.* at 4.
        The Psychotropic Medication Policy also outlines Maine's Youth Bill of Rights, which provides that foster children have the rights, among other things, to: have an informed choice in the type of care received, see and understand treatment plans, have a say in treatment decisions, be informed about medications and medication options, have a voice in decisions about prescription of medications, not be overmedicated, not be punished for refusal to take medications, be made aware of possible risks that come from refusing to take medications, and access medical records. *Id.* at 9.

The Defendants also point to the judicial oversight by the Maine District Court, which they characterize as being "[c]ategorically . . . adequate process under the Due Process [C]lause." Defs.' Mot. 25. But post-deprivation procedures such as judicial oversight may be inadequate if "the state is in a position to provide for predeprivation process." *San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 479 (1st Cir. 2012) (en banc) (quoting *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)). "Whether the opportunity [for due process] needs to be furnished before the seizure or whether a post-seizure opportunity is sufficient depends on the circumstances." *Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998). "Where feasible, the opportunity (for obvious reasons) is expected to be pre-deprivation . . . ." *Id.* Post-deprivation opportunity is only sufficient where quick action is required or where the provision of any meaningful pre-deprivation process is impractical. *Id.* The Defendants make no argument that pre-deprivation process is not possible here.

The Plaintiffs have adequately alleged a violation of their procedural due process rights. Contrary to the Defendants' claim that the issue is a question of law, Defs.' Reply Mem. in Further Supp. of Mot. to Dismiss First Am. Compl. 9 (ECF No. 42), the adequacy of the existing procedural safeguards is at least a mixed question of law and fact. Issues such as whether there is a substantial interference with a liberty interest, the risks of erroneous deprivation, and the value of additional or alternative procedures are fact-based. The Defendants repeatedly invoke *Connor B.* in an attempt to shore up their claims, but the Plaintiffs in *Connor B.* had the benefit of discovery and actually were allowed to present their entire case during a bench

trial. *See* 774 F.3d at 48. At this stage in the proceedings, I take the allegations as true and draw all inferences in favor of the Plaintiffs, who need only state a plausible claim, which they have done. The motion to dismiss the procedural due process claim is therefore denied.

## V.   AACWA

### A.   Legal Background

#### 1.   AACWA

Pursuant to the AACWA, a state is eligible for federal funding for its foster care system if it meets particular requirements established by Congress. *See* 42 U.S.C. § 671(a). As relevant here:

> In order for a State to be eligible for [such] payments . . . it shall have a plan approved by the Secretary which—
>
> (16) provides for the development of a case plan . . . for each [foster] child . . . and provides for a case review system which meets the [statutory requirements] with respect to each child.

*Id.* § 671(a)(16).

The statutory requirements for what must comprise a case plan and a case review system are numerous and lengthy, but I highlight in abbreviated fashion the components that are most important to my analysis:

> (1) The term "case plan" means a written document which . . . includes at least the following:
>
> > (A) A description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement . . . .
> >
> > (B) A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of

the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan . . . .

(C) The health and education records of the child, including the most recent information available regarding—

>   (i) the names and addresses of the child's health and educational providers;

>   (ii) the child's grade level performance;

>   (iii) the child's school record;

>   (iv) a record of the child's immunizations;

>   (v) the child's known medical problems;

>   (vi) the child's medications; and

>   (vii) any other relevant health and education information concerning the child determined to be appropriate by the State agency.

(D) For a child who has attained 14 years of age or over, a written description of the programs and services which will help such child prepare for the transition from foster care to a successful adulthood.

(E) In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find [a suitable placement]. At a minimum, such documentation shall include child specific recruitment efforts . . . .

(F) In the case of a child with respect to whom the permanency plan is placement with a relative . . . a description of—

>   (i) the steps the agency has taken to determine that it is not appropriate for the child to be returned home or adopted;

>   (ii) the reasons for any separation of siblings during placement;

37

> > (iii) the reasons why a permanent placement with a fit and willing relative  . . . is in the child's best interests;
>
> > . . .
>
> (G) A plan for ensuring the educational stability of the child while in foster care, including—
>
> > (i) assurances that each placement of the child in foster care takes into account the appropriateness of the current educational setting and the proximity to the school in which the child is enrolled at the time of placement; and
>
> > (ii)
> > > (I) an assurance that the State agency has coordinated with appropriate local educational agencies . . . to ensure that the child remains in the school in which the child is enrolled at the time of each placement; or
> >
> > > (II) if remaining in such school is not in the best interests of the child, assurances  . . .  to provide immediate and appropriate enrollment in a new school, with all of the educational records of the child provided to the school.

*Id.* § 675(1).

> The case plan for any child in foster care under the responsibility of the State who has attained 14 years of age shall [also] include—
>
> > (1) a document that describes the rights of the child with respect to education, health, visitation, and court participation, the right to be provided with the documents specified in section 675(5)(I) of this title in accordance with that section, and the right to stay safe and avoid exploitation; and
>
> > (2) a signed acknowledgment by the child that the child has been provided a copy of the document and that the rights contained in the document have been explained to the child in an age-appropriate way.

*Id.* § 675a(b).

> The term "case review system" means a procedure for assuring that—
>
> > (A) each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most

38

appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child, which—

> (i) if the child has been placed [somewhere] a substantial distance from the home of the parents of the child . . . sets forth the reasons why such placement is in the best interests of the child, and

> (ii) if the child has been placed in foster care outside the State in which the home of the parents of the child is located, requires that, periodically, but not less frequently than every 6 months, a caseworker . . . visit such child in such home or institution and submit a report on such visit . . . ,

(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review . . . in order to determine the safety of the child, the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship, and, for a child for whom another planned permanent living arrangement has been determined as the permanency plan, the steps the State agency is taking to ensure the child's foster family home or child care institution is following the reasonable and prudent parent standard and to ascertain whether the child has regular, ongoing opportunities to engage in age or developmentally appropriate activities . . . ;

. . .

(D) a child's health and education record . . . is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care provider with whom the child is placed . . . ; [and]

. . .

(I) each child in foster care under the responsibility of the State who has attained 14 years of age receives without cost a copy of any consumer report . . . pertaining to the child each year until the child is discharged from care, receives assistance . . . in interpreting and resolving any inaccuracies in the report, and, if the child is leaving foster care . . . is not discharged from care without being provided with . . . an official or

> certified copy of the United States birth certificate of the child, a social
> security card issued by the Commissioner of Social Security, health
> insurance information, a copy of the child's medical records, and a
> driver's license or identification card issued by a State . . . and any
> official documentation necessary to prove that the child was previously
> in foster care.

*Id.* § 675(5).

Section 622 then provides that in order to be eligible for funding, "a State must have a plan for child welfare services" that meets a number of requirements, including that the plan "provides assurances that the State . . . is operating, to the satisfaction of the Secretary . . . a case review system . . . for each child" in foster care. *Id.* § 622(a), (b)(8)(A)(ii).

## 2.    Private Causes of Action

Legislation enacted pursuant to Congress's spending power typically does not allow for a private cause of action in the event of noncompliance. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981). Rather, the appropriate remedy is for the federal government to terminate the funds to the state violating the statute. *Id.* However, if the statute does provide for an enforceable right, a plaintiff can sue to enforce that right pursuant to § 1983. *Id.*

Assessing whether a statute may be enforceable under § 1983 begins with the question of whether Congress intended for that statute to create an individual right. *See Colón-Marrero v. Vélez*, 813 F.3d 1, 15 (1st Cir. 2016). Congress's intention to create an individual right is apparent if three conditions are met. *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997); *Colón-Marrero*, 813 F.3d at 17. "First, Congress must have intended that the provision in question benefit the plaintiff."

40

*Colón-Marrero*, 813 F.3d at 17 (quoting *Blessing*, 520 U.S. at 340). This "requires more than a showing that the plaintiff is an intended beneficiary of the statute or 'within the general zone of interest that the statute is intended to protect.' " *Id.* (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)). "Rather, 'the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs.' " *Id.* (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)). Even where language merely "directs state officials in the implementation of statutory objectives," such language can "still create an enforceable right where it 'mentions a specific, discrete beneficiary group within the statutory text' and 'speaks in individualistic terms, rather than at the aggregate level of institutional policy or practice.' " *Id.* at 17–18 (quoting *Rio Grande*, 397 F.3d at 74).

"Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Id.* at 17 (quoting *Blessing*, 520 U.S. at 340–41). "[S]pecificity" can help to "shield[ ] against potentially disparate outcomes, bolstering the conclusion that the language is rights-creating." *Id.* at 20.

"Third, the statute must unambiguously impose a binding obligation on the States." *Id.* at 17 (quoting *Blessing*, 520 U.S. at 341). "In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* (quoting *Blessing*, 520 U.S. at 341).

If a plaintiff "demonstrates that Congress intended to confer an individual right, the right is presumptively enforceable by § 1983." *Id.* at 16. To rebut that presumption, it is incumbent upon the defendant to "show that Congress 'shut the door to private enforcement either expressly' in the statute creating the right, 'or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.' " *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 284 n.4 (2001)). The burden to overcome the presumption of enforceability is a "difficult" one. *Blessing*, 520 U.S. at 346.

Evaluating whether a statute provides for a private cause of action requires the plaintiff "to identify with particularity the rights" claimed, rather than looking at the statute "as an undifferentiated whole." *Id.* at 342. Thus, this framework must separately be applied to *each* identified right in a statute. *See id.*

### 3. Private Causes of Action in the AACWA Context

The Plaintiffs' AACWA claim partially relies on the notion that 42 U.S.C. § 671(a)(16)—the AACWA's case plan requirement—creates a private cause of action. Close to forty years ago, the First Circuit examined this exact question. *See Lynch v. Dukakis*, 719 F.2d 504, 506 (1st Cir. 1983). In doing so, the First Circuit noted the Supreme Court's repeated conclusion (prior to 1983) that rights under various provisions of the Social Security Act ("**SSA**") are enforceable and that remedies under the SSA are exclusive only when the SSA expresses such an intent. *Id.* at 510. The court also rejected the defendants' arguments that a private cause of action would weaken the enforcement discretion of the Secretary of the U.S. Department of Health

42

and Human Services (the "**Secretary**") or that the Secretary's ability to withhold funding precluded a private cause of action. *Id.* at 511. Ultimately, the court concluded that a private cause of action could be brought pursuant to § 1983 to enforce the case plan requirement in § 671(a)(16). *Id.* at 512; *see Suter v. Artist M.*, 503 U.S. 347, 354 n.5 (1992) (noting—but not opining on—*Lynch*'s holding).

But *Lynch* is not dispositive because the governing law, both in the context of private causes of action in general and in the context of private causes of action under the AACWA specifically, has changed.[21] Notably, a decade after *Lynch*, the Supreme Court analyzed a neighboring provision of the AACWA, § 671(a)(15). That provision requires states to "have a plan approved by the [federal government] which . . .

---

[21]     The Plaintiffs contend that *Lynch* settles the issue as to whether the case plan and case review requirements are privately enforceable. Pls.' Opp'n 26–27. I disagree, but not for the same reasons as the Defendants. The Defendants contend that *Lynch* analyzed other case plan requirements than the one at issue here and contend that "other case plan requirements in the [Adoption Assistance and Child Welfare Act ("**AACWA**")] remain subject to evaluation." Defs.' Reply 11.

I recognize that *Blessing* requires that statutes be analyzed piece by piece rather than being examined "as an undifferentiated whole." *Blessing v. Freestone*, 520 U.S. 329, 342 (1997). But I do not understand this to mean that each case plan or case review system requirement must be analyzed independently to establish whether it can support a private cause of action. This is because each of these components comprises the *definition* of "case plan" and "case review system." It does not make sense to subdivide these definitions because, by definition, if any component is lacking, it is not a "case plan" or a "case review system," since each term is defined by the *entirety* of its parts. In my view, then, the question is whether a private cause of action can be brought based on the idea that a state's case plan (in general) or case review system (in general) is deficient because it is lacking in some way. In other words, the question is whether the case plan and case review system requirements are privately enforceable, not whether it is privately enforceable to have *each component* of a case plan or case review system. As the Defendants emphasize, § 671 is merely definitional. It is § 675(a) that does or does not establish the right, and § 671 only serves to flesh out what some of the words in § 675(a) mean.

Having said this, I do not view *Lynch* as dispositive. While it has not been overruled, and its holding might remain good law, the analysis in *Lynch* is outdated. It appears to skip the first part of the so-called *Blessing*/*Gonzaga* framework (i.e., the modern approach to evaluating the existence of a private right of action) and jumps right to asking whether Congress intended to foreclose a § 1983 remedy before examining whether Congress intended to create a federal right. *See Lynch v. Dukakis*, 719 F.2d 504, 512 (1st Cir. 1983) ("[N]othing in the language or structure of Title IV-E suggests that Congress meant section 671(b) to be an exclusive remedy . . . ."). I thus question the continuing vitality of *Lynch* and do not think its holding can be extrapolated to new fact patterns like the one at issue here.

provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." *Suter*, 503 U.S. at 351 (quoting 42 U.S.C. § 671(a)(15)). The *Suter* plaintiffs brought a class action alleging that the Illinois Department of Children and Family Services ("**DCFS**") failed to promptly assign caseworkers to children placed in DCFS custody and that DCFS thereby failed to make reasonable efforts to prevent removal and to facilitate reunification of families, in violation of § 671(a)(15). *Id.* at 352.

The Court recognized that § 671(a)(15) was mandatory by its terms but found that the statute only mandated the states to have a plan containing the listed features approved by the federal government. *Id.* at 358. That is, the Court found that § 671(a)(15) only guaranteed the *existence* of the plan, not the *implementation* of the plan. *See id.* at 358–59. This is in contrast to the Supreme Court's prior rejection of this same line of reasoning in another case just two years earlier in which the Court had taken a broader approach in analyzing the existence of a private right of action. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 513–14 (1990).[22]

---

[22]     In that case, *Wilder v. Virginia Hospital Association*, the Supreme Court analyzed whether a healthcare provider could sue pursuant to § 1983 to challenge the reimbursement method of a state (in that case, Virginia) under the Medicaid Act. 496 U.S. 498, 501 (1990). The Medicaid Act required states to submit a "plan for medical assistance" to be approved by the Secretary of the U.S. Department of Health and Human Services (the "**Secretary**"). *Id.* at 502 (quoting 42 U.S.C. § 1396a(a)). And that plan was required to provide payments that "the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs" of a facility's provision of care. *Id.* at 502–03 (quoting 42 U.S.C. § 1396a(a)(13)(A)) (emphasis deleted). Virginia tried to argue that the statute's requirements were mere procedural requirements and that it was not required to adopt rates that were actually found to *be* reasonable and adequate but that the statute only required states to satisfy themselves that their rates were "reasonable and adequate and to make assurances to that effect to the Secretary." *Id.* at 512–13. The Court rejected that argument, finding that that "would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless." *Id.* at 514. And the Court ultimately held—adopting a similar framework to

The *Suter* court also concluded that the AACWA gave the states broad discretion in deciding how to comply with the directive in § 671(a)(15). *See* 503 U.S. at 360. And the Court concluded that the statute lacked sufficient "guidance . . . as to how 'reasonable efforts' [were] to be measured." *Id.* Rather than a private cause of action, the Court concluded that the remedy for a violation of § 671(a)(15) was for the Secretary to reduce or eliminate payments if he/she were to find that a state's plan failed to comply with the statute or that a state failed to comply with its established plan. *Id.*

This decision was met with backlash. Congress was concerned that "beneficiaries of the State plan titles of the" SSA—meaning those aspects of the SSA requiring states to develop specific plans to implement federal programs, such as the AACWA —would not be able to sue to ensure that these plans complied with the SSA. H.R. Rep. No. 102-631, at 365 (1992). Congress was also concerned that *Suter* would affect not just the enforceability of the AACWA, but also the ability of beneficiaries of all federal programs with state plan requirements (e.g., Medicaid, Unemployment, etc.) to sue to enforce state violations of those federal programs. *Id.* And Congress also noted that the Supreme Court's pre-*Suter* case law "recognized, in a substantial number of decisions" (such as *Wilder*) "that beneficiaries of Federal-State programs could seek to enjoin State violations of Federal statu[t]es by suing under 42 U.S.C. § 1983." *Id.* at 364.

---

that of *Blessing* and *Gonzaga*—that healthcare providers could use a private right of action to sue to enforce the outlined reimbursement requirements. *See id.*

Based on those concerns, Congress swiftly responded with legislation colloquially known as the "*Suter* fix." *Connor B.*, 771 F. Supp. 2d at 168 n.9. That statute says:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a-2.

In enacting the *Suter* fix, Congress sought to turn back the clock, "to restore to an aggrieved party the right to enforce . . . the Federal mandates of the State plan titles of the" SSA as it existed prior to *Suter* (i.e., in *Wilder*). H.R. Rep. No. 102-631, at 365. In other words, Congress sought to "preserve[ ] private rights of action as they existed before" *Suter* and "to assure that individuals who have been injured by a state's failure to comply with . . . state plan requirements [would be] able to seek redress in the federal courts to the extent they were able to prior to" *Suter*. *Id*. at 366. Congress did not, however, seek to overturn the specific holding of *Suter* that § 671(a)(15) was too vague to be judicially enforceable. *Id*. Rather, Congress only sought to alter the aspect of *Suter* "suggesting that failure of a state to comply with a state plan provision is not litigable as a violation of federal statutory rights." *Id*.

"[A]lthough Congress did not overrule *Suter* . . . it made clear that the inclusion of a requirement as part of a state plan was not sufficient to render that requirement unenforceable by private action." *L.J. v. Wilbon*, 633 F.3d 297, 309 (4th Cir. 2011); *accord Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 484 (D.N.J. 2000). Courts have thus interpreted the *Suter* fix to overrule the "portion of the opinion identifying and allowing a court to rely exclusively on the state plan criteria in determining the existence of a federal right." *Sam M.*, 800 F. Supp. 2d at 386 (internal quotation marks omitted); *see also Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 559–60 (S.D. Miss. 2004).

## B.    Analysis

The Plaintiffs argue that two provisions of the AACWA can support a private cause of action: §§ 671(1)(a)(16) and 622(b)(8)(A)(ii). Pls.' Opp'n 25–26. The Defendants dispute this and also argue that even if these private causes of action are viable, the Plaintiffs' AACWA claim fails on the merits. I begin with the question of whether these provisions provide for a private cause of action.

### 1.    Private Cause of Action

#### a.    Section 671(a)(16)

##### i.    Intent to Benefit

Section 671(a)(16) requires states to include in their foster care plans provisions for the development of a "case plan . . . for each [foster] child" and for a "case review system . . . with respect to each . . . child." From this language alone it is apparent that the "case plan" and "case review system" requirements are intended

to benefit "each child" (i.e., individual foster children). *Sam M.*, 800 F. Supp. 2d at 387–88; *Connor B.*, 771 F. Supp. 2d at 171; *Kenny A.*, 218 F.R.D. at 292. This congressional intent to benefit foster children is made more apparent by looking through these terms of art to their statutory definitions.

The statutory requirements for what comprise a "case plan" contain no fewer than eight components that are focused directly on, and clearly intended to benefit, individual foster children.[23] The description of the "case review system" is similarly child-focused, as at least four components of that system are focused directly on, and clearly intended to benefit, individual foster children.[24] The required components of the case plan and the case review system speak in individualized terms rather than

---

[23]     *See* 42 U.S.C. § 675(1)(A) ("a discussion of the safety and appropriateness" of the child's placement), (B) ("[a] plan for assuring that the child receives safe and proper care and that services are provided to . . . address the needs of the child while in foster care"), (C) (inclusion of all "relevant health and education information concerning the child"), (D) (for children over fourteen, description of programs and services that will help them prepare for transition to adulthood), (E) (documentation of steps agency is taking to find a suitable placement for the child, including "child specific recruitment efforts"), (F) (for children placed with a relative, explanations for why child should not be returned home or adopted, why the child is separated from any siblings, and why the placement "is in the child's best interests"), (G) ("[a] plan for ensuring the educational stability of the child," including consideration of the proximity of the child's placement to the child's current school, and a requirement that school placement must be "in the best interests of the child"); *id.* § 675a(b)(1) (for children over fourteen, case plan must describe the child's rights, including "the right to stay safe and avoid exploitation"), (2) (children over fourteen must sign an acknowledgment they have been given documentation reflecting these rights and have had them explained "in an age-appropriate way").

[24]     *See* 42 U.S.C. § 675(5)(A) (placement must be "in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child," and more distant placements must be "in the best interests of the child," while out-of-state placements require a caseworker to visit the child periodically and to submit a report), (B) ("status of the child" must be reviewed at least every six months to evaluate "safety of the child," appropriateness of the placement, and "whether the child has regular, ongoing opportunities to engage in age or developmentally appropriate activities"), (D) ("child's health and education record" must be "reviewed and updated" and "supplied to" the child's custodian), (I) (children over fourteen must receive copies of reports and assistance in interpreting and resolving inaccuracies, while children leaving foster care must receive particular documents/information).

in terms of institutional policy or practice as a whole. It is apparent from the language used that the statute is primarily concerned with the interests of the individual children in foster care. *M.B.*, 2018 WL 327767, at *15; *Elisa W. ex rel. Barricelli v. City of New York*, No. 15 CV 5273-LTS-HBP, 2016 WL 4750178, at *5 (S.D.N.Y. Sept. 12, 2016); *Kenny A.*, 218 F.R.D. at 292; *Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 947 (M.D. Tenn. 2000); *cf. Colón-Marrero*, 813 F.3d at 19 (noting that "no gap exists between the operative text . . . and the persons whose interests are at stake" where "[t]he statutory proscription . . . directly and explicitly protects individual voters").

The Defendants provide four arguments as to why they believe § 671(a)(16) does not satisfy the "intent to benefit" prong of the test. Defs.' Mot. 30–31. First, the Defendants contend that the statute is "not unambiguously structured to benefit individual claimants" since it "is enforced by the Secretary." Defs.' Mot. 30. This misunderstands the structure of the statute. While the plan must be approved by the Secretary, the focus of § 671(a)(16) is on ensuring that the plan contains each of the listed components. The two components at issue—the case plan and case review system—have numerous sub-components clearly intended to benefit individual foster children.[25]

---

[25]     The Defendants implicitly acknowledge that at least part of the AACWA's case review system is intended to benefit individual foster children. They note how, under Maine law, the Maine District Court must review foster children's cases at least every six months. Defs.' Mot 2, 11, 17, 25. And they highlight this as a child-protective aspect of Maine's foster care system. *See* Defs.' Mot. 17–18 (explaining that guardians ad litem can raise issues with child's care with Maine District Court at least every six months), 25 ("In instances where these [procedural] safeguards fail, the child and/or [guardian ad litem] can bring their concerns to the Maine District Court overseeing their child protective case . . . even outside the regular six-month review period."). The requirement that reviews be held at least every six months is mandated by the AACWA. *See* 42 U.S.C. § 675(5)(B). It cannot be

49

The Defendants' interpretation mostly ignores § 675(1) and (5), focusing exclusively on § 671(a)(16). But "case plan" and "case review system," as used in § 671(a)(16), are defined phrases, and those defined phrases are devoid of meaning without looking at their definitions in § 675(1) and (5). Because these are defined phrases, every time those phrases appear in the statute, their definitions must be plugged into their place. *See King v. Burwell*, 576 U.S. 473, 489 (2015); *cf. Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020) (noting that a statutory definition controls over the plain meaning of a word). When the child-focused language is imported into § 671(a)(16), it is plainly structured to benefit the children in foster care.

Second, the Defendants insist that § 671(a)(16) has an "aggregate focus." Defs.' Mot. 30–31. This is belied by the requirements that the case plan must be developed "for each child" and that the case review system meet the requirements for "each such child." *See Connor B.*, 771 F. Supp. 2d at 171 ("The fact that these provisions are 'embedded within the requirements for a state plan' does not transform them into an institutional policy." (quoting *Rio Grande*, 397 F.3d at 74)).

The Defendants cite *31 Foster Children* for the proposition that § 671(a)(16) has an aggregate focus. Defs.' Mot. 31. But *31 Foster Children* is of little precedential value. The plaintiffs in *31 Foster Children* brought suit specifically to enforce two particular provisions of § 675(5) (not § 671)—that is, *some* of the requirements for a case review system. 329 F.3d at 1270. And the Eleventh Circuit found that because

---

the case that both the State's case review system provides adequate protections for foster children and that the AACWA's requirement for this case review system is not sufficiently focused on benefitting individual foster children.

those aspects of the statute were "definitional in nature, they alone cannot and do not supply a basis for conferring rights enforceable under § 1983." *Id.* at 1271. The *31 Foster Children* court thus looked to § 671(a)(16) because it is the only other part of that portion of the AACWA that uses the term "case review system." *Id.* But the court found it significant that § 671(a)(16) did not "explicitly require a plan to meet the requirements" of the particular provisions of § 675(5) that the plaintiffs sought to enforce. *Id.* That is, while § 671(a)(16) required that a case review system meet *other* requirements specified in the statute, it did not require a case review system to meet the requirements that the plaintiffs sought to enforce. *Id.* The court thus found it significant that Congress required compliance with some aspects of the case review system but not others. *Id.* at 1272.

That statutory mismatch no longer exists because § 671(a)(16) has specifically included a reference to § 675(5) in its entirety since 2014. *See M.B.*, 2018 WL 327767, at *15 n.8. The *31 Foster Children* analysis is thus inapt. *See Kenny A.*, 218 F.R.D. at 292 (noting that *31 Foster Children*—which was binding precedent—did not control because it only held that § 675(5)(D) and (E) together with § 671(a)(16) did not *alone* create privately enforceable rights).

The *31 Foster Children* analysis also contravenes the *Suter* fix. The Eleventh Circuit noted the references to individual children and their placements in § 675(5) but reasoned that because these references are only "made in the context of describing what the procedure is supposed to ensure," they "cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983." *31 Foster*

51

*Children*, 329 F.3d at 1272 (quoting *Gonzaga*, 536 U.S. at 289). That sounds like a conclusion that inclusion of these references as requirements as part of a state plan necessarily means that there is no enforceable private right. But that is exactly the reasoning that the *Suter* fix disavowed. *See Connor B.*, 771 F. Supp. 2d at 168 & n.9.

Third, the Defendants argue that the language of § 671(a)(16) "stands in stark contrast" to the language of other statutes that do provide for private causes of action, such as Title IX. Defs.' Mot. 31. I am not persuaded that there is a meaningful difference between the "No person . . . shall" language in Title IX[26] and the requirement that a state "shall have a plan approved by the Secretary which . . . provides for the development of a case plan . . . for each child . . . and provides for a case review system . . . with respect to each such child." In my view, the inclusion of the requirement that the plan be approved by the Secretary does not vitiate the statute's focus that a case plan and case review system must be established for "each child." And that "each child" language is just as individualized as the language in Title IX.

Fourth, the Defendants point to § 674(d)(3)(A) as evidence that Congress did not intend to establish a private cause of action. Section 674(d)(3)(A) specifically creates a private cause of action by allowing "[a]ny individual who is aggrieved by a

---

[26]     Title IX says: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," except in certain circumstances. 20 U.S.C. § 1681(a).

violation of" § 671(a)(18) to sue. 42 U.S.C. § 674(d)(3)(A). Section 671(a)(18),

meanwhile, requires a state plan to:

> provide[ ] that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—
>
>> (A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child, involved; or
>>
>> (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved . . . .

*Id.* § 671(a)(18). That § 674(d)(3)(A) creates a private cause of action for a violation of

§ 671(a)(18) is obvious. And some courts have concluded that Congress's decision to

add this provision explicitly allowing a lawsuit for a violation of § 671(a)(18) but not

for any other parts of § 671 "is strong evidence that Congress did not intend" the other

parts of § 671(a) to allow for a private cause of action. *See, e.g.*, *Charlie H.*, 83 F. Supp.

2d at 489; *Ashley W. ex rel. Durnell v. Holcomb*, 467 F. Supp. 3d 644, 659 (S.D. Ind.

2020) (citing *Charlie H.*).

I am not as persuaded. To begin with, it is difficult to read too much into

Congress's *failure* to do something, especially when there is no authoritative evidence

explaining such a failure to act. For example, it may be the case that some legislators

thought it unnecessary to spell out that a private cause of action existed for other

aspects of § 671 because they already interpreted the statute to allow it. *See Bostock*

*v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("Maybe some in the later legislatures

understood the impact [the statute's] broad language already promised for cases like

ours and didn't think a revision needed."). In short, "speculation about why a later Congress" failed to legislate in a particular manner "offers a particularly dangerous basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Id.* (internal quotation marks omitted).

The argument that § 674(d)(3)(A) is the only permissible private cause of action under the AACWA also proves too much. Congress made clear in enacting the *Suter* fix that, outside of § 671(a)(15), it *expected* that some parts of the AACWA allowed for private rights of action. To say that they do not contravenes Congress's clear intent in enacting the *Suter* fix.

There is also a logical explanation for why § 674(d)(3)(A) is different from the rest of the AACWA. Section 671(a)(18) is uniquely situated among the other provisions of § 671(a) in that it embodies an antidiscrimination value that is omnipresent in the United States Code. It transcends the foster care system. The other aspects of § 671(a), on the other hand, are particular to the foster care context. It thus makes sense that Congress would want to provide an explicit private cause of action for victims of discrimination as it does in other statutes (like in Title IX). Given how distinct § 671(a)(18) is from the rest of the statute, the inclusion of § 674(d)(3)(A) is not significant evidence of a congressional intent on the broader issue of whether § 671(a)(16) allows for a private cause of action.

### ii.    Judicially discernible language

The case plan and case review system requirements are not so vague and amorphous as to strain judicial competence. *Elisa W.*, 2016 WL 4750178, at *5; *Sam*

*M.*, 800 F. Supp. 2d at 388; *Kenny A.*, 218 F.R.D. at 292; *Brian A.*, 149 F. Supp. 2d at 947. Each has multiple, highly specific components that are easy enough for a court to assess. *Sam M.*, 800 F. Supp. 2d at 388; *see Brian A.*, 149 F. Supp. 2d at 947 ("These provisions [of the AACWA] are extraordinarily specific, spelling out exactly what a state must do for children in its care in order to receive funding under the Act."). For example, it is no particular challenge for a court to review a case plan to determine whether it contains a description of the child's placement, a plan for the child's safe and proper care, the child's health and education records, or a plan for ensuring the educational stability of the child. 42 U.S.C. § 675(1)(A), (B), (C), (G). Nor is it unusually difficult for a court to assess a case review system to determine whether it has a plan designed to achieve a placement that is in the best interests of the child, a procedure to evaluate the child's status every six months (including assessing specific aspects of the child's placement), or whether the child's health and education record is reviewed and updated. *See id.* § 675(5)(A), (B), (D).

Some of these provisions are nonspecific, to be sure, and there is a lot of room for states to have flexibility in crafting case plans and case review systems. But the difficulty comes on the front end—in terms of a state crafting such a plan and system—not on the back end, in terms of evaluating what the state has developed. For example, it may be difficult for a state to figure out how to develop a procedure for assuring that "each child has a case plan designed to achieve placement in a setting . . . consistent with the best interest and special needs of the child." *See id.* § 675(5)(A). But this "best interests of the child" benchmark is a familiar judicial

standard that the Maine state courts are often called on to apply in family court proceedings. *See Costigan v. Costigan*, 418 A.2d 1144, 1146 (Me. 1980) ("The paramount concern of the court in any proceeding concerning child custody is to act in the best interest of the child."). It may not be an easy standard, but it is a judicially administrable one. *See id.* ("In determining [who] will provide for a child's best interests, the court should consider all factors having reasonable bearing on the physical and psychological well-being of the child.").

### iii.    Mandatory rather than precatory language

Section 671(a)(16) expresses a clear mandate through the use of the term "shall." *Sam M.*, 800 F. Supp. 2d at 388; *Connor B.*, 771 F. Supp. 2d at 171. The statute is couched in mandatory terms and is unmistakably focused on the benefitted class. *Elisa W.*, 2016 WL 4750178, at *5; *Sam M.*, 800 F. Supp. 2d at 387–88; *Connor B.*, 771 F. Supp. 2d at 171; *Brian A.*, 149 F. Supp. 2d at 947. The statute clearly imposes a binding obligation on the states. *Kenny A.*, 218 F.R.D. at 292. The Defendants do not dispute this.

### iv.    Whether Congress shut the door to private enforcement

The Defendants have not argued here that Congress has expressly or impliedly attempted to overcome any presumption of enforceability, and there is no indication that it has. For example, AACWA has no private enforcement mechanism. *Sam M.*, 800 F. Supp. 2d at 388; *Kenny A.*, 218 F.R.D. at 292; *Connor B.*, 771 F. Supp. 2d at 171–72. And the *Suter* fix plainly left the door to private enforcement open.

### b.      Section 622(b)(8)(A)(ii)

Unlike with § 671, the language of § 622 is not focused on the intended beneficiary (the foster children) but rather is focused on the Secretary. The only reference to the Secretary in § 671 is requiring that the plan be approved by the Secretary, but otherwise, § 671 requires a case plan and case review system meeting the specified requirements, most of which are directly intended to benefit foster children. The role of the Secretary in § 671 appears purely ministerial. That is, while § 671 notes that a state's case plan and case review system must be approved by the Secretary, the focus of § 671 is on ensuring that the case plan and case review system are comprised of the individual components designed to benefit foster children.[27]

Section 622, on the other hand, is focused on ensuring that the case review system is being implemented in a manner that is "to the satisfaction of the Secretary." So, while § 671 is focused on ensuring that the case review system contains the particular components intended to benefit foster children, § 622 is focused on ensuring that the case review system is operating to the satisfaction of the Secretary. This belt and suspenders approach exists presumably to ensure that a state's case review system is operating in the way Congress intended, both to ensure foster children are being helped (§ 671) and to ensure that the Secretary is satisfied of the

---

[27]      The grammar of § 671(a) supports this reading as well. The statute says that states "shall have a plan approved by the Secretary which" provides for various requirements. That is, § 671(a) does not require that the Secretary approve a plan, but rather it requires that a plan *has been* approved by the Secretary. If there were a comma after "Secretary," it would support the reading that the "shall" mandates the plan approval. Because of the lack of a comma, the sentence implies that the plan must have been approved by the Secretary at some point but that the "shall" is directed at mandating the listed requirements, rather than the plan approval.

same (§ 622). But only § 671 is focused directly on the benefit to foster children, and only § 671 can support a private cause of action. The Defendants' motion is thus **GRANTED** with respect to the Plaintiffs' AACWA claim premised on a violation of § 622.

### 2.    Merits of the Claim

The Defendants contend that even if a private cause of action can be brought pursuant to the AACWA, "DHHS policy plainly meets the dictates of the AACWA." Defs.' Mot. 32. OCFS has a policy governing the management of health records for youth in foster care. OCFS Policy V.I-2. An OCFS caseworker "is responsible for gathering [a youth's] health and health care information and providing it directly to the foster parent or other child care provider at the time of the child's placement." *Id.* at 1. The child's caseworker is then responsible for updating this health record. *Id.* Similarly, the child's caseworker is responsible for updating the child's portable health record, either by providing an updated "sheet" to the caretaker or by asking the foster parent or caretaker to make the necessary changes on the existing sheet. *Id.* at 4. Whenever a child's placement changes, the portable health record is returned to an OCFS caseworker, who reviews the record and adds any information not already recorded in it. *Id.* at 6. "While the child is in [OCFS] care or custody, the child's caseworker is responsible for adding medical information to the child's case record in order that the case record contain that included in the portable health record." *Id.* These updates must occur at the time of each child's placement, or at least every six months. *Id.*

While this policy does exist, the Defendants ignore the Plaintiffs' allegations that the Defendants have violated their own policies.[28] The Defendants also nitpick the Plaintiffs' allegations regarding their medical records and portray them as failing to allege any violation of federal law. Defs.' Mot. 33–34. That is not so. Every plaintiff except Trent W. has alleged that the Defendants have not maintained updated medical records or provided those updated medical records to the Plaintiffs' caregivers, in violation of the AACWA. FAC ¶¶ 23, 30–34 (Bryan), 53 (Henry), 98–99 (Grayson), 124 (Kendall), 148–49 (Neville). To the extent that the Defendants allege that these allegations are unclear or conclusory, I disagree. They meet the low bar to survive a motion to dismiss.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendants' motion to dismiss, except the Court **GRANTS** the Defendants' motion to dismiss the aspect of the Plaintiffs' AACWA claim relying on 42 U.S.C. § 622(b)(8)(A)(ii). Although Trent W.'s allegations are currently insufficient to support his claims, the Court *sua sponte*

---

[28]    The Defendants do not specifically argue that to the extent that the AACWA allows for a private cause of action, it only allows a plaintiff to require that a case plan be developed, not that a case plan be implemented. Courts have reached differing conclusions on whether the AACWA private cause of action extends to the implementation of the plan. *Compare Brian A.*, 149 F. Supp. 2d at 947 ("[T]he enforceable rights in question are not merely procedural rights that the state's plan make the relevant provisions. Rather, the rights that are enforceable include the substantive right that the state actually act in accordance with its plan; it must implement that which it assures." (quoting *Wood v. Tompkins*, 33 F.3d 600, 608 n.16 (6th Cir. 1994)), *with Elisa W. ex rel. Barricelli v. City of New York*, No. 15 CV 5273-LTS-HBP, 2016 WL 4750178, at *6 (S.D.N.Y. Sept. 12, 2016) ("While it is of course to be expected that a plan will be implemented, nothing in the statutory language specifically requires implementation or achievement of all of the particulars of the plan, much less successful achievement of outcomes. Rather, the plan principally serves notice and accountability functions in aid of reviews of goals, services and outcomes."). However, it is a more faithful application of the law, particularly in light of the *Suter* fix, to say that the cause of action also extends to the implementation of the plan. *See Wilder*, 496 U.S. at 513–14.

**GRANTS** Trent W. leave to amend his claims. Trent W. has fourteen days from the date of this order to file an Amended Complaint. Should Trent W. fail to timely file an Amended Complaint, Trent W.'s claims shall be **DISMISSED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 4th day of October, 2021.